```
1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF IOWA
2                    EASTERN DIVISION

3    _____
                                    )
     UNITED STATES OF AMERICA,      )
4                                   )   CASE NO. 3:21-cr-91
             Plaintiff,             )
5                                   )
         vs.                        )   TRANSCRIPT OF
6                                   )   JURY TRIAL PROCEEDINGS
     NAJAWAUN MARCUS QUINN and      )
7    DIMETRI ALEXANDER SMITH,       )   VOLUME II
                                    )
8            Defendants.            )
9    _____

                                COURTROOM, SECOND FLOOR
10                              U.S. COURTHOUSE
                                131 East Fourth Street
11                              Davenport, Iowa 50281
                                Tuesday, February 7, 2023
12                              8:38 a.m.

13   BEFORE:  THE HONORABLE REBECCA GOODGAME EBINGER, DISTRICT JUDGE

14   APPEARANCES:

15   For the Plaintiff:       TORRIE SCHNEIDER
                              WILLIAM RIPLEY
16                            United States Attorney's Office
                              131 East Fourth Street, Suite 310
17                            Davenport, Iowa 50281

18   For Defendant Quinn:     ALFRED WILLETT
                              Viner Law Firm
19                            228 Second Street SE
                              Cedar Rapids, IA 52401
20
     For Defendant Smith:     WILLIAM BREEDLOVE
21                            Breedlove Legal LLC
                              2103 16th Street
22                            Moline, IL 61265

23
                     Chelsey Wheeler, CSR, RPR, FCRR
24                      United States Courthouse
                        123 East Walnut Street
25                        Des Moines, IA 50309
```

1                       <u>**I N D E X**</u>

2     <u>GOVERNMENT'S WITNESSES</u>                              <u>PAGE</u>

3     <u>JAKOB BLACKMAN</u>
      Cross-Examination By Mr. Breedlove                149
4     Redirect Examination By Mr. Ripley                158

5     <u>BRYAN BUTT</u>
      Direct Examination By Ms. Schneider               162
6     Voir Dire Examination By Mr. Breedlove            186
      Direct Examination Resumed By Ms. Schneider       188
7     Voir Dire Examination By Mr. Breedlove            192
      Direct Examination Resumed By Ms. Schneider       194
8     Voir Dire Examination By Mr. Breedlove            199
      Direct Examination Resumed By Ms. Schneider       202
9     Direct Examination Resumed By Ms. Schneider       205
      Direct Examination Resumed By Ms. Schneider       273
10    Cross-Examination By Mr. Willett                  304
      Cross-Examination By Mr. Breedlove                314
11    Redirect Examination By Ms. Schneider             325

12    <u>DEJARVAE THORPE</u>
      Direct Examination By Mr. Ripley                  329
13    Cross-Examination By Mr. Willett                  339
      Redirect Examination By Mr. Ripley                352

14
      <u>MICHAEL SCHNEIDER</u>
15    Direct Examination By Ms. Schneider               355

16    <u>TIAESHA FLORENCE</u>
      Direct Examination By Mr. Ripley                  365
17    Cross-Examination By Mr. Willett                  375
      Cross-Examination By Mr. Breedlove                375

18
      <u>EMILY RASCHE</u>
19    Direct Examination By Ms. Schneider               377
      Cross-Examination By Mr. Willett                  386

20
      <u>SETH FARLEY</u>
21    Direct Examination By Mr. Ripley                  389
      Cross-Examination By Mr. Willett                  397

22
      <u>BRIAN MOREL</u>
23    Direct Examination By Ms. Schneider               399

24    <u>WILEY ROSS</u>
      Direct Examination By Mr. Ripley                  413

25

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | | | OFFERED | RECEIVED |
|---|---|---|---|---|
| 1 | Shell Casing | | 386 | 386 |
| 2 | Shell Casing | | 386 | 386 |
| 3 | Shell Casings | | 411 | 411 |
| 4 | Projectile | | 411 | 411 |
| 100 | Photograph | | 370 | 371 |
| 101 | Photograph | | 370 | 371 |
| 102 | Photograph | | 370 | 371 |
| 103 | Photograph | | 370 | 371 |
| 104 | Photograph | | 370 | 371 |
| 105 | Photograph | | 370 | 371 |
| 106 | Photograph | | 370 | 371 |
| 107 | Photograph | | 380 | 380 |
| 108 | Photograph | | 380 | 380 |
| 109 | Photograph | | 380 | 380 |
| 110 | Photograph | | 380 | 380 |
| 111 | Photograph | | 380 | 380 |
| 112 | Photograph | | 380 | 380 |
| 113 | Photograph | | 380 | 380 |
| 114 | Photograph | | 380 | 380 |
| 115 | Photograph | | 380 | 380 |
| 116 | Photograph | | 380 | 380 |
| 117 | Photograph | | 380 | 380 |
| 118 | Photograph | | 380 | 380 |

| 1  | 119 | Photograph | 380 | 380 |
| 2  | 120 | Photograph | 380 | 380 |
| 3  | 121 | Photograph | 380 | 380 |
| 4  | 122 | Photograph | 380 | 380 |
| 5  | 123 | Photograph | 380 | 380 |
| 6  | 124 | Photograph | 380 | 380 |
| 7  | 125 | Photograph | 380 | 380 |
| 8  | 126 | Photograph | 380 | 380 |
| 9  | 127 | Photograph | 380 | 380 |
| 10 | 128 | Photograph | 380 | 380 |
| 11 | 129 | Photograph | 380 | 380 |
| 12 | 130 | Photograph | 380 | 380 |
| 13 | 131 | Photograph | 380 | 380 |
| 14 | 132 | Photograph | 404 | 404 |
| 15 | 133 | Photograph | 404 | 404 |
| 16 | 134 | Photograph | 404 | 404 |
| 17 | 135 | Photograph | 404 | 404 |
| 18 | 137 | Photograph | 404 | 404 |
| 19 | 138 | Photograph | 404 | 404 |
| 20 | 139 | Photograph | 404 | 404 |
| 21 | 140 | Photograph | 404 | 404 |
| 22 | 141 | Photograph | 404 | 404 |
| 23 | 142 | Photograph | 404 | 404 |
| 24 | 143 | Photograph | 404 | 404 |
| 25 | 144 | Photograph | 404 | 404 |

| 1  | 145 | Photograph | 404 | 404 |
| 2  | 146 | Photograph | 404 | 404 |
| 3  | 147 | Photograph | 404 | 404 |
| 4  | 148 | Photograph | 404 | 404 |
| 5  | 149 | Photograph | 404 | 404 |
| 6  | 150 | Photograph | 404 | 404 |
| 7  | 151 | Photograph | 404 | 404 |
| 8  | 152 | Photograph | 404 | 404 |
| 9  | 153 | Photograph | 404 | 404 |
| 10 | 154 | Photograph | 404 | 404 |
| 11 | 155 | Photograph | 404 | 404 |
| 12 | 156 | Photograph | 404 | 404 |
| 13 | 157 | Photograph | 404 | 404 |
| 14 | 158 | Photograph | 404 | 404 |
| 15 | 159 | Photograph | 404 | 404 |
| 16 | 160 | Photograph | 404 | 404 |
| 17 | 161 | Photograph | 404 | 404 |
| 18 | 162 | Photograph | 404 | 404 |
| 19 | 163 | Photograph | 404 | 404 |
| 20 | 164 | Photograph | 404 | 404 |
| 21 | 165 | Photograph | 404 | 404 |
| 22 | 166 | Photograph | 404 | 404 |
| 23 | 167 | Photograph | 404 | 404 |
| 24 | 168 | Photograph | 404 | 404 |
| 25 | 169 | Photograph | 404 | 404 |

| | | | | |
|---|---|---|---|---|
| 1 | 170 | Photograph | 404 | 404 |
| 2 | 173 | Photograph | 404 | 404 |
| 3 | 174 | Photograph | 404 | 404 |
| 4 | 175 | Photograph | 404 | 404 |
| 5 | 176 | Photograph | 404 | 404 |
| 6 | 177 | Photograph | 404 | 404 |
| 7 | 178 | Photograph | 404 | 404 |
| 8 | 179 | Photograph | 404 | |
| 9 | 180 | Photograph | 404 | |
| 10 | 383 | Photograph | 430 | 430 |
| 11 | 621 | Map | 297 | 298 |
| 12 | 622 | Map | 297 | 298 |
| 13 | 623 | Map | 298 | 298 |
| 14 | 624 | Map | 299 | 299 |
| 15 | 625 | Map | 299 | 299 |
| 16 | 626 | Map | 300 | 300 |
| 17 | 627 | Map | 301 | 301 |
| 18 | 628 | Map | 301 | 301 |
| 19 | 629 | Map | 302 | 302 |
| 20 | 630 | Map | 303 | 303 |
| 21 | 631 | Map | 303 | 303 |
| 22 | 635 | Photo Lineup | 394 | 395 |
| 23 | 700 | Culbreath Facebook Affidavit | 182 | 183 |
| 24 | 700A | Culbreath Facebook Foundation | 182 | 183 |
| 25 | | | | |

| | | | | |
|---|---|---|---|---|
| 1 | 701 | Facebook Record | 184 | 187 |
| 2 | 702 | Facebook Record | 184 | 187 |
| 3 | 703 | Facebook Record | 184 | 187 |
| 4 | 704 | Facebook Record | 184 | 187 |
| 5 | 705 | Facebook Record | 184 | 187 |
| 6 | 706 | Facebook Record | 184 | 187 |
| 7 | 707 | Facebook Record | 184 | 187 |
| 8 | 708 | Facebook Record | 184 | 187 |
| 9 | 709 | Facebook Record | 184 | 187 |
| 10 | 710 | Facebook Record | 184 | 187 |
| 11 | 711 | Facebook Record | 184 | 187 |
| 12 | 712 | Facebook Record | 184 | 185 |
| 13 | 713 | Facebook Record | 184 | 187 |
| 14 | 714 | Gardner Facebook Affidavit | 190 | 190 |
| 15 | 714A | Gardner Facebook Foundation | 190 | 190 |
| 16 | 715 | Facebook Record | 192 | 195 |
| 17 | 716 | Facebook Record | 192 | 195 |
| 18 | 717 | Facebook Screenshot | 192 | |
| 19 | 717 | Facebook Record | 274 | 274 |
| 20 | 718 | Facebook Record | 192 | 195 |
| 21 | 719 | Facebook Record | 192 | 195 |
| 22 | 720 | Facebook Record | 192 | 195 |
| 23 | 721 | Facebook Record | 192 | 195 |
| 24 | 722 | Facebook Record | 192 | 195 |
| 25 | 723 | Facebook Record | 192 | 195 |

| | | | | |
|---|---|---|---|---|
| 1 | 725 | Facebook Record | 192 | 195 |
| 2 | 726 | Facebook Record | 192 | 195 |
| 3 | 727 | Facebook Record | 192 | 195 |
| 4 | 728 | Facebook Record | 192 | 195 |
| 5 | 729 | Facebook Record | 192 | 195 |
| 6 | 730 | Facebook Record | 192 | 195 |
| 7 | 731 | Facebook Record | 192 | 195 |
| 8 | 732 | Facebook Record | 192 | 279 |
| 9 | 732A | Facebook Record | 276 | 276 |
| 10 | 733 | Facebook Record | 192 | 195 |
| 11 | 734 | Quinn Facebook Affidavit | 206 | 206 |
| 12 | 734A | Quinn Facebook Foundation | 206 | 206 |
| 13 | 735 | Facebook Record | 209 | 212 |
| 14 | 736 | Facebook Record | 209 | 212 |
| 15 | 737 | Facebook Record | 209 | 212 |
| 16 | 738 | Facebook Record | 209 | 212 |
| 17 | 739 | Facebook Record | 209 | 212 |
| 18 | 740 | Facebook Record | 209 | 212 |
| 19 | 741 | Facebook Record | 209 | 212 |
| 20 | 742 | Facebook Record | 209 | 212 |
| 21 | 743 | Facebook Record | 209 | 212 |
| 22 | 744 | Facebook Record | 209 | 212 |
| 23 | 745 | Facebook Record | 209 | 212 |
| 24 | 746 | Facebook Record | 209 | 212 |
| 25 | 747 | Facebook Record | 209 | 212 |

| | | | | |
|---|---|---|---|---|
| 1 | 748 | Facebook Record | 209 | 212 |
| 2 | 749 | Facebook Record | 209 | 212 |
| 3 | 750 | Facebook Record | 209 | 212 |
| 4 | 751 | Facebook Record | 209 | 212 |
| 5 | 752 | Facebook Record | 209 | 212 |
| 6 | 753 | Facebook Record | 209 | 212 |
| 7 | 754 | Facebook Record | 209 | 212 |
| 8 | 755 | Facebook Record | 209 | 212 |
| 9 | 756 | Facebook Record | 209 | 212 |
| 10 | 758 | Facebook Record | 209 | 212 |
| 11 | 759 | Facebook Record | 209 | 212 |
| 12 | 760 | Facebook Record | 209 | 212 |
| 13 | 761 | Facebook Record | 209 | 212 |
| 14 | 762 | Facebook Record | 209 | 212 |
| 15 | 763 | Facebook Record | 209 | 212 |
| 16 | 764 | Facebook Record | 209 | 212 |
| 17 | 765 | Facebook Record | 209 | 212 |
| 18 | 766 | Facebook Record | 209 | 212 |
| 19 | 767 | Facebook Record | 209 | 212 |
| 20 | 768 | Facebook Record | 209 | 212 |
| 21 | 769 | Smith Facebook Affidavit | 197 | 197 |
| 22 | 769A | Smith Facebook Foundation | 197 | 197 |
| 23 | 770 | Facebook Record | 199 | 202 |
| 24 | 771 | Facebook Record | 199 | 202 |
| 25 | 772 | Facebook Record | 199 | 202 |

| | | | | |
|---|---|---|---|---|
| 1 | 773 | Facebook Record | 199 | 202 |
| 2 | 774 | Facebook Record | 199 | 202 |
| 3 | 775 | Facebook Record | 199 | 202 |
| 4 | 776 | Facebook Record | 199 | 202 |
| 5 | 777 | Facebook Record | 199 | 202 |
| 6 | 778 | Facebook Record | 199 | 202 |
| 7 | 779 | Facebook Record | 199 | 202 |
| 8 | 780 | Facebook Record | 199 | 202 |
| 9 | 781 | Facebook Record | 199 | 202 |
| 10 | 782 | Facebook Record | 199 | 202 |
| 11 | 783 | Facebook Record | 199 | 202 |
| 12 | 784 | Vesey Facebook Affidavit | 213 | 214 |
| 13 | 784A | Vesey Facebook Foundation | 213 | 214 |
| 14 | 785 | Facebook Record | 215 | 216 |
| 15 | 790 | Armstrong Facebook Affidavit | 217 | 217 |
| 16, 17 | 790A | Armstrong Facebook Foundation | 217 | 217 |
| 18 | 791 | Facebook Record | 218 | 219 |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1                    P R O C E E D I N G S

2              (In open court, with the defendants present, outside

3        the presence of the jury.)

4              THE COURT:  Thank you.  You may be seated.

5              We are here in the matter of the United States of

6        America versus Quinn and Smith.  This is Case No. 3:21-cr-91.

7              I understand that we're still troubleshooting some

8        technology issues, but I wanted to go ahead and get started.

9        Defendants are personally present, as are counsel.

10             The first thing I will say is that in the overnight

11       filings, I learned that yesterday was Mr. Willett's birthday.

12       I did not know that yesterday; otherwise, I would have said

13       happy birthday, Mr. Willett.  Thank you for spending your

14       birthday with us.

15             MR. WILLETT:  It was my honor, Your Honor.

16             THE COURT:  That brings us to the nature of the

17       overnight filings.

18             So, to be clear, at this point this Court has no

19       jurisdiction over the issue of whether or not Mr. Armstrong

20       testifies.  Whether rightly or wrongly, when someone files a

21       notice of appeal, this Court is divested of jurisdiction until

22       the Eighth Circuit says that I can do something.

23             My understanding is that the United States has filed a

24       motion to dismiss.  Unlike Mr. Armstrong's attorney, the

25       Government did file for expedited relief.  I have confirmed

1   that the Eighth Circuit is aware of the time-sensitive nature

2   of this issue, and I expect we will hear something from them at

3   some point promptly.

4           Until that time, the issues raised in Mr. Breedlove's

5   filing are largely academic because I can't do anything with

6   them.

7           Additionally, it's curious, I understand that you were

8   being a good colleague because Mr. Willett -- it was his

9   birthday, and he comes from Cedar Rapids.  But there is some

10  questions in regards to standing and issues in regards to your

11  concerns about a witness testifying in regards to events that

12  your client is not charged with.

13          But, again, I don't feel the need to go into all of

14  those issues at this time because of the fact that I can't do

15  anything about it.

16          Would the Government like to be heard in any way on

17  that issue at this time?

18          MS. SCHNEIDER:  No, Your Honor.

19          THE COURT:  Mr. Willett?

20          MR. WILLETT:  Just to give you a wee bit of backdrop

21  to the events of last night, Your Honor, I don't want you to

22  think I am a slacker because it was my birthday.

23          THE COURT:  I am not accusing you of being a slacker.

24          MR. WILLETT:  I received a phone call during dinner

25  regarding the information that is attached to this motion,

1    which is basically the social media communications.  As soon as

2    I received it -- I was told about it, I asked if it could be

3    sent to me because I didn't really have a clear understanding

4    of what had been posted.

5              Once I received it, I was able to forward it to

6    Mr. Breedlove and say, Please call me.  It was probably

7    somewhere in the area of 9:00 last night when we were able to

8    get together on the phone.  We both agreed that it was

9    reciprocal discovery.  We both agreed that it was material of a

10   highly sensitive nature.  That is how it came to be that the

11   decision was Mr. Breedlove says, I'm filing this motion.  We'll

12   attach it under seal.  That way we're protecting the sensitive

13   information, but we're providing the reciprocal discovery to

14   the Government.  So that's how the thought processes went.

15             THE COURT:  Thank you, Mr. Willett.

16             Mr. Breedlove?

17             MR. BREEDLOVE:  Just in terms of the Court's question

18   about standing, given the enterprise -- the alleged enterprise

19   nature, any testimony about Mr. Willett's client and activities

20   is necessarily about mine.

21             THE COURT:  I understand the concept.  We can address

22   that should we need to.

23             Statements made, as you all indicated with these, by

24   someone who does testify are required to be disclosed to the

25   other side, as you all did.  And so we will look at any filings

1    that Mr. Armstrong has made and see if there are any statements

2    that need to be disclosed should he testify consistent with

3    *Jencks* and -- I don't know if it's applicable -- but *Giglio* or

4    any other required disclosures at the time.  But, again, we can

5    talk about that subsequently.

6            In regards to the material witnesses, it is the

7    Court's intent to have United States Magistrate Judge Bremer

8    handle the initial appearances for those so that this Court can

9    continue to preside over this trial.  I assume that those will

10   happen in due course today, and then we can address those

11   witnesses as they come up in the course of the Government's

12   case in chief.

13           I don't know where those individuals are being

14   detained.  I don't know -- I am concerned, based upon my visual

15   observation of communication between Mr. Quinn and one of the

16   witnesses yesterday, about communication between those

17   witnesses and the detained defendants.

18           I want to make sure that everybody understands that

19   there cannot be communication between the defendants and any

20   witnesses, but those material witnesses that are now in custody

21   who were not previously in custody.

22           Anything from the Government in that regard?

23           MS. SCHNEIDER:  Yes.  Two things, Your Honor.  It's my

24   understanding that Mr. Grandberry and Mr. Vesey do have initial

25   appearances scheduled with the magistrate judge today.

1    Ms. Thorpe I don't believe does.  She is scheduled to testify

2    this morning.  I know the marshals were asking about that.  I

3    indicated that because she's scheduled to be here to testify

4    this morning, I wasn't sure if she needed an initial.  I also

5    let my supervisor -- she was on that email chain -- state if

6    she thought differently.

7              What is Your Honor's preference on that?

8              THE COURT:  The issue that I have is I'll want her to

9    have counsel, and if she has not yet -- I know the other two

10   individuals have had counsel appointed.  I don't know if she

11   has or not.

12             MS. SCHNEIDER:  Okay.

13             THE COURT:  I'm concerned about timing in that regard.

14             MS. SCHNEIDER:  Sure.

15             THE COURT:  So it would be my preference that she have

16   an initial appearance with a magistrate judge to allow for her

17   rights to be preserved, the opportunity to consult with

18   counsel, and to keep our matter proceeding according to our

19   schedule.

20             MS. SCHNEIDER:  Thank you.

21             And then I would have emailed the marshals last right

22   about keep separate orders and communications.  However,

23   because I knew one of the -- Mr. Grandberry had been taken to

24   Muscatine, I had assumed Mr. Vesey would have as well.  I

25   learned this morning, I believe, that Mr. Vesey was brought to

1  Scott County which is also where Mr. Smith is being held.

2  Given that they are related, I do have concerns with that.

3         And so, I guess, to the extent -- I'm not sure if

4  there were any communications there, but the Government shares

5  that concern.

6         THE COURT:  Mr. Willett, would you like to be heard on

7  material witness issues or communication between your client

8  and detained individuals?

9         MR. WILLETT:  The only thing I wanted to advise the

10 Court on, Your Honor, is I just inquired of my client if either

11 Mr. Vesey or Mr. Grandberry were in his cell block last night.

12 Because, believe it or not, some of the times mistakes are made

13 at the Muscatine County Jail.  He assured me they were not.

14        THE COURT:  Mr. Breedlove?

15        MR. BREEDLOVE:  Similarly, I discussed with my client.

16 He has not had any contact with Mr. Vesey, who is in Scott

17 County.  Mr. Vesey did send him a message that he did not

18 respond to, so that is -- I have not seen it.  I don't know

19 what it contains.  I think it just says, Call me.

20        And, also, after we began yesterday -- after the first

21 time Mr. Vesey was removed from the court --

22        THE COURT:  He wasn't removed the first time.  He left

23 on his own --

24        MR. BREEDLOVE:  Or left.

25        THE COURT:  He left on his own volition after I told

1    him he couldn't communicate with the defendant.

2            MR. BREEDLOVE:  I apologize, Your Honor.

3            After that --

4            THE COURT:  He wasn't removed the second time either

5    to be clear.  He left and then was subsequently arrested in the

6    exterior of the courtroom.

7            MR. BREEDLOVE:  In between those two incidents, he did

8    call my office and leave a voicemail.  I did not listen to it.

9    My assistant let me know we had the voicemail.  And I told her

10   she is not to call him back because he's sequestered.  And

11   given everything that happened yesterday, I did not want my

12   office reaching out to contact him in any way.

13           THE COURT:  Anything from the Government in response?

14           MS. SCHNEIDER:  No, Your Honor.

15           THE COURT:  Issue three on my list this morning is

16   timing of exhibits related to a limiting instruction.  We

17   just -- or testimony.  The Court ruled -- one of the areas that

18   the Government wished to explore was 404(b) testimony.  In

19   order to be able to provide the limiting instruction, which I

20   believe is requested by the defense -- Mr. Willett, would you

21   like a limiting instruction on that 404(b) evidence?

22           MR. WILLETT:  Absolutely, Your Honor.

23           THE COURT:  Mr. Breedlove?

24           MR. BREEDLOVE:  Yes, Your Honor.

25           THE COURT:  Thank you.

1          I need to know when that's going to occur.  Do you

2     have any sense of what the timing is there?

3          MS. SCHNEIDER:  Right now it is planned for the last

4     time Detective Butt is listed on the witness list, so not for

5     some time.

6          THE COURT:  Is there a preference between the

7     defendants as to before or after the testimony as to the

8     limiting instruction, Mr. Willett?

9          MR. WILLETT:  Before.

10         THE COURT:  Mr. Breedlove, do you agree?

11         MR. BREEDLOVE:  Yes, Your Honor.

12         THE COURT:  In light of that, I would ask you,

13    whoever -- whichever Government attorney is addressing that

14    witness at that time, when you are transitioning to the, I

15    think, 2019 incident, if you will make me aware of that fact

16    prior to asking questions, and I'll go ahead and give the

17    limiting instruction at that time.

18         I have not received any other requests for limiting

19    instructions from the defense.  If there are any other limiting

20    instructions that you believe are necessary or required by the

21    law or would be instructions that you want me to give during

22    the course of trial, please let me know that so that I can be

23    prepared to address that issue.

24         Finally -- anything about 404(b)?

25         MS. SCHNEIDER:  We may seek some clarification

1  regarding the redaction that Your Honor requests, but I would

2  like to speak with co-counsel based on some stuff I was looking

3  at last night first.

4         THE COURT:  Okay.

5         MS. SCHNEIDER:  Thank you.

6         THE COURT:  But you're not doing that this morning?

7         MS. SCHNEIDER:  No.

8         THE COURT:  Mr. Willett, anything else on that issue?

9         MR. WILLETT:  Not at this time, Your Honor.

10         THE COURT:  Mr. Breedlove?

11         MR. BREEDLOVE:  No, Your Honor.

12         THE COURT:  Thank you.

13         The last thing is just exhibits generally.  Yesterday

14  we received from the Government the new versions of some of

15  those exhibits.

16         Mr. Willett, have you had the opportunity to look at

17  those?

18         MR. WILLETT:  Your Honor, I apologize.  I was trying

19  to do two things at once.  I heard exhibits and then have you

20  had a chance to look at those.  I apologize.

21         THE COURT:  The Government gave us revised versions of

22  their videos that took out the commentary.  Have you had the

23  opportunity to look at those?

24         MR. WILLETT:  No, I have not, Your Honor.

25         THE COURT:  Mr. Breedlove?

1          MR. BREEDLOVE:  No.  I have them, but I have not

2     reviewed the modified versions, Your Honor.

3          THE COURT:  Okay.  Please do so.  Make sure that they

4     comport with what your expectations are.

5          To the extent that -- I brought this up sua sponte

6     yesterday to avoid issues that I, of course, saw arising at

7     trial.  To the extent that the defendants have the opportunity

8     to review the exhibits that have been provided to you, please

9     bring any issues with those exhibits to my attention earlier

10    rather than later so that we can, as we have with the videos,

11    address those issues ahead of time to be able to smoothly have

12    the evidence presented to the jury.  I do not want to have

13    gotcha-type discussions about any of the exhibits.  We have had

14    them for some time now.  If there are issues with them, I would

15    like to know about that so that we can address them before

16    having to have the jury leave to discuss those things.

17         We'll have this conference this morning.  We'll have a

18    conference before the afternoon.  We'll have a conference

19    tomorrow morning.  But please do bring that to my attention if

20    you have any issues.

21         Mr. Willett, have you noticed anything other than

22    those items that I brought to the parties' attention on our

23    conference on Monday morning that you needed to bring to my

24    attention?

25         MR. WILLETT:  No, Your Honor.  The only thing was the

1    overnight filing, Your Honor, and we have discussed it.

2         THE COURT:  Thank you.

3         Mr. Breedlove?

4         MR. BREEDLOVE:  No, Your Honor.

5         THE COURT:  That exhausts my list of topics for

6    conversation this morning.

7         Ms. Schneider, anything on behalf of the Government?

8         MS. SCHNEIDER:  Just to point out that we have also

9    changed the names of the social media PDF files that I will be

10   displaying -- or Mr. Ripley I suppose will be displaying as I

11   am examining Detective Butt this morning to what I believe was

12   the Court's instruction.

13        THE COURT:  Thank you.  I appreciate you doing that

14   overnight.

15        Anything that needs to be brought to the Court's

16   attention on behalf of Defendant Quinn?

17        MR. WILLETT:  Not at this time, Your Honor.

18        THE COURT:  Mr. Breedlove, anything on behalf of

19   Defendant Smith?

20        MR. BREEDLOVE:  No, Your Honor.

21        THE COURT:  Our jurors are prompt this morning.  In

22   order to -- we could bring them in now.  Is anyone in need of a

23   break before we begin?

24        Mr. Ripley?

25        MR. RIPLEY:  I'm not in need of a break, Your Honor.

1  I'm wondering where you would like Detective Blackman at the

2  time the jury enters.

3          THE COURT:  He can be seated on the stand unless

4  there's an objection from the defense to him being seated.  I

5  will remind him that he's under oath, but that's all I intend

6  to do.

7          MR. WILLETT:  There's no objection to that, Your

8  Honor.

9          I would like just a couple minutes to talk with

10  Mr. Breedlove and my legal assistant regarding some of the

11  logistics we've discussed about viewing of exhibits.

12          THE COURT:  Okay.  It's 8:52 right now.  We'll plan on

13  coming in just shortly before 9:00.

14          I will say that you were in the midst of

15  cross-examination yesterday -- Mr. Blackman, please remain

16  outside the courtroom for a moment.

17          The jury will remember what you said yesterday, so

18  please make sure that we are asking new questions and not going

19  back over the cross-examination yesterday.

20          MR. WILLETT:  Ms. Wheeler has helped me get back on

21  track, Your Honor.

22          THE COURT:  Thank you.  She's good at that.

23          All right.  We'll be in recess.  Thank you.

24          (Recess taken at 8:53 a.m. until 9:00 a.m.)

25          (In open court, with the defendants present, outside

```
 1    the presence of the jury.)

 2            THE COURT:  Thank you.  You may be seated.

 3            Is the Government prepared to proceed?

 4            MS. SCHNEIDER:  Yes, Your Honor.

 5            THE COURT:  On behalf of Defendant Quinn?

 6            MR. WILLETT:  Yes, Your Honor.

 7            THE COURT:  On behalf of Defendant Smith?

 8            MR. BREEDLOVE:  Yes, Your Honor.

 9            THE COURT:  Okay.  We will bring in the jury.

10            (Jury in at 9:01 a.m.)

11            THE COURT:  Thank you.  You may be seated.

12            Good morning.  We're back on the record, in the

13    presence of the jury, in the matter of the United States of

14    America versus Quinn and Smith.  This is Case No. 3:21-cr-91.

15            This is our second day of our jury trial.  You'll

16    recall that Detective Blackman is on the stand.  He was being

17    subjected to cross-examination from Mr. Willett when we left

18    off yesterday afternoon.

19            Mr. Willett will resume his cross-examination when we

20    first start.

21            Mr. Blackman, I'll remind you that you're still under

22    oath.

23            THE WITNESS:  Yes, ma'am.

24         JAKOB BLACKMAN, PREVIOUSLY SWORN, RESUMED THE STAND

25            THE COURT:  Mr. Willett.
```

BLACKMAN - CROSS

1              MR. WILLETT:  Your Honor, if it would please the

2     Court, after reviewing my notes, I have no further

3     cross-examination of this agent.

4              THE COURT:  Thank you.

5              On behalf of Defendant Smith?

6              MR. BREEDLOVE:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8     BY MR. BREEDLOVE:

9     Q.   Detective Blackman -- Detective?

10    A.   Yes, sir.

11    Q.   Thank you.

12         You were talking about how you are sort of in a hybrid

13    role; is that fair?

14    A.   That's fair.

15    Q.   So some of it leads to issues where you're working with the

16    State and some of it leads to issues where you're working with

17    the federal government?

18    A.   Yes, that's correct.  They kind of blend.

19    Q.   And those go sort of down different paths of investigation;

20    is that fair?

21    A.   Depending on the types of crimes --

22    Q.   Okay.

23    A.   -- I would agree with that.

24    Q.   And so some of your investigations relating to state

25    crimes, those are all in what state?

1   A.   Kansas.

2   Q.   Okay.  And none of those have led to any testimony from you

3   in front of a federal criminal jury trial about those

4   investigations; is that correct?

5   A.   Not a jury trial, that is correct.

6   Q.   You talked about the idea that neighborhood gangs may pull

7   ideas or customs from national gangs.

8        Do you recall that?

9   A.   I do.

10   Q.   But they aren't national gangs; correct?

11   A.   That's correct.

12   Q.   So a fair analogy would be a high school football coach may

13   see a new formation that an NFL team is using, they may want to

14   employ that, but they're certainly not associated with it;

15   fair?

16   A.   That's fair.

17   Q.   And so even if you see someone using a particular sign,

18   that doesn't mean they're associated with any group without

19   further evidence; correct?

20   A.   Yeah.  Again, it would be the totality of everything on the

21   organization being investigated.

22   Q.   Sure.

23   A.   So I would agree with that for the most part, yes.

24   Q.   I mean, if we asked you to show us some of the gang signs

25   you're aware of today, certainly that wouldn't mean, we assume,

1   that you are in one of those neighborhood gangs?

2   A.   Correct.

3   Q.   But among the police department do you have handshakes with

4   any of your colleagues, stuff like that?

5   A.   I would say just, like, a regular handshake --

6   Q.   No --

7   A.   -- like most people do.

8   Q.   Okay.  You talked about the limited desire to cooperate.

9        How long have you been a police officer?

10  A.   Since 2011.

11  Q.   And is it fair to say there's a significant subset of

12  individuals that generally don't wish to cooperate with the

13  police?

14  A.   Like, just in the general population or --

15  Q.   Sure.

16  A.   I would say in the criminal element, that's correct.

17  Q.   Okay.  And not all of the criminal element that has a

18  reluctance to cooperate are in gangs; correct?  There are --

19  A.   I would agree with that.

20  Q.   There are, in fact, some criminals that you investigate,

21  and it turns out they're not in a gang, they're just a

22  criminal?

23  A.   Correct.

24  Q.   You talked quite a bit about various signaling on social

25  media.

1    Do you recall that?

2  A.  I do.

3  Q.  One of the things that you talked about was emojis.  An

4  emoji is a little picture image that goes along with text;

5  correct?

6  A.  Correct.

7  Q.  And I know most of us know what that is.  I'm trying to

8  make the record clear.  So you may have a text message that

9  says, "What are you doing today" and a little football.  And

10  that's implying, Hey, what are you doing today?  Do you want to

11  watch a football game, go to a football game, play football,

12  whatever; fair?

13  A.  In that context, that's fair.

14  Q.  Okay.  And is it fair that different emojis can mean

15  different things at different times?

16  A.  That's correct.

17  Q.  And when you talk about understanding the full context of

18  something, what emoji goes along with a message would change

19  the interpretation of it; fair?

20  A.  Fair.

21  Q.  Okay.  So, for example, you talked about the word "slide."

22  Okay.

23    Do you recall saying that can mean a drive-by or a drug

24  deal?

25  A.  Correct.

1  Q.  Are you familiar with it being used in a -- to be

2  delicate -- more romantic context between someone and a female?

3  A.  I am.

4  Q.  And so if somebody texted "Want to slide" and an emoji, it

5  could mean many different things based on what that emoji was;

6  fair?

7  A.  Fair.  I think it would be, again, the entire context of

8  the messages.

9  Q.  So "Want to slide" and a picture of a car and a gun, that's

10  going to be a reference probably to?

11  A.  That would be -- yeah.  That would be an obvious one of a

12  shooting, right.

13  Q.  But if it's "Want to slide" and it's the leaf emoji and the

14  little wind emoji, that's going to be in reference to?

15  A.  A narcotic deal.

16  Q.  And so is it -- and if it was something else, it could mean

17  looking for a sexual encounter; correct?

18  A.  It could.

19  Q.  Depending on, again, the emoji?

20  A.  Correct.

21  Q.  So is it fair to say under that, without having the actual

22  emojis associated with a message, it would be difficult to

23  determine the full context?

24  A.  Without seeing the whole context, it could be.

25  Q.  You talked about a couple different ways that police

1  officers learn about alleged gang activity.

2      Do you recall that?

3  A.  I do.

4  Q.  One of those was cooperating witnesses; correct?

5  A.  Correct.

6  Q.  One of those was confidential informants; correct?

7  A.  Correct.

8  Q.  And then there are also undercover officers; correct?

9  A.  There are.

10  Q.  And officers that attempt to infiltrate a gang or a non --

11  a professional law enforcement officer trying to gather sort of

12  the same information as a cooperating or a confidential

13  informant by getting involved with the gang; is that fair?

14  A.  It's fair.

15  Q.  You talked about the varying structures of gangs and lack

16  of structures of some neighborhood gangs.

17      Do you recall that?

18  A.  I do, sir.

19  Q.  When you use that term to talk about a neighborhood gang,

20  does that help you as a police officer classify a group of

21  individuals for investigatory purposes?

22  A.  I'm kind of confused by the question, I guess.

23  Q.  If you're talking to the other officers and say -- I'm not

24  familiar with Kansas City, but we'll just say there's a gang

25  called the KC Boys, and you tell everybody, Hey, we need to

1   go -- I think John Doe is part of the KC Boys, do you describe

2   it in that way so that your fellow officers already know the

3   whole group of circumstances that you're talking about?

4   A.  Yeah.  I would call it the gang that is identified on what

5   we believe the gang is.

6   Q.  And when you do that, it's for the purposes of helping your

7   fellow officers understand the totality of the circumstances;

8   fair?

9   A.  Fair.

10  Q.  It's not to indicate -- well, let me back up.

11      You said a lot of gangs have different and varying

12  structures; correct?

13  A.  That's correct.

14  Q.  And so you would use those terms in reference to a group

15  name in order to identify them regardless of how closely or

16  loosely these groups of people were associated with; fair?

17  A.  Fair.  If the gang is defined historically as who that gang

18  is, regardless of structure or hierarchy, we would still just

19  call them by the name of the gang.

20  Q.  And you have groups of people that you identify as a law

21  enforcement officer as groups that are together by a group name

22  that aren't necessarily part of a gang; fair?

23  A.  That may happen.  I can't think of a time I have done that.

24  Q.  Okay.  You talked about roles in a gang.

25      Do you recall talking about that?

BLACKMAN - CROSS

1   A.  Yes, sir.

2   Q.  So a role in a neighborhood gang, for example, may be

3   producer, somebody who is supposed to produce drugs; fair?

4   A.  Sell drugs to make money, yes.

5   Q.  And those are roles that are specifically defined in

6   relation to their criminal activity?

7   A.  I would say that's correct.

8   Q.  And are a lot of the roles that gangs and neighborhood

9   gangs arrange themselves around associated with how they are

10  going to organize their criminal activity?

11  A.  I would say that's somewhat correct, yeah.

12  Q.  You talked about family and gangs.

13      Do you recall that?

14  A.  I do.

15  Q.  Is it fair to say that older members of a family, whether

16  it's cousins or uncles or older brothers, will try and get

17  younger members of their family to associate with the same

18  group gang or neighborhood gang?

19  A.  Yes.

20  Q.  Would gangs typically do work for another neighborhood

21  gang?  Would the Missouri KC Boys do work for another group?

22  A.  Not in my experience, no.

23  Q.  And, in fact, fair to say that doing work with or for

24  another gang may lead to retaliation, excommunication, those

25  types of things?

1   A.   It could.

2   Q.   So if you saw somebody who was engaging in work for a

3   number of different groups or gangs, would it be fair to say

4   that person is not associated -- he may be a criminal, but he

5   is not working as a member of those gangs because he's somewhat

6   of a free agent?

7   A.   I think that could be correct.  It's -- again, it's the big

8   picture.  Sometimes I refer to, like, an umbrella, and it kind

9   of -- there's gangs that are different neighborhood identifying

10  names that are all kind of part of the big picture of a

11  philosophy of a gang.  So those gang members could work with --

12  like, Fifth Street could work with a guy from 10th Street

13  because they're kind of part of the big gang together.

14  Q.   And I know you -- I apologize.  I know you don't know this

15  about what we talked about earlier.  If you're using street

16  names for gangs just for -- again, you don't know about these

17  things -- can you use letters so there's no confusion?

18  A.   Sure.  So if gang A, B, C and D may be somewhat linked

19  together by a common belief or theme, they would work possibly

20  together.  Again, it would be the big picture on defining which

21  group and how they're linked.

22  Q.   But if gangs were committing -- if gang -- if the A Street

23  Boys were committing violence against the B Street Boys, you

24  wouldn't then find somebody from A Street spending time with

25  helping, going to dinner with, et cetera, somebody from B

1    Street?

2    A.  I would agree with that.

3    Q.  And that would be an indication they're not really involved

4    in -- they may be involved in criminal activity, but not in the

5    gang itself?

6    A.  Possibly.

7    Q.  And just in general, is it fair to say that when

8    investigating a neighborhood gang, the largest factor is

9    looking at the totality of the circumstances?

10   A.  I would agree with that.

11   Q.  And until you have absolutely every piece of information,

12   it becomes difficult to come to a conclusion as a law

13   enforcement officer?

14   A.  I would agree with that.

15           MR. BREEDLOVE:  Thank you, Your Honor.

16           I have no further questions.

17           THE COURT:  Thank you.

18           Redirect examination?

19           MR. RIPLEY:  Thank you, Your Honor.

20                       REDIRECT EXAMINATION

21   BY MR. RIPLEY:

22   Q.  Detective, Mr. Breedlove was just asking you questions

23   about whether you as a law enforcement officer kind of have an

24   internal list, if you will, that you share amongst patrol

25   officers, other members of the department, and you indicated

1    that you do and that you slot people.

2        Does that aid in law enforcement purposes, in particular

3    safety of officers, so they have an awareness of who is who?

4    A.   I would agree with that, yes.

5    Q.   Does that help them have an awareness of who's capable of

6    what and maybe what they have done in the past?

7    A.   That is correct.

8    Q.   Do you make that list up without any basis of any kind?

9    A.   No.  It's based on something.

10   Q.   What is it based on?

11   A.   It depends on how it's defined per jurisdiction.  In my

12   experience, we had a number of requirements in order to do

13   that.  When those requirements were met, we could actually

14   document somebody.

15   Q.   Is it based on information that you have received, like you

16   talked about yesterday, from cooperating individuals, officers,

17   over the course of time learning about the conduct of these

18   people on the street?

19   A.   Yes.

20   Q.   The names that you give these gangs, those come from the

21   members themselves?

22   A.   That's correct.

23   Q.   These are not your names?

24   A.   No.  We don't make them up.

25   Q.   In your experience, have you seen, again, going with our

1    theoretical A, B, and C gang, say in the year 2014, A and B

2    align themselves with one another?  They form a bit of an

3    alliance because of some external pressure of some kind

4    happening in the neighborhood or in the greater community?

5        Have you seen that?

6    A.  I have seen that.

7    Q.  Have you seen, then, fast-forward a couple of years,

8    something changed, A and B are shooting at each other all of a

9    sudden?

10   A.  I have seen that too.

11   Q.  Fast-forward a few more years, some subtle membership

12   changes in A and B, are they back aligned again because, again,

13   of some external pressures, some larger community happening?

14   A.  They can be.

15   Q.  So you've seen this kind of morphing back and forth?

16   A.  I would say especially as generations move on and younger

17   people come together.

18   Q.  You indicated -- as far as this family connection, have you

19   seen over the course of multiple generations a situation where

20   extended family, maybe half brothers, cousins, things like

21   that, will end up growing up in slightly different communities

22   and they'll be family, but their allegiances will be that as

23   well as with different gangs?

24       Have you seen that?

25   A.  I've seen that.  Probably not like brothers but, like,

 1  cousins more I've seen.

 2  Q.  Sure.

 3     These alliances that we've talked about, while there is

 4  some allegiance, some alliance, some assistance, the level of

 5  working with each other is not as strong as it is for the

 6  members of the gang itself.

 7     Would you agree with that?

 8  A.  I would.

 9          MR. RIPLEY:  Give me just a moment, Your Honor.  I'm

10  sorry.

11          THE COURT:  Thank you.

12          MR. RIPLEY:  I don't have anything else.

13          Thank you, Your Honor.

14          THE COURT:  Thank you, Mr. Ripley.

15          Redirect limited to -- no.  Recross limited to

16  redirect, Mr. Willett?

17          MR. WILLETT:  No thank you, Your Honor.

18          THE COURT:  Recross limited to redirect?

19          MR. BREEDLOVE:  Can I have a moment to look at my

20  notes, Your Honor?

21          THE COURT:  Of course.

22          MR. BREEDLOVE:  Thank you, Your Honor.

23          Nothing further.

24          THE COURT:  Thank you, Detective Blackman.  You may

25  step down.

1          Is the Government prepared to call your next witness?

2          MS. SCHNEIDER:  The Government calls Detective Bryan

3    Butt.

4          THE COURT:  Thank you.

5          Detective Butt, if you'd please come forward.

6          Please raise your right hand and prepare to be sworn.

7             BRYAN BUTT, GOVERNMENT'S WITNESS, SWORN

8          THE COURT:  Thank you.  You may be seated.

9          Once you're comfortable, if you would please state and

10   spell your full name for the record.

11         THE WITNESS:  First name is Bryan, B-r-y-a-n.  Last

12   name is Butt, B-u-t-t.

13         MS. SCHNEIDER:  May I inquire?

14         THE COURT:  Oh, yes.  Thank you.

15         MS. SCHNEIDER:  Thank you.

16                      DIRECT EXAMINATION

17   BY MS. SCHNEIDER:

18   Q.  Good morning, Detective Butt.

19   A.  Good morning.

20   Q.  How are you employed?

21   A.  I work for the Davenport Police Department.

22   Q.  How long have you been with the Davenport Police

23   Department?

24   A.  I started March 1, 2004.

25   Q.  What is your educational background?

1   A.  I have a bachelor of science degree from Illinois State

2   University.

3   Q.  And did you graduate from the Iowa Law Enforcement Academy?

4   A.  I did.

5   Q.  What is your current assignment with the Davenport Police

6   Department?

7   A.  I am assigned as an investigator in their Gun

8   Investigations Unit.

9   Q.  How long have you been a detective?

10  A.  Since 2011.

11  Q.  And how long have you been in the Gun Investigations Unit?

12  A.  Since 2018.

13  Q.  Is that when the Gun Investigations Unit started?

14  A.  That's correct.

15  Q.  What are your responsibilities in that unit?

16  A.  We do both reactive and proactive gun investigations, so we

17  handle everything from prohibited person possession, all the

18  way through to assisting with homicides, investigating shots

19  fired, investigating shootings with victims.

20  Q.  And in what unit were you before you were assigned to the

21  Gun Investigations Unit?

22  A.  I was a street crimes investigator.

23  Q.  Do you have any law enforcement experience outside of the

24  Davenport Police Department?

25  A.  I do not.

1   Q.   Were you assigned to a federal agency at one point?

2   A.   I was.

3   Q.   What was that?

4   A.   In 2015 to 2018, I was assigned as a special deputy with

5   the Bureau of Alcohol, Tobacco and Firearms.

6   Q.   Sort of similar to what Agent Blackman just testified to?

7   A.   That's correct.

8   Q.   And when you were a street crimes investigator, was that in

9   the Tactical Operations Bureau?

10  A.   It was.

11  Q.   What kind of -- I guess you said street crimes, but more

12  generally -- or I should say more specifically, what kind of

13  crimes were you investigating?

14  A.   Initially in 2011, when I was assigned up there, we

15  investigated trending crimes, crimes in progress, and spree

16  crimes.  So we were responding to the burglaries in progress,

17  burglary trends, robberies, robbery trends, robberies in

18  progress, and shots fired.

19  Q.   So through your work as a detective in the Gun

20  Investigations Unit, is it fair to say you're familiar with

21  firearms?

22  A.   I am.

23  Q.   And have you had training in how they work?

24  A.   Yes.

25  Q.   You're personally able to operate them?

1  A.  That's correct.

2  Q.  Have you attended any trainings specific to firearms,

3  narcotics, or gang investigations through DPD?

4  A.  I have.

5  Q.  Can you just briefly describe that?

6       THE COURT:  Slowly, please, Detective Butt.

7  A.  I have been to clandestine lab, certified.  I have been to

8  schools reference interview and interrogation.  I have been to

9  schools reference social media investigations, armed subject

10  investigations; ATF -- like an overview school that was three

11  days that went from everything from armed subjects to NIBIN

12  leads to firearm investigations.

13  BY MS. SCHNEIDER:

14  Q.  What is a NIBIN lead?

15  A.  A NIBIN lead is a -- NIBIN is the National Integrated

16  Ballistics Imaging [sic] Network, and that is a program where

17  casings that are collected at the scenes of shots fired or

18  through test-fired firearms are then entered into a computer

19  system, and that computer system then can provide correlations

20  between firearms and shootings or shooting scenes.

21  Q.  So has your time as a detective, regardless of the

22  constitution of the unit, been spent investigating street

23  crimes, violent crimes, and even some drug crimes?

24  A.  Yes.

25  Q.  Does the Davenport Police Department have narcotics

1   investigators?

2   A.   They do.

3   Q.   And does the Gun Investigations Unit work together with

4   them?

5   A.   We do.

6   Q.   Does the Quad Cities have units focused on narcotics and

7   drug crimes?

8   A.   Yes.

9   Q.   Are some of those units comprised of both state and federal

10  law enforcement?

11  A.   Yes.

12  Q.   Do you regularly communicate with members of those units?

13  A.   We do.

14  Q.   And do other area cities here in the Quad Cities,

15  Bettendorf, Moline, Rock Island, do they have detective

16  bureaus?

17  A.   Yes.

18  Q.   Do you regularly communicate with them regarding the crimes

19  that are being committed in your respective cities?

20  A.   We do.

21  Q.   Does that include interstate between Iowa and Illinois?

22  A.   Yes.

23  Q.   And do Davenport police in general and you specifically

24  engage in information sharing with those other agencies as it

25  relates to street crime?

1   A.   We do.

2   Q.   So through your experience as a street crimes investigator

3   here in Davenport, have you become familiar with the street

4   gangs in the Quad Cities, both in Iowa and Illinois?

5   A.   I have.

6   Q.   How have you become familiar?

7   A.   Basically through police contacts and investigations that I

8   have done throughout my career and that information sharing

9   that we do with these other agencies, I have become familiar

10  with them.

11  Q.   Before 2011, when you became a detective, were you on

12  patrol?

13  A.   I was.

14  Q.   And what parts of the cities were you patrolling?

15  A.   I was predominantly assigned to what we classify as the

16  lower east side and central part of Davenport.  Essentially I

17  worked east of Division Street, south of Locust, and then west

18  of Jersey.

19  Q.   And so does your experience and familiarity with street

20  gangs in the Quad Cities encompass both your time on patrol and

21  all of your years as a detective?

22  A.   Yes, ma'am.

23  Q.   Based on your personal knowledge and experience, what are

24  some of the street gangs currently operating in the Quad

25  Cities?

1    A.   We have some of the more traditional gangs, like the Maniac

2    Latin Disciples, the Latin Kings, the Low Riders.   We have

3    hybrid gangs, including Savage Life and several of their

4    offsets, Fifth Street.   There's several other hybrid gangs that

5    operate in Rock Island, OCB.

6    Q.   Were those the same sets that were operating in 2016, 2017?

7    A.   There's been an evolution.

8    Q.   So there's been some differences?

9    A.   Yes.

10   Q.   You mentioned Savage Life.   Are you familiar with that

11   gang?

12   A.   I am.

13   Q.   How familiar with them are you?

14   A.   I would say very.

15   Q.   And how did you become very familiar with them?

16   A.   From my time on the street as both a patrol officer and

17   then as an investigator.

18   Q.   Do you know when Savage Life formed?

19   A.   Right around 2009, 2010.

20        MR. BREEDLOVE:   Objection, Your Honor.   Foundation.

21        THE COURT:   The objection is overruled.

22   A.   2009, 2010.

23   BY MS. SCHNEIDER:

24   Q.   Do you know how they formed?

25   A.   They were a group of subjects that were associated with

1  another one of our hybrid street gangs, 12th Street, which was

2  an older member group.  They were searching for their own

3  identity, and they took some phrases from some --

4          MR. BREEDLOVE:  Your Honor, I object again to

5  foundation.

6          THE COURT:  Will you ask a new question to allow --

7          MS. SCHNEIDER:  Yes.

8          THE COURT:  -- Detective Butt to respond to the

9  question?

10          MS. SCHNEIDER:  Yes.

11          MR. BREEDLOVE:  Thank you, Your Honor.

12  BY MS. SCHNEIDER:

13  Q.  You said you know how they formed, that they broke out

14  from -- or they had been part of 12th Street and that -- can

15  you explain how that happened?

16  A.  Can you clarify the question, please?

17  Q.  Yes.  I'm sorry.  I'm trying to take part of your question

18  and move on.  Actually, I'm just -- we're going to come back to

19  that.

20      Does Savage Life go by any other names?

21  A.  They'll use Dae Dae Gang, DDG.

22  Q.  Why Dae Dae Gang -- and that's D-a-e D-a-e -- or DDG?

23  A.  In January of 2012, Damien Howard, Jr., was killed in gun

24  violence in Rock Island, Illinois.  And in memory of him or a

25  sort of a way to identify themselves, they started using his

1   nickname which was Dae Dae.

2   Q.   And was Damien Howard a member of Savage Life?

3   A.   He was.

4   Q.   How old was he?

5   A.   He was 14.

6   Q.   So as Savage Life formed, did they carry any remnants of

7   12th Street with them when they formed?

8   A.   They did.

9   Q.   What?

10        MR. BREEDLOVE:   Objection.  Foundation.

11        THE COURT:   The objection is overruled.

12   BY MS. SCHNEIDER:

13   Q.   What did they bring with them?

14   A.   Specifically in reference to a hand sign, they used the

15   12th hand sign.  On social media, we'll see the hashtag #1200.

16   Q.   You said the 12th hand sign.  Do you know what the 12th

17   hand sign is?

18   A.   I do.

19   Q.   What is it?

20   A.   It is the index finger with the middle finger down and the

21   other two fingers.  And I'm holding it up.

22   Q.   So to describe what you're holding up, you have the middle

23   finger and your thumb making a circle, almost like an okay

24   symbol if you had your index finger, so that the first finger

25   is up and the last two fingers are down; is that right?

1    A.   That's correct.

2    Q.   And that represents a 1 and a 2?

3    A.   That's correct.

4    Q.   And what did you say -- I think you said something about

5    1200?

6    A.   Correct.

7    Q.   What was that?

8    A.   On social media they'll reference 1200.

9    Q.   Do you know if Savage Life associates with any traditional

10   or national gangs?

11   A.   What we have seen over -- especially utilization on social

12   media photographs is that they will use the Gangster Disciple

13   hand sign.

14   Q.   Do you know what the Gangster Disciple hand sign is?

15   A.   I'm not very good at it.

16   Q.   I'll have you point it out later.

17        You're familiar with it?  You know what it is?

18   A.   Yes.

19   Q.   You just can't put it up?

20   A.   Yes.

21   Q.   Okay.  How would you describe Savage Life's association

22   with the Gangster Disciples?  Is it simply the hand sign?

23   A.   It is not.

24        MR. WILLETT:  Objection, Your Honor.  Federal Rule of

25   Evidence 401, Federal Rule of Evidence 403.

1          THE COURT:  The objection is overruled.  The witness

2    has testified to the basis of his familiarity and the -- it's

3    relevant, and the balancing test allows for the admission of

4    the evidence.

5          MR. BREEDLOVE:  Your Honor, just for the record, I

6    would join the objection and ask if you would like us to treat

7    similar objections as standing or at each question.

8          THE COURT:  You can object at the appropriate time.

9          MR. BREEDLOVE:  Thank you, Your Honor.

10         THE COURT:  You may ask a question.

11         MS. SCHNEIDER:  Thank you.

12   BY MS. SCHNEIDER:

13   Q.  How would you characterize or describe Savage Life's

14   association with the Gangster Disciples?  Is it simply the hand

15   sign or is there anything more?

16   A.  There is more.

17   Q.  Can you describe that?

18   A.  What we have learned is that, particularly when they're

19   incarcerated, is they will affiliate with that group while

20   incarcerated.

21   Q.  Thank you.

22        Do you know who founded the Gangster Disciples?

23   A.  Larry Hoover.

24   Q.  Based on your personal knowledge and experience, do you

25   know if Savage Life has had any rival street gangs?

1   A.   Yes.

2   Q.   How do you know?

3   A.   Both through our extensive social media monitoring that we

4   do and through police investigations.

5   Q.   Have those rivals remained constant over the years?

6   A.   No.

7   Q.   Based on your personal knowledge and experience, who has

8   Savage Life's rivals been over the years?

9   A.   They have feuded with, in particular, Fifth Street, which

10  is a Rock Island-based hybrid street gang.  Here on our side of

11  the river or Davenport, they have feuded with Black Savages.

12  They have feuded with the Low Riders.

13  Q.   When you say Fifth Street, does Fifth Street go by any

14  other names?

15  A.   Zone Fifth.

16  Q.   So sort of like Savage Life and Dae Dae Gang?

17  A.   Correct.

18  Q.   Who was Savage Life's rivals around 2016, 2017?

19  A.   It was primarily Fifth Street.

20  Q.   You said that Fifth Street is from Rock Island?

21  A.   That's correct.

22  Q.   Does Fifth Street have a hand sign?

23  A.   They do.

24  Q.   What is it?

25  A.   It is the middle finger up on one hand and the other hand

1  holding up the number 4.

2  Q.  Like four fingers?

3  A.  Four fingers, correct.

4  Q.  Do you know why Savage Life and Fifth Street feuded?

5  A.  This has been a generational thing.  There has been a

6  long-standing Rock Island and Davenport-based feud over the

7  years.

8  Q.  And in 2016 and 2017, what did it mean for those two gangs

9  to be rivals?

10  A.  When they would have contact with each other, that could

11  lead to assaults, large disturbances, shots fired.

12  Q.  Was that the main conduct you saw due to that rivalry?

13  A.  That's correct.

14  Q.  Based on your personal knowledge and experience of these

15  gangs, have you been able to identify individuals who you

16  believe were members or associates of these gangs?

17  A.  Yes.

18  Q.  How?

19  A.  Through our police investigations, police contacts,

20  confidential sources, other cooperators, and social media.

21  Q.  So aside from violence in the street, have you seen

22  evidence of that rivalry anywhere else?

23  A.  Yes.

24  Q.  Where?

25  A.  In particular social media.

1   Q.  As part of your work investigating these cases, do you

2   regularly monitor the social media feeds of gang members and --

3   members and associates in the Quad Cities area?

4   A.  We do.

5   Q.  When you do that, what are you looking for?

6   A.  We are looking for everything from evidence related to

7   firearm possession, narcotics sales, up into what the current

8   temperature of the environment is, basically who they're

9   feuding with, who they are disrespecting in music videos, who

10  they're associating with regularly.

11  Q.  Do you also use social media to attempt to identify who is

12  claiming that gang?

13  A.  Yes.

14  Q.  What social media platforms have you seen Savage Life

15  members and associates use?

16  A.  Facebook, Snapchat, Instagram.

17  Q.  And what kinds of things have you seen them post?

18  A.  We see everything from RIP posts, to general Facebook

19  statuses, to pictures that are disrespectful in nature, like,

20  taking pictures -- Savage Life members taking pictures on Fifth

21  Street in Rock Island or posting pictures in other locations

22  that are disrespectful to these groups they're feuding with or

23  in memory of other dead members of the gang, pictures, or

24  hashtag posts.

25  Q.  What's a hashtag post?

1    A.   So when you post something and say you put a Facebook

2    status up, and it says whatever it says, and then afterwards

3    you may hashtag it Dae Dae Gang or hashtag it DDG or hashtag

4    1200.

5    Q.   Aside from Dae Dae, are there other deceased Savage Life

6    members who are held in high esteem by this group?

7    A.   Yes.

8    Q.   Who?

9    A.   Lewis Woodson, Demetrius Allen.

10   Q.   Does Lewis Woodson have a nickname?

11   A.   Lewy.

12   Q.   L-e-w-y?

13   A.   Yes.

14   Q.   So what are some things you've seen on social media that

15   are posted besides RIP related to Dae Dae or Lewy?

16   A.   We will see things like -- like I said earlier, we will see

17   Dae Dae Gang or we will see Lewy Gang.

18   Q.   So you've seen on Dae Dae, on Lewy?

19   A.   Yes.

20   Q.   And what does that mean?

21   A.   That is like swearing on their memory or, like, if you're

22   telling the truth and then you're asserting that that's the

23   truth, that's why you say on Dae Dae or on Lewy.

24   Q.   And I think you testified about this a little bit.  You've

25   seen evidence of feuds on social media?

1   A.   That's correct.

2   Q.   Aside from the disrespectful posts you've testified about,

3   have you seen other evidence of feuds?

4   A.   We have.

5   Q.   Can you describe that?

6   A.   We will see -- can you kind of clarify the question for me?

7   Q.   Sure.  I mean, you've testified that you've seen, like,

8   disrespectful posts or posts of, for instance, Savage Life

9   people on Fifth Street.  Is there any other evidence of feuds

10  between Savage Life and Fifth Street that you've seen on social

11  media?

12  A.   I mean, I think they -- we see -- we have seen posts in

13  reference to not only the disrespect, but, like, a common

14  phrase is, like, smoking on this such and such --

15          MR. BREEDLOVE:  Objection, Your Honor.  Rule 802.

16  Hearsay.

17          THE COURT:  The objection is overruled.

18  A.   We have seen, like, statuses, like, smoking on this

19  particular dead person, which is disrespectful to that group.

20  BY MS. SCHNEIDER:

21  Q.   So in your personal knowledge and experience, is it

22  disrespectful to speak ill of a deceased gang member?

23  A.   Yes.

24  Q.   Have you seen gang members and associates in the Quad

25  Cities increase their use of social media since 2016 and 2017?

1   A.   Yes.

2   Q.   Before the advent of social media, where did you generally

3   see evidence of these feuds?

4   A.   So prior to social media and the mobility of our society

5   based on cell phones, we would typically see tagging.  So we

6   would see graffiti painted where they would mark their --

7   generally the neighborhoods that they were in with graffiti

8   that identified the group.  They may put up, then,

9   disrespectful graffiti in reference to who they're feuding

10  with.

11  Q.   Do you still see much graffiti today?

12  A.   We do not.

13  Q.   Detective Butt, do you recognize anyone in the courtroom

14  today from this investigation that we have been discussing?

15  A.   I do.

16  Q.   Who?

17  A.   I see Dimetri Smith who is seated next to his counsel,

18  Mr. Breedlove.  I also Najawaun Quinn who is seated next to his

19  counsel, Mr. Willett.

20  Q.   And can you just point out something that Mr. Smith is

21  wearing so we're sure we're talking about the same person?

22  A.   He's wearing a black suit with a white shirt and design

23  tie.

24       MS. SCHNEIDER:  Your Honor, may the record reflect

25  that the witness has identified Mr. Smith?

```
 1            THE COURT:  Yes.
 2   BY MS. SCHNEIDER:
 3   Q.  And what is something Mr. Quinn is wearing?
 4   A.  He is wearing a black button-up style shirt with
 5   white-colored, like, dots all over it.
 6            MS. SCHNEIDER:  Your Honor, may the record reflect the
 7   witness has identified Mr. Quinn?
 8            THE COURT:  Yes.
 9   BY MS. SCHNEIDER:
10   Q.  Detective Butt, does Mr. Smith go by any nicknames of which
11   you are aware?
12   A.  He does.
13   Q.  What?
14   A.  He goes by Metri, O Block, Meech.
15   Q.  And does Mr. Quinn go by any nicknames of which you are
16   aware?
17   A.  He does.
18   Q.  What?
19   A.  Fat Boi.
20   Q.  Are you aware of any Savage Life related tattoos?
21   A.  I am.
22   Q.  Can you describe those?
23   A.  I have seen subjects involved that have tattoos on their
24   forearms that say Savage Life, Savage Life on their fingers,
25   Dae Dae on hands, born and death dates for Dae Dae on a
```

1    forearm.

2    Q.  And do people involved in this case have some of those

3    tattoos, including Mr. Quinn?

4    A.  Yes.

5    Q.  During your investigation did Davenport police obtain any

6    search warrants?

7    A.  We did.

8    Q.  Can you explain briefly what a search warrant is?

9    A.  A search warrant is a legal document that allows you to

10   search -- in this case it was Facebook.  So we had a legal

11   document that a judge ruled that there was probable cause for

12   us to obtain information from associated accounts of Savage

13   Life members for this investigation.

14        MR. BREEDLOVE:  Objection, Your Honor.  That's

15   bolstering.

16        THE COURT:  The objection is sustained.

17        The jury should disregard any statement as to the

18   basis for the issuance of the search warrant.  The search

19   warrant was issued in accordance with the law, and the witness

20   will testify as to that.  You should disregard any legal basis

21   that that search warrant was granted upon.

22        Does that satisfy the defense?

23        MR. BREEDLOVE:  Yes.  Thank you, Your Honor.

24        THE COURT:  You may proceed.

25        MS. SCHNEIDER:  Thank you.

1    BY MS. SCHNEIDER:

2    Q.   Did Davenport obtain or did you obtain Olajuwan Culbreath's

3    Facebook account?

4    A.   Yes.

5    Q.   What was his Facebook profile name?

6    A.   Wang Bang Culbreath.

7    Q.   Could it have been Bang Mann?

8    A.   Yes.

9    Q.   Did he have more than one?

10   A.   He did.

11   Q.   He did.  And so are those names provided by the user?

12   A.   They are.

13   Q.   And so if it was called Bang Mann, why did you believe that

14   was Olajuwan Culbreath's account?

15   A.   We associated that account through our -- so we do social

16   media monitoring.  We have done extensive amounts of social

17   media monitoring throughout the years.  And by viewing posts

18   and associations and statuses on that account, we were able to

19   associate that account with Mr. Culbreath.

20   Q.   Are you also aware of any nicknames that Mr. Culbreath goes

21   by?

22   A.   Bang.

23   Q.   And did Facebook then send you the records from that

24   account?

25   A.   They did.

 1   Q.  Can you turn in the binder -- I think it would be the

 2   second binder.  Are they in front of you?

 3   A.  They are not.

 4   Q.  Oh, they're not.  They're up here on the table.  I'm sorry.

 5       Can you please turn to Exhibits 700 and 700a.

 6       Do you recognize those?

 7   A.  I do.

 8   Q.  What is Exhibit 700?

 9   A.  700 is a certificate of authenticity of domestic records

10   for Facebook.

11   Q.  And what is 700a?

12   A.  It is four pages of a Facebook business record for the

13   account of Bang Mann.

14   Q.  Does that contain the -- essentially subscriber

15   information?

16   A.  It does.

17           MS. SCHNEIDER:  Your Honor, the Government moves to

18   admit Government Exhibits 700 and 700a.

19           THE COURT:  Any objection on behalf of Defendant

20   Quinn?

21           MR. WILLETT:  No objection to 700, Your Honor.

22           If you'll give me just a moment.  700a is multiple

23   pages.

24           401 objection as it pertains to Mr. Quinn, Your Honor,

25   Federal Rule of Evidence 401.

1           THE COURT:  401 objection is overruled as to 700a.

2           Mr. Breedlove, objection to 700 or 700a?

3           MR. BREEDLOVE:  I would join, but I understand the

4     ruling, Your Honor, for the record.

5           THE COURT:  700 and 700a are admitted.

6           MS. SCHNEIDER:  May we publish 700a?

7           THE COURT:  Yes.

8           Members of the jury, you saw yesterday that we

9     sometimes have technical difficulties.  It appears -- the

10    technical difficulty has resolved.  I appreciate your patience

11    as we navigate the technical challenges of the trial.

12          Thank you.

13    BY MS. SCHNEIDER:

14    Q.  Detective Butt, looking at Exhibit 700a, what information

15    did you learn from this?

16    A.  That the account name was bang.mann.338863.  It had a

17    registered email address of bangculbreath@gmail.com and then

18    that the birthday provided is Mr. Culbreath's date of birth.

19    Q.  What was the vanity name here that we see on the screen?

20    A.  The vanity name is bang.mann.338863.

21    Q.  And we have already established that Bang is a known

22    nickname of Mr. Culbreath's; correct?

23    A.  That's correct.

24    Q.  Did the records from this account contain messages to and

25    from Mr. Culbreath?

1  A.  They did.

2  Q.  And did you also obtain information from those that led you

3  to believe that this was Mr. Culbreath's account?

4  A.  We did.

5       MS. SCHNEIDER:  Your Honor, the government --

6       MR. BREEDLOVE:  Your Honor, I'm going to object on

7  foundation that the messages are to and from the account.

8       THE COURT:  Objection is overruled.

9       Ms. Schneider, please be precise in your language.

10       MS. SCHNEIDER:  Thank you.

11  BY MS. SCHNEIDER:

12  Q.  Detective Butt, can you please review Exhibits 701 to 713.

13       Detective Butt, do you recognize those?

14  A.  I do.

15  Q.  What are they?

16  A.  They are Facebook posts and messages from the account.

17  Q.  And are they fair and accurate copies of photos and

18  messages from the account that you established was Olajuwan

19  Culbreath's?

20  A.  Yes.

21       MS. SCHNEIDER:  The Government moves to admit Exhibits

22  701 to 713.

23       THE COURT:  Any objection on behalf of Defendant

24  Quinn?

25       MR. WILLETT:  One moment, Your Honor.

1          Federal Rule of Evidence 401 and 403 as it pertains to

2    Government's Exhibits 701 to 711.  No objection to 712.  The

3    same objection, Federal Rule of Evidence 401 and 403, as it

4    pertains to Government's Exhibit 713.

5          THE COURT:  The 401 objection is overruled.  The

6    evidence is relevant.  403, similarly, the balancing test is

7    supportive of the entry of the exhibits.  That objection is

8    overruled.

9          Mr. Breedlove, any objection to 712?

10         MR. BREEDLOVE:  Your Honor, I have no objection to

11   712.

12         I would note for the record I'm joining in

13   Mr. Willett's objections, but I would like the opportunity to

14   voir dire on one issue on the exhibits in addition to his

15   motion for the Court's consideration and ruling.

16         THE COURT:  712 is admitted without objection.

17         On which exhibits do you intend to voir dire?

18         MR. BREEDLOVE:  701 first, Your Honor.  And based on

19   the ruling, I would determine if I would do the same on the

20   others.

21         THE COURT:  You may conduct limited voir dire on 701

22   for the purpose of laying foundation for an objection.

23         MR. BREEDLOVE:  Do you want me to do that from the

24   table or from the podium?

25         THE COURT:  You can question from the table.

DIRECT - BUTT

```
1                      VOIR DIRE EXAMINATION
2    BY MR. BREEDLOVE:
3    Q.  Detective Butt, do you see on 701, after it says "text," a
4    number of squares?
5    A.  Yes.
6    Q.  And do you see shortly below that where it says "status,"
7    there's some language and then a number of squares and then
8    some hashtags?
9         Do you see that?
10   A.  I do.
11   Q.  Those squares in an actual Facebook post would be emojis;
12   is that correct?
13   A.  That's correct.
14   Q.  And those emojis do not appear on these exhibits.  They've
15   been replaced with squares; is that correct?
16   A.  That's correct.
17   Q.  And that's the same for the square boxes on all of the
18   Facebook records you've looked at.  In the original posting
19   would be emojis, such as a heart or any of the available
20   emojis; but in these records, they are squares; is that
21   correct?
22   A.  That's correct.  That's the way they come from Facebook.
23            MR. BREEDLOVE:  That concludes the voir dire,
24   Your Honor.
25            THE COURT:  Based upon that voir dire, do you have --
```

1          MR. BREEDLOVE:  I would renew the previous objections

2     with that information, Your Honor.  They are not accurate and

3     complete because they have squares instead of the emojis, which

4     are relevant.

5          THE COURT:  So the objections as to relevance are

6     overruled.  The document is as produced by the service provider

7     as testified to by this witness.  That would go to weight and

8     not admissibility.

9          MR. BREEDLOVE:  Thank you, Your Honor.

10          THE COURT:  So 712 is admitted without objection.  701

11     to 711 and 713 are admitted over objections.

12          MR. BREEDLOVE:  Your Honor, given that I anticipate a

13     lot of Facebook posts from the Government over the next several

14     days, I know your preference is to have objections with each

15     question.  But for that issue related to the squares replacing

16     emojis on the exhibits, may I treat that as a standing

17     objection, or do you want it addressed each time?

18          THE COURT:  You need to object to the specific

19     exhibits that you believe are improper or unable to be

20     admitted.  If you believe there is a foundation error, you may

21     do so.  But in this instance, you have made an objection as to

22     relevance.  That objection is overruled.  If you wish to object

23     to any other exhibits, you'll be expected to do so at that

24     time.

25          MR. BREEDLOVE:  Thank you.

1            THE COURT:  You may proceed.

2            MS. SCHNEIDER:  Thank you.

3                     DIRECT EXAMINATION RESUMED

4   BY MS. SCHNEIDER:

5   Q.  Did you obtain Darion Gardner's Facebook account?

6   A.  We did.

7   Q.  What was the name of his Facebook profile?

8   A.  And I'm drawing a blank.

9            MS. SCHNEIDER:  May I approach?

10           THE COURT:  Yes.

11           MR. WILLETT:  Your Honor, if the Court please, could

12  Detective Butt's microphone either be somehow better positioned

13  or his volume turned up because the acoustics in this room,

14  everything goes to the ceiling.  And there are times when I'm

15  straining to hear, and I don't want to ask to repeat.

16           THE COURT:  Thank you.

17           I see that Detective Butt has rearranged himself.  If

18  at any time you can't hear, please just simply let me know and

19  we'll address it.

20           MR. WILLETT:  Thank you, Your Honor.

21  BY MS. SCHNEIDER:

22  Q.  I don't need to approach.  You have it in front of you.

23      I believe if you review 714a, that may refresh your

24  recollection.  Please review that and let me know if it does.

25  A.  It does.

DIRECT - BUTT

1   Q.  What was the name of his Facebook profile?

2   A.  It was Rambo Ofdatgang Gardner.

3   Q.  Ofdatgang Gardner?

4   A.  Yeah.

5   Q.  O-f-d-a-t-g-a-n-g.

6       Why did you believe that was Darion Gardner's account?

7   A.  So the account name was labeled dawaun, d-a-w-a-u-n, period

8   gardner, g-a-r-d-n-e-r, period 3.  Darion's middle name is

9   Dajuan, D-a-j-a-u-n.

10  Q.  So before we get into the record --

11  A.  Yep.

12  Q.  -- before you got these, why did you believe that was

13  Darion Gardner's account?

14  A.  Again, as I previously stated, we do an extensive amount of

15  social media monitoring.  And through the posts on that

16  account, photographs, statuses, interactions with other people,

17  we determined that account was associated with Darion Gardner.

18  Q.  And, of course, his last name is Gardner?

19  A.  Correct.

20  Q.  Now, can you please review 714?  And then, of course,

21  you're on 714a, please review that.

22      Do you recognize those?

23  A.  I do.

24  Q.  What is 714?

25  A.  714 is the certificate of authenticity of domestic records

1   for the Facebook records.

2   Q.  And what is 714a?

3   A.  It is the account information, first four pages of a

4   Facebook business record for that account of Rambo Ofdatgang

5   Gardner account.

6   Q.  And, again, this has the subscriber information in it?

7   A.  That's correct.

8          MS. SCHNEIDER:  I'm probably going to sound like a

9   broken record here eventually.  Your Honor, the Government

10  moves to admit 714 and 714a.

11         MR. WILLETT:  No objection.

12         THE COURT:  Mr. Breedlove, on behalf of Defendant

13  Smith?

14         MR. BREEDLOVE:  No objection, Your Honor.

15         THE COURT:  714 and 714a are admitted.

16         MS. SCHNEIDER:  May we please publish 714a?

17         THE COURT:  Yes.

18  BY MS. SCHNEIDER:

19  Q.  So you testified that the Dawaun part is very close to

20  Mr. Gardner's middle name; is that right?

21  A.  That's correct.

22  Q.  And what else do we know on here?  What was -- did this

23  have Mr. Gardner's correct date of birth?

24  A.  It did not.  It is one year off.  Mr. Gardner's date of

25  birth is 7-10 of 1995.

1   Q.  But fairly close; is that right?

2   A.  That's correct.

3   Q.  Okay.  Thank you.

4       And did the records you received from Facebook contain

5   messages to and from this account?

6   A.  Yes.

7   Q.  And did the content therein also contain things that led

8   you to believe it was Mr. Gardner's account?

9   A.  Yes.

10  Q.  Like what?

11  A.  References to Lil Man.

12  Q.  And why did that lead you to believe it was Mr. Gardner?

13  A.  We know that to be Darion Gardner's nickname or moniker.

14  Q.  And did the records also contain images and statuses and

15  other messages?

16  A.  Yes.

17  Q.  Please turn to Exhibits 715 to 733, and please review

18  those.

19      Do you recognize those?

20  A.  I do.

21  Q.  What are they?

22  A.  They are messages, statuses, and media from the account for

23  Rambo Ofdatgang Gardner or Darion Gardner.

24  Q.  Do they appear to be fair and accurate copies of what you

25  got from Facebook?

DIRECT - BUTT

1   A.   That's correct.

2            MS. SCHNEIDER:  Your Honor, the Government moves to

3   admit Government's Exhibits 715 to 733, with the exception of

4   724 as there is no 724.

5            THE COURT:  Any objection to 715 to 733, except for

6   724 which is omitted?

7            MR. WILLETT:  Your Honor, 715, Federal Rule of

8   Evidence 401 and 403 as it pertains to Mr. Quinn; 716, Federal

9   Rule of Evidence 401; 717, hearsay; 718, Federal Rule of

10  Evidence 403; 719, 401 and 403; 720, 401 and 403; 721, 401 and

11  403; 722, 401 and 403; 723, 401 and 403; 725, 401 and 403; 726,

12  401 and 403; 727, 401 and 403; 728, 401 and 403; 729, 401 and

13  403; 730, 401 and 403; 731, 401 and 403 and hearsay; 732, 401

14  and 403 and hearsay; 733, 401 and 403.

15           Thank you, Your Honor.

16           THE COURT:  Before I rule on those, I will hear from

17  you, Mr. Breedlove.

18           MR. BREEDLOVE:  Your Honor, I would join in those and

19  ask for a brief voir dire on 717 and 732.

20           THE COURT:  Yes.  For purposes of making an objection,

21  you may.

22                    VOIR DIRE EXAMINATION

23  BY MR. BREEDLOVE:

24  Q.   Can you look at 717, please, sir?

25  A.   I'm there.

1  Q.  Unlike the other exhibits, that does not contain Facebook

2  business record and a page number; correct?

3  A.  That's correct.

4  Q.  And it looks to be a screenshot, not something that was

5  received from Facebook; correct?

6  A.  I can't testify either way.

7  Q.  Okay.  When you receive things from Facebook, do they not

8  have Facebook business record on each page?

9  A.  Yes.

10  Q.  And does Exhibit 717 have Facebook business record on that

11  page?

12  A.  Not on this page, no.

13  Q.  Okay.  I'll ask you to look at 732, please.

14     Are you there, sir?

15  A.  I am.

16  Q.  And, similarly, as to 717, this one does not contain

17  Facebook business record; correct?

18  A.  That's correct.

19  Q.  And, in your experience, anything that comes from Facebook

20  as a business record is watermarked with that at the top of the

21  page?

22  A.  So when it comes in its records as media, it does not have

23  a business record with that media in a separate file.

24  Q.  But 732 and 717 are posts like some of the other posts;

25  correct?

1   A.   That is correct.

2   Q.   And they appear in an entirely different form than the

3   other posts in the other exhibits?

4   A.   That, I'll agree to.

5   Q.   And, again, don't contain the notation that they're

6   Facebook business records?

7   A.   That's correct.

8          MR. BREEDLOVE:  No further voir dire, Your Honor.

9          THE COURT:  Thank you.

10          Additional record as to 717 and 732?

11          MS. SCHNEIDER:  Thank you.

12                    DIRECT EXAMINATION RESUMED

13   BY MS. SCHNEIDER:

14   Q.   Detective Butt, 732, does that post contain tags?

15   A.   It does.

16   Q.   Do you know what tags are?

17   A.   Tags are when you identify or associate another account

18   with a post.

19   Q.   And in the Facebook record, do all the tags show up?  Or

20   when there are so many, does it only indicate other people were

21   tagged?

22   A.   It indicates other people were tagged.

23   Q.   And so in this case, it shows the specific people who were

24   tagged?

25   A.   That's correct.

```
1              MS. SCHNEIDER:  Thank you.

2              Nothing further.

3              THE COURT:  So Exhibits 715, 716, 718, 719 through

4    723, 725 through 730 are admitted.  The 401 and 403 objections

5    posed are overruled.

6              The Court withholds ruling on 717 and 732 until

7    additional record is made.  I believe that there was a hearsay

8    objection posed to 731 as well, and that objection is

9    overruled.

10             I believe I addressed all of the objections, and I

11   have admitted all of the exhibits offered except 717 and 732.

12             Mr. Willett.

13             MR. WILLETT:  I was just double-checking, Your Honor.

14             THE COURT:  I appreciate it.

15             MR. WILLETT:  Your Honor, I thought I had two hearsay

16   objections.  I was wondering if I had raised hearsay to 717.

17   But the Court has reserved ruling?

18             THE COURT:  That's right.

19             Mr. Breedlove?

20             MR. BREEDLOVE:  I believe the Court has addressed all

21   objections, Your Honor.

22             THE COURT:  Thank you.

23             You may proceed.

24             MS. SCHNEIDER:  Thank you.

25
```

1    BY MS. SCHNEIDER:

2    Q.   Detective Butt, did Davenport police obtain Dimetri Smith's

3    Facebook account?

4    A.   Yes.

5    Q.   What was the name of his Facebook profile?

6    A.   Metri O Block Meech.

7    Q.   And, again, that's the name provided by the user?

8    A.   That's correct.

9    Q.   And why did you believe that was Dimetri Smith's account?

10   A.   Through the extensive amount of social media monitoring

11   that we do, that account had photos, posts, statuses,

12   interactions with other subjects that made us believe that that

13   account was associated with Mr. Smith.

14   Q.   And you previously testified that he has some nicknames,

15   all of which appear in that Facebook profile name?

16   A.   That's correct.

17   Q.   And Facebook sent you the records from that account?

18   A.   Yes.

19   Q.   Can you please review 769 to 769a.

20        Do you recognize those?

21   A.   I do.

22   Q.   What are they?

23   A.   769 is the certificate of authenticity for the domestic

24   records from Facebook, and then 769a is the first four pages of

25   a Facebook business record that contains the subscriber

1   information for the account.

2           MS. SCHNEIDER:  Your Honor, the Government moves to

3   admit 769 and 769a.

4           THE COURT:  Mr. Willett, any objection?

5           MR. WILLETT:  No objections, Your Honor.

6           THE COURT:  Mr. Breedlove?

7           MR. BREEDLOVE:  401 and 403, Your Honor.

8           THE COURT:  The evidence is relevant.  401 is

9   overruled.  The balancing test favors admission.  403 is

10  overruled.

11          Those are both admitted.

12          MS. SCHNEIDER:  Permission to publish 769a?

13          THE COURT:  Yes.

14  BY MS. SCHNEIDER:

15  Q.  Looking at this exhibit -- if we could just scroll up a

16  little bit.

17          What did you learn from this exhibit?

18  A.  The account name is dimetri.smith.

19  Q.  And then what was the vanity name?

20  A.  The same.

21  Q.  And then what was the email -- registered email associated

22  with this account?

23  A.  Both of them say dimetri.smith@yahoo.com and then

24  dimetri.smith@facebook.com.

25  Q.  And then if we could scroll to the last page.

1          Was the date of birth associated with this account

2    Mr. Smith's date of birth?

3    A.   Yes.

4    Q.   Thank you.

5          Did the records also contain messages -- were there

6    messages in these records to and from the account?

7    A.   Yes.

8    Q.   And did that corroborate that this was Mr. Smith's account?

9    A.   Yes.

10   Q.   Did the records also contain images and other posts related

11   to Facebook?

12   A.   Yes.

13   Q.   Can you please review Exhibits 770 and [sic] 783.

14          THE COURT:  Did you say 770 and 783 or 770 through

15   783?

16          MS. SCHNEIDER:  Through.

17          THE COURT:  Okay.  Thank you.

18   BY MS. SCHNEIDER:

19   Q.   Do you recognize those?

20   A.   I do.

21   Q.   And what are they?

22   A.   Messages, statuses, and media from that account.

23   Q.   From the Metri O Block Meech account?

24   A.   Yes.

25   Q.   Which you established was Dimetri Smith?

DIRECT - BUTT

1   A.  Yes.

2   Q.  Are they fair and accurate?

3   A.  Yes.

4        MS. SCHNEIDER:  Your Honor, the Government moves to

5   admit Exhibits 770 through 783.

6        MR. WILLETT:  Same objection previously urged,

7   Your Honor, Federal Rule of Evidence 401 and 403 as to all of

8   Exhibits 770 through 783, Your Honor.

9        THE COURT:  Mr. Breedlove?

10       MR. BREEDLOVE:  I would join those, Your Honor.  And I

11  would ask to voir dire briefly.

12       THE COURT:  On which?

13       MR. BREEDLOVE:  771, Your Honor.

14       THE COURT:  For purposes of laying foundation for an

15  objection?

16       MR. BREEDLOVE:  Correct, Your Honor.

17       THE COURT:  You may.

18                    VOIR DIRE EXAMINATION

19  BY MR. BREEDLOVE:

20  Q.  Detective, in looking at 771, you, again, see the square

21  blocks that we discussed previously that are placeholders for

22  emojis on the second page?

23  A.  Yes, sir.

24  Q.  Okay.  And as I flip through the exhibits that you're

25  looking at, that also happens on 770; is that correct?

1  A.  Yes, sir.

2  Q.  That also happens on Exhibit 773; is that correct?

3  A.  Yes, sir.

4  Q.  That happens on Exhibit 775; is that correct?

5  A.  Yes, sir.

6  Q.  If you would look at -- excuse me.

7       That happens on 776 as well, is that correct, on the

8  second page at the bottom?

9  A.  Yes, sir.

10  Q.  On the third page of 776, starting on the bottom of page 2

11  and going to the third page of 776, there's a statement that

12  says, Attachments, sticker; type, image/png, and then provides

13  a URL for that image.

14       Do you see that?

15  A.  I do.

16  Q.  But the image itself is not there; is that correct?

17  A.  That's correct.

18  Q.  On Exhibit 778, do you see the boxes on that page as well?

19  A.  I do.

20  Q.  And, again, we have the same situation where there's an

21  image -- reference to the image, but the image itself does not

22  appear?

23  A.  That's correct.

24  Q.  That happens again on page 3 of Exhibit 778?

25  A.  That's correct.

1   Q.   And page 4?

2   A.   Again, that's correct.

3   Q.   Exhibit 781, it has the boxes indicating the removed emoji;

4   is that correct?

5   A.   That's correct.

6   Q.   And that happens again on page 7 of that exhibit; correct?

7   A.   That's correct.

8   Q.   It appears again on page 2 of Exhibit 782; is that correct?

9   A.   Yes, sir.

10  Q.   And pages 1 and 2 of Exhibit 783?

11  A.   Yes, sir.

12          MR. BREEDLOVE:  I would renew the objections with that

13  foundation, Your Honor.

14          MR. WILLETT:  Your Honor, if I may before the Court

15  rules, somehow I don't have a 778.  Could I just look at

16  Mr. Breedlove's 778 for a moment?  For some reason, it just

17  skips.

18          THE COURT:  You may.

19          MR. WILLETT:  Thank you, Your Honor.

20          THE COURT:  Mr. Willett, you now have the exhibit.

21          MR. WILLETT:  Thank you, Your Honor.

22          THE COURT:  The objections are overruled for the

23  reasons previously stated.  The arguments go to weight and not

24  admissibility.  The exhibits are relevant, admissible, and the

25  403 balance weighs in favor of admission.

DIRECT - BUTT

```
 1          Any additional record in that regard from the
 2   Government?
 3          MS. SCHNEIDER:  No, Your Honor.
 4          THE COURT:  From the defense?
 5          Mr. Willett?
 6          MR. WILLETT:  No, Your Honor.
 7          THE COURT:  Mr. Breedlove?
 8          MR. BREEDLOVE:  No.  Thank you, Your Honor.
 9                  DIRECT EXAMINATION RESUMED
10   BY MS. SCHNEIDER:
11   Q.  And because I guess I wanted to see if everyone was on
12   their toes, I skipped some, went out of order.
13          Did you --
14          THE COURT:  Before you go back, we're going to go
15   ahead and take our morning recess.  It's 10:23 right now.
16   We're going to take about a 10-, 15-minute break.  I'll ask for
17   you to be back and ready to come in the courtroom at 10:40.
18          Please continue to remember the admonition of the
19   Court.
20          We'll be in recess.
21          (Jury out at 10:23 a.m.)
22          THE COURT:  Thank you, Counsel.  You may be seated.
23          We're outside the presence of the jury.
24          You may return to counsel table, Detective Butt.
25          So, Mr. Breedlove, to be clear, you do not have to
```

1   note each time there is a square in order to make your record.

2          MR. BREEDLOVE:  Understood, Your Honor.

3          THE COURT:  You just have to object to the fact that

4   there are squares on those exhibits to clarify the basis of

5   your foundation objection.

6          Do you understand my instruction?

7          MR. BREEDLOVE:  Yes, Your Honor.  And when she's doing

8   them by groups, can I refer to the whole group or exhibit by

9   exhibit?

10          THE COURT:  You can object to the inclusion of the --

11   some of them won't have squares; right?

12          MR. BREEDLOVE:  Correct.

13          THE COURT:  So you can object to the -- based upon

14   the -- I don't think it is proper to say removal because of the

15   fact that that implies some action on the part of the witness.

16          MR. BREEDLOVE:  Understood.

17          THE COURT:  But the omission is probably the correct

18   verb to use.

19          MR. BREEDLOVE:  Understood.

20          THE COURT:  Okay.  Let's talk about Exhibits 717 and

21   732.  The foundation laid was foundation for a business record.

22   The objection was based upon the fact that that isn't what was

23   testified to.  Do you intend to lay further foundation for

24   those exhibits?

25          MS. SCHNEIDER:  Yes, Your Honor.

1          THE COURT:  Okay.  So we won't talk about those then

2    now.  You can have the opportunity to do so.

3          Anything that the Government needs to bring to my

4    attention at this time?

5          MS. SCHNEIDER:  No, Your Honor.

6          THE COURT:  Anything on behalf of Defendant Quinn?

7          MR. WILLETT:  No thank you, Your Honor.

8          THE COURT:  On behalf of Defendant Smith?

9          MR. BREEDLOVE:  No.  Thank you, Your Honor.

10          THE COURT:  All right.  We'll be in recess.  It's

11    10:25.  I asked the jury to be back at 10:40.  That should give

12    us all plenty of time, so please also follow that request.

13          We'll be in recess.

14          (Recess taken at 10:25 a.m. until 10:40 a.m.)

15          (In open court, with the defendants present, outside

16    the presence of the jury.)

17          THE COURT:  Thank you.  You may be seated.

18          We're back on the record, outside the presence of the

19    jury.

20          Is there anything the Government needs to bring to my

21    attention?

22          MS. SCHNEIDER:  No, Your Honor.

23          THE COURT:  Anything on behalf of Defendant Quinn?

24          MR. WILLETT:  Not at this time, Your Honor.

25          THE COURT:  On behalf of Defendant Smith?

1          MR. BREEDLOVE:  No.  Thank you, Your Honor.

2          THE COURT:  Detective Butt, you can return to the

3    stand.  And we'll bring in the jury.

4          Mr. Willett, were your concerns about hearing

5    addressed?

6          MR. WILLETT:  They were much better, Your Honor.

7          THE COURT:  Okay.  Thank you.

8          (Jury in at 10:43 a.m.)

9          THE COURT:  Thank you.  You may be seated.

10         We're back on the record in the presence of the jury

11    in the matter of the United States of America versus Quinn and

12    Smith.  This is Case No. 3:21-cr-91.

13         We left off for our morning recess with Detective Butt

14    on the stand.  Ms. Schneider is still engaged in her direct

15    examination.

16         Detective Butt, you're reminded that you're still

17    under oath.

18         And, Ms. Schneider, you may proceed.

19         MS. SCHNEIDER:  Thank you.

20                    DIRECT EXAMINATION RESUMED

21    BY MS. SCHNEIDER:

22    Q.  Detective Butt, did Davenport police obtain Najawaun

23    Quinn's Facebook account?

24    A.  We did.

25    Q.  What was the name of his Facebook profile?

1   A.   Wayne Perry.

2   Q.   Why did you believe that belonged to Mr. Quinn?

3   A.   Again, through our use of social media monitoring, we were

4   able to observe that profile and noted that it had post

5   statuses, media, interactions with other subjects that led us

6   to believe that account belonged to Mr. Quinn.

7   Q.   And did Facebook send you the records from that account?

8   A.   They did.

9   Q.   Can you please review Exhibits 734 and 734a.

10       What are those?

11  A.   734 is a certificate of authenticity of domestic records

12  for the Facebook account, and then 734a is the first five pages

13  of a Facebook business record for the subscriber information

14  for this Facebook account.

15  Q.   And they're fair and accurate copies from Facebook -- from

16  what you received from Facebook?

17  A.   Yes.

18       MS. SCHNEIDER:   Your Honor, the Government moves to

19  admit 734 and 734a.

20       MR. WILLETT:   No objection on behalf of Mr. Quinn,

21  Your Honor.

22       THE COURT:   Mr. Breedlove?

23       MR. BREEDLOVE:   No objection.

24       THE COURT:   734 and 734a are admitted.

25       MS. SCHNEIDER:   Permission to publish 734a?

BUTT - DIRECT

```
 1            THE COURT:  Yes.
 2   BY MS. SCHNEIDER:
 3   Q.  From this information on the last page, what did you find?
 4   A.  That the date of birth was Mr. Quinn's date of birth.
 5   Q.  That's Mr. Quinn's date of birth?
 6   A.  That's correct.
 7   Q.  Thank you.
 8            MS. SCHNEIDER:  Can we scroll up to the top.
 9   BY MS. SCHNEIDER:
10   Q.  This number that's listed on the top here as target account
11   number -- do you see that --
12   A.  Yes.
13   Q.  -- that I circled on the left side of the very top?  Is
14   that number meaningful?
15   A.  It is.
16   Q.  What is it?
17   A.  It's the unique account identifying number.  It can never
18   be changed.
19   Q.  So unlike -- can a person's username, like that Wayne
20   Perry, can that be changed?
21   A.  Yes.
22   Q.  But that number right there cannot be?
23   A.  That's correct.
24   Q.  Thank you.
25            Did the records you received also contain messages to
```

1    and from this account?

2    A.  Yes.

3    Q.  And was there information within the content of those

4    messages that also led you to believe this was Mr. Quinn's

5    account?

6    A.  Yes.

7    Q.  Such as?

8    A.  The use of his moniker Fat Boi.

9    Q.  And then did the records also contain images, posts,

10   statuses, and things like that?

11   A.  Yes.

12   Q.  Can you please review 735 to 768?

13          THE COURT:  Ms. Schneider, are you offering all

14   exhibits inclusive from 735 to 768?

15          MS. SCHNEIDER:  With the exception of 757, Your Honor.

16          THE COURT:  Thank you.

17          MR. BREEDLOVE:  I'm sorry.  Ms. Schneider, could you

18   repeat the numbers?

19          MS. SCHNEIDER:  757.

20          THE COURT:  735 through 768, exclusive of 757.

21          MR. BREEDLOVE:  Thank you.

22   BY MS. SCHNEIDER:

23   Q.  Did you have a chance to review those?

24   A.  I did.

25   Q.  Do you recognize them?

 1    A.   I do.

 2    Q.   What are they?

 3    A.   They are statuses, posts, and media associated with the

 4    account for Mr. Quinn.

 5    Q.   Do they appear to be fair and accurate copies?

 6    A.   Yes.

 7              MS. SCHNEIDER:  Your Honor, the Government moves to

 8    admit Exhibits 735 to 768, except for 757.

 9              THE COURT:  Mr. Willett, any objection?

10              MR. WILLETT:  Your Honor, if it pleases the Court.  In

11    regards to Government Exhibits 735 through 768, with the

12    exception of 757, Federal Rules of Evidence 403 with regard to

13    each and every one of those exhibits, but I would also, in

14    regards to Exhibits 756 and 763, hearsay.

15              THE COURT:  Mr. Breedlove?

16              MR. BREEDLOVE:  Your Honor, I would join in all of

17    those objections and for the reasons as well that we discussed

18    prior.

19              THE COURT:  Mr. Willett has made a 403 objection and

20    hearsay objection.  Is your objection then a 401 objection

21    based upon the omission of the emojis?

22              MR. BREEDLOVE:  Yes, Your Honor.

23              THE COURT:  The 403 objection is overruled.  The

24    balancing test weighs in favor of admission.

25              Would the Government like to be heard as to the

 1    hearsay objections for 756 and 763?

 2          MS. SCHNEIDER:  I don't understand the hearsay

 3    objection on 763, so I guess I will say 801(d)(2).  It's an

 4    admission of a party-opponent.

 5          THE COURT:  Mr. Willett, briefly and by citation to

 6    rule, can you assert how this -- do you believe this is a

 7    statement being offered for the truth of the matter asserted,

 8    that it does not fall into an exception as identified by the

 9    Government, including a statement by a party-opponent?

10          MR. WILLETT:  The concern I have besides the first two

11    words that -- is that we did have a series of emojis and how

12    that could be interpreted.

13          THE COURT:  The objection was hearsay.  I have

14    overruled the 403 objection.  I have asked you to specifically

15    address the hearsay objection you -- I'll try to be in front of

16    the microphone.  I know that you can't hear me as well when I

17    move over there.  I'm just trying to look at a lot of different

18    things.

19          My apologies to the jury.

20          Mr. Willett, you posed a hearsay objection to 756 and

21    763.  I'm trying to understand those objections and how they do

22    not fall within the exception for a statement by a

23    party-opponent.

24          MR. WILLETT:  You wish me to speak to both exhibits,

25    Your Honor?

1          THE COURT:  You can address 756 first to the extent

2    you believe that...

3          MR. WILLETT:  I believe it's an out-of-court statement

4    by a third person for the purpose to assert the truth of the

5    statement, Your Honor.

6          In regards to the -- and that was in regards to 756.

7          In regards to 763, my concern is that with the series

8    of emojis, again, it appears to be an out-of-court statement by

9    a third person, and it is hard to interpret what that statement

10   is supposed to mean other than the first two words.  But I am

11   going to object -- besides 403, which the Court has overruled,

12   I'm going to object that this could very well be hearsay.

13         THE COURT:  So 763 is overruled as to hearsay.  The

14   statements made, other than that made by the user identified as

15   Wayne Perry, are necessary to understand the context of the

16   statement made by Perry.  And the second page is not -- is

17   addressed in the objection.  So 763 hearsay objection is

18   overruled.

19         I'm sorry.

20         MS. SCHNEIDER:  May I respond to 756?  I think I was

21   focused on 763.

22         THE COURT:  Yes.

23         MS. SCHNEIDER:  It's offered to show the state of mind

24   of those in this alleged enterprise, Your Honor.  So that's

25   what it will be offered for.

1        THE COURT:  So the hearsay objection is overruled.

2   The statements include statements made by the defendant, which

3   would be statements by a party-opponent.  Other participation

4   by him and other conversations or statements made to him are

5   necessary for understanding his own statements, including state

6   of mind.  The objection is overruled.

7        All exhibits, 735 to 768, exclusive of 757, are

8   admitted and may be displayed to the jury.

9        MS. SCHNEIDER:  Thank you.

10  BY MS. SCHNEIDER:

11  Q.  Detective Butt, did DPD obtain Elleck Vesey's Facebook

12  account?

13      And that is first name E-l-l-e-c-k, last name V-e-s-e-y.

14  A.  Yes.

15  Q.  Who is Elleck Vesey?

16  A.  It's Dimetri Smith's half brother.

17  Q.  Based on your personal knowledge and experience, is he

18  affiliated with a gang?

19  A.  Yes.

20  Q.  With which?

21  A.  He is affiliated with the Fifth Street group.

22  Q.  What was the name of his Facebook profile?

23  A.  Was it Easy Vesey?  I'm sorry.  I do not recall.

24  Q.  Would you like to refer to 784a to refresh your

25  recollection?

```
1    A.   Yes, please.

2         It was Marlo Stanfield.

3    Q.   And did that help refresh your recollection?

4    A.   Yes.

5    Q.   And is that like Marlo Stanfield from The Wire?

6    A.   I'm not sure.

7    Q.   Why did you believe that was Elleck Vesey's account?

8    A.   Based on our social media monitoring that we do

9    extensively, the account had media posts, statuses,

10   interactions with other subjects that led us to believe that

11   account belonged to Elleck.

12   Q.   And did Facebook send you the records?

13   A.   They did.

14   Q.   Can you please review 784 and 784a.

15        What are those?

16   A.   They are -- 784 is the certificate of authenticity of

17   domestic records for the Facebook account, and then 784a is

18   four pages of a Facebook business record that contains the

19   subscriber information for the account.

20   Q.   Are they fair and accurate copies?

21   A.   Yes.

22        MS. SCHNEIDER:  Your Honor, the Government moves to

23   admit 784 and 784a.

24        THE COURT:  Mr. Willett?

25        MR. WILLETT:  No objection, Your Honor.
```

1          THE COURT:  Mr. Breedlove?

2          MR. BREEDLOVE:  No objection, Your Honor.

3          THE COURT:  784 and 784a are admitted.

4          MS. SCHNEIDER:  Permission to publish 784a.

5          THE COURT:  Yes.

6    BY MS. SCHNEIDER:

7    Q.  Looking at this record, what is the target account name?

8          THE COURT:  As I just corrected myself, please make

9    sure that everyone speaks into the microphone so that the

10   jurors can hear us well.  The microphones are excellent, but

11   they work effectively only when you are speaking directly into

12   them.

13         MS. SCHNEIDER:  Thank you.

14   BY MS. SCHNEIDER:

15   Q.  Detective Butt, what is the target account name?

16   A.  The target account name is j-a-e-l-l-e-c-k dot v-e-s-e-y,

17   so jaelleck.vesey.

18   Q.  Thank you.

19        Can we scroll down, please?

20        And what is the registered email addresses?

21   A.  One of them is elleck.vesey@yahoo.com.  The other one is

22   jaelleck.vesey@facebook.com.

23   Q.  And what is the vanity name?

24   A.  The vanity name is, again, jaelleck.vesey.

25   Q.  And on the last page, was the date of birth the correct

1    date of birth?

2    A.  Yes.

3    Q.  Okay.  Thank you.

4        Did the records contain images that Mr. Vesey posted?

5    A.  Yes.

6    Q.  I'm sorry.  That this account posted?

7    A.  That's correct.

8    Q.  Can you please review Exhibit 785.

9        Do you recognize that?

10   A.  I do.

11   Q.  Is it a fair -- what is it?

12   A.  It is a picture of Mr. Vesey and --

13   Q.  No.  What is it?  Is it --

14   A.  It is a photograph.

15   Q.  From this account?

16   A.  Yes.

17   Q.  And is it a fair and accurate photo from the account you

18   have established to be Elleck Vesey's?

19   A.  Yes.

20           MS. SCHNEIDER:  Your Honor, the Government moves to

21   admit Exhibit 785 into evidence.

22           MR. WILLETT:  Relevance.  401 as it pertains to this

23   defendant, Your Honor.

24           THE COURT:  Mr. Breedlove?

25           MR. BREEDLOVE:  I would join the objection.

1          THE COURT:  Relevance is overruled.  The Exhibit 785

2    is admitted.

3    BY MS. SCHNEIDER:

4    Q.  Detective Butt, did Davenport police obtain Romance

5    Armstrong's Facebook account?

6    A.  Yes.

7    Q.  Who is Romance Armstrong?

8    A.  Romance Armstrong is a victim involved in an incident in

9    this investigation.

10   Q.  In your personal knowledge and experience, do you know him

11   to be affiliated?

12   A.  I do.

13   Q.  With what set?

14   A.  The 12th Street.

15   Q.  What was the name of his Facebook profile?

16   A.  Willie Earl Jenkins.

17   Q.  How did you know that to be Romance Armstrong?

18   A.  Again, through our extensive social media monitoring, this

19   account had posts, media, and interactions that led us to

20   believe this account was associated with Mr. Armstrong.

21   Q.  Can you please review 790 and 790a.

22       What are they?

23   A.  790 is a certificate of authenticity of domestic records

24   for the Facebook account.  790a is two pages of Facebook

25   business records that contains subscriber information for the

1    account Willie Earl Jenkins.

2    Q.   Are they fair and accurate?

3    A.   Yes.

4          MS. SCHNEIDER:  Your Honor, the Government moves to

5    admit 790 and 790a.

6          MR. WILLETT:  No objection, Your Honor.

7          THE COURT:  Mr. Breedlove?

8          MR. BREEDLOVE:  No objection, Your Honor.

9          THE COURT:  790 and 790a are admitted.

10         MS. SCHNEIDER:  Permission to publish 790a?

11         THE COURT:  Yes.

12   BY MS. SCHNEIDER:

13   Q.   Here at the top we have the account identifier as

14   davenport.bound.  Is that significant as it relates to Romance

15   Armstrong?

16   A.   Yes.

17   Q.   How?

18   A.   Romance is born and raised here in Davenport.

19   Q.   Have you seen that associated with him before?

20   A.   I have seen that associated with him before.  It used to be

21   the username or it would be the screen name of his Facebook

22   account.

23   Q.   Prior to -- at some point prior to it being Willie Earl

24   Jenkins?

25   A.   That's correct.

1  Q.  Because previously you testified that is something the user

2  can change?

3  A.  That's correct.

4        MS. SCHNEIDER:  And if we could scroll down, please.

5  BY MS. SCHNEIDER:

6  Q.  What is one of the registered email addresses?

7  A.  So the -- one of them is armstrongromance@gmail.com, and

8  the other one is davenport.bound.1@facebook.com.

9  Q.  Thank you.

10      When you looked at the Facebook records that Facebook

11  disclosed, did it include messages sent and received from the

12  account?

13  A.  Yes.

14  Q.  Can you please turn to Exhibit 791 and review that.

15      Do you recognize that?

16  A.  Yes.

17  Q.  What is it?

18  A.  It is a -- several sets of messages exchanged from the

19  Facebook messenger part of the profile.

20  Q.  From the account you established to be Romance Armstrong's.

21  A.  That's correct.

22        MS. SCHNEIDER:  Your Honor, the Government moves to

23  admit Government's Exhibit 791.

24        THE COURT:  Any objection to 791?

25        MR. WILLETT:  No objection.

1          THE COURT:  Mr. Breedlove?

2          MR. BREEDLOVE:  I would renew my previous objections

3    on Facebook records, Your Honor.

4          THE COURT:  Specifically for the one based upon the

5    omission of the emojis?

6          MR. BREEDLOVE:  Yes, Your Honor.

7          THE COURT:  That objection is overruled.  791 is

8    admitted.

9    BY MS. SCHNEIDER:

10   Q.  Detective Butt, you previously testified of what the Fifth

11   Street hand sign is; is that right?

12   A.  That's correct.

13   Q.  And that Mr. Vesey is a member?

14   A.  That's correct.

15          MS. SCHNEIDER:  Can we please publish Exhibit 785?

16          THE COURT:  Yes.

17   BY MS. SCHNEIDER:

18   Q.  Detective Butt, can you describe what this image is

19   depicting?

20   A.  It is a picture of Elleck Vesey, who is in the white shirt

21   with light blue sleeves, and an unknown male subject.  Elleck

22   is displaying the Fifth Street hand sign.

23   Q.  So that's an example of what the Fifth Street hand sign is?

24   A.  That's correct.

25   Q.  Thank you.

1      You've also testified that one of the things these rival

2  groups would do is post pictures of themselves displaying a

3  rival gang's hand sign; is that right?

4  A.   That's correct.

5  Q.   And how do they do that when they wish to be disrespectful?

6  A.   Particularly with the Fifth Street sign, they would hold

7  the sign facing down.

8           MS. SCHNEIDER:  May we please publish 723?

9           THE COURT:  One moment.

10          Yes.

11  BY MS. SCHNEIDER:

12  Q.   Detective Butt, what we're seeing here is a picture from

13  Darion Gardner's Facebook account.

14      What are we seeing in this picture?

15  A.   The subject in the blue jeans, tan boots, and black shirt

16  is displaying a disrespectful sign towards Fifth Street.

17  Q.   Can you circle the person you're referring to, please?

18  A.   (Witness complied.)

19  Q.   And that is the person that -- except for the person who's

20  not fully on the screen on the left side, all the way to the

21  left; is that right?

22  A.   That's correct.

23          MS. SCHNEIDER:  May we please display Exhibit 768?

24          THE COURT:  Yes.

25          MS. SCHNEIDER:  Second page, please.

1   BY MS. SCHNEIDER:

2   Q.  Detective Butt, what are we seeing here?

3   A.  We are seeing a picture of Najawaun Quinn in the blue jean

4   shorts, the Jordans.  He's in the center of the picture with

5   the Chicago Bulls hat, and he is displaying the disrespectful

6   sign for the Fifth Street.  It's down.  It's actually kind of

7   to the side, but...

8   Q.  In fact, are all three people in that picture making that

9   hand sign?

10  A.  Yes.

11  Q.  But you're saying the person in the middle is Najawaun

12  Quinn?

13  A.  That's correct.

14  Q.  Thank you.

15      Do some of these gangs have geographic areas that are known

16  to them to have significance?

17  A.  Yes.

18  Q.  What are --

19          MR. BREEDLOVE:  Objection, Your Honor.

20  BY MS. SCHNEIDER:

21  Q.  -- some of those areas for Savage Life?

22          THE COURT:  Wait.  There was an objection.

23          MS. SCHNEIDER:  Oh, I didn't hear it.  I apologize.

24          MR. BREEDLOVE:  Objection.  Foundation.  He was

25  testifying to the knowledge of the enterprise, it sounded like,

1    the alleged enterprise, it sounded like was the question.

2          THE COURT:  The question posed was:  Do some of these

3    gangs have geographic areas that are known to have some

4    significance?  The question is proper.

5          The witness may answer that question.

6    A.  Yes.

7    BY MS. SCHNEIDER:

8    Q.  What are some of those areas for Savage Life?

9    A.  Traditionally 14th and Gaines has been a spot, and then we

10   have a couple spots on Brady Street.  One of them is 3100

11   Brady, which is where Lewis Woodson was gunned down in gun

12   violence.  And then another one is the area of Brady Street

13   Stadium, 3600 Brady Street in Davenport, and that is where

14   Demetrius Allen was gunned down.

15   Q.  And do you know if Fifth Street has any areas of

16   significance?

17   A.  They do.

18   Q.  Where?

19   A.  In particular, Fifth Street in Rock Island.

20   Q.  Any other areas?

21   A.  The Jesse Mart, the original location in Rock Island on

22   11th Street, has technically been always known as a place that

23   Fifth Street members frequent.

24   Q.  So do members of one gang tend to frequent the significant

25   areas or locations of the other?

1    A.   No.

2    Q.   Why not?

3    A.   Going to those areas is a safety risk.

4         MS. SCHNEIDER:  Can we please display or publish

5    Exhibit 781?

6         THE COURT:  Yes.

7         MS. SCHNEIDER:  Actually, if we can hold on and make

8    it bigger, please.

9    BY MS. SCHNEIDER:

10   Q.   I am showing you a post from Dimetri Smith's account.

11        When was this posted?

12   A.   It was posted on November 19, 2016.

13   Q.   And what is the status associated with the photos we're

14   about to see?

15   A.   The status says: *When you got respect, you go where da fuck*

16   *you want*.

17   Q.   And, of course, there were emojis that followed that.

18   A.   That's correct.

19   Q.   Can we go to the second page?

20   A.   That is a picture of Mr. Smith standing in front of the

21   Jesse Mart.

22   Q.   And if we go to the fourth page, what do we see in this

23   picture?

24   A.   That is a picture of Mr. Smith and Brian Brand, again,

25   standing in front of the Jesse Mart.

1    Q.   Who is Brian Brand?

2    A.   A close associate of Mr. Smith.

3    Q.   Can we go, then, to the sixth page.

4         What do we have here?

5    A.   Again, Mr. Smith standing in front of the Jesse Mart.

6    Q.   And does he have a large smile on his face?

7    A.   He does.

8    Q.   Can we go to the last page, please.

9         And what -- the last comment here under this post was made

10   by who?

11   A.   Metri O Block Meech.

12   Q.   And that is Mr. Smith?

13   A.   Yes.

14   Q.   And what is the text of his message?

15   A.   It is:  *On Larry*.

16   Q.   And in your personal knowledge and experience, what does

17   that mean?

18   A.   It is a reference to Larry Hoover, and it's, as I testified

19   earlier, no different than asserting the truth as in, like, on

20   Dae Dae.

21   Q.   Thank you.

22        In 2016, 2017, did you often see these five defendants

23   together -- I'm sorry -- Mr. Quinn, Mr. Smith, Mr. Gardner,

24   Mr. Ruiz, and Mr. Culbreath?

25   A.   Yes.

1    Q.   Either all five together or in come combination?

2    A.   That's correct.

3    Q.   Was that in person or on social media?

4    A.   Both.

5    Q.   When you saw them together on social media, what would they

6    often be doing?

7    A.   They would be posing for photographs, flashing related

8    signs to 12th Street -- or sorry -- Savage Life.

9    Q.   Is the Savage Life hand sign similar to the 12th Street?

10   A.   Yes.

11   Q.   And would they occasionally be flashing another hand sign?

12   A.   Yes.

13   Q.   Which one?

14   A.   They would flash the Gangster Disciple hand sign.

15   Q.   In addition to flashing the hand sign, was there other

16   things you saw them do that would -- do or post, I should say,

17   referring to their Savage Life affiliation?

18   A.   They would post things like DDG, SLB, 1200.

19        MS. SCHNEIDER:  If we could pull up and display 702,

20   please?

21        THE COURT:  Yes.

22   BY MS. SCHNEIDER:

23   Q.   This is from Mr. Culbreath's account.  What is -- what date

24   did he post this?

25   A.   He posted it on January 6, 2017.

1    Q.   Was it January 16th?

2    A.   Oh, sorry.  I was looking at the date above.  Sorry.  Yes,

3    January 16, 2017.

4    Q.   And what message or status did he post with it?

5    A.   The status says:  *Blood.*

6           MS. SCHNEIDER:  Can we scroll down to the next page,

7    please.

8    BY MS. SCHNEIDER:

9    Q.   And what do we see here in the photo?

10   A.   We see a picture of -- from left as you're facing it to

11   right, in the red T-shirt is Olajuwan Culbreath.  In the

12   camouflage mask and the black coat is Dimetri Smith, and in the

13   dark-colored T-shirt or black T-shirt holding up the bottle of

14   liquor and gold necklace is Darion Gardner.  And then on the

15   far last photo is -- or the last person in the photo is Austin

16   Ruiz.  In that photo Darion Gardner is holding up the GDD hand

17   sign.

18   Q.   When you said you weren't good at demonstrating it, is that

19   the GDD hand sign?

20   A.   Yes.

21          MS. SCHNEIDER:  Thank you.

22          May we please display 706?

23          THE COURT:  Yes.

24   BY MS. SCHNEIDER:

25   Q.   This is again from Mr. Culbreath's account.

1    What is the status text here?

2  A.   The status text was posted on January 16, 2017, and it is:

3  *Gang shit out here with bro.*

4  Q.   And if we can scroll down to the photo.

5    Can you describe the photo?

6  A.   Yes.  It is a picture of Olajuwan Culbreath in the red

7  T-shirt and Darion Gardner in the dark-colored shirt, and

8  Culbreath is displaying the Gangster Disciple hand sign.

9    MS. SCHNEIDER:  Thank you.

10    May we display 712?

11    THE COURT:  Yes.

12  BY MS. SCHNEIDER:

13  Q.   What do we see in 712?

14  A.   We see a photograph of Najawaun Quinn in the blue jersey

15  and Olajuwan Culbreath in the red jersey.  Culbreath and Quinn

16  are displaying the GD hand sign.

17    MS. SCHNEIDER:  Thank you.

18    May we please display 715?

19    THE COURT:  Yes.

20  BY MS. SCHNEIDER:

21  Q.   This is from Mr. Gardner's account.  When was this posted?

22  A.   It was posted on February 10, 2017.

23  Q.   And what was the status?

24  A.   *RIP, little Dae Dae.  Happy birthday, little bro.*

25  Q.   Do you know when Damien Howard's birthday was?

```
 1   A.  I do not.

 2   Q.  You don't recall?

 3   A.  No, I don't.

 4         MS. SCHNEIDER:  Thank you.

 5         Can you scroll down to the second page?

 6   BY MS. SCHNEIDER:

 7   Q.  What does this image depict?

 8   A.  It is a picture of Damenica Bragg and Darion Gardner, and

 9   Gardner is displaying the Gangster Disciple hand sign.

10   Q.  Can you please spell Damenica?

11   A.  Yes.  It's D-a-m-e-n-i-c-a, and then Bragg is two g's.

12         MS. SCHNEIDER:  Thank you.

13         May we please display 716?

14         THE COURT:  Yes.

15         MS. SCHNEIDER:  Can you scroll down, please, a little

16   bit?

17         Good.

18   BY MS. SCHNEIDER:

19   Q.  When was that posted?  This is also from Mr. Gardner's

20   account.

21   A.  March 25, 2017.

22   Q.  And what was the content of the post?

23   A.  It says:  *Fuck you if you ain't gang, hashtag DDG.*

24   Q.  Is that an example of one of the hashtags you were

25   referring to?
```

1    A.   Yes.

2             MS. SCHNEIDER:   Thank you.

3             May we please display 720?

4             THE COURT:   Yes.

5    BY MS. SCHNEIDER:

6    Q.   What are we seeing in this photo?

7    A.   This is a photograph of -- in the gray and black sweatshirt

8    with the White Sox hat on is DeMarco Gray, also known as Deeg.

9    In the center -- in the black sweatshirt and black stocking cap

10   in the center of the photo is Darion Gardner.   On the

11   right-hand side in the Nike sweatshirt and stocking cap is

12   Austin Ruiz.

13            DeMarco Gray is displaying the Savage Life hand sign

14   while Gardner is throwing up the Gangster Disciple hand sign.

15   Q.   So this is an example of the crossover of Savage Life and

16   the Gangster Disciples?

17   A.   Correct.

18   Q.   Who is DeMarco Gray or Deeg, D-e-e-g?

19   A.   A Savage Life associate.

20            MS. SCHNEIDER:   Thank you.

21            May we please display 721?

22            THE COURT:   Yes.   I would ask for both counsel and the

23   witness to speak more slowly.

24            MS. SCHNEIDER:   Thank you.

25

```
 1   BY MS. SCHNEIDER:
 2   Q.  These are all still from Mr. Gardner's account.
 3       What are we seeing in this photo?
 4   A.  In this photo, starting on your left, if you're facing the
 5   photo, is Dimetri Smith in all black.  In the red sweatshirt is
 6   Trayvon.  In the white T-shirt with the -- I think a green
 7   jacket or shirt is Austin Ruiz.  And then in the gray shirt or
 8   jacket is Darion Gardner.
 9   Q.  And what is Trayvon Oliver doing?
10   A.  With his right hand he is displaying the Savage Life hand
11   sign.
12   Q.  And what is Mr. Ruiz doing?
13   A.  He is throwing up the Gangster Disciple hand sign.
14           MS. SCHNEIDER:  Thank you.
15           Can you scroll all the way down, please.
16           Thank you.
17           Can we please display 721?
18           THE COURT:  Yes.
19           MS. SCHNEIDER:  I mean, this is 722.
20           THE COURT:  Yes.
21   BY MS. SCHNEIDER:
22   Q.  Detective Butt, can you please describe this photo?
23   A.  This is a photo of -- from -- as you're facing left to
24   right is -- in the all black Chicago Bulls T-shirt is Darion
25   Gardner.  In the middle in the red Bulls hat and white T-shirt
```

1   is Austin Ruiz.  And then on the far right in the black shirt

2   and ball cap is Frederick Bateman.

3   Q.  What is Darion Gardner doing with his hand?

4   A.  He is holding up the Savage Life gang sign.

5   Q.  Actually, what are all of them doing?

6   A.  Holding up the Savage Life gang sign.

7   Q.  Who is Frederick Bateman?

8   A.  An associate of Savage Life.

9        MS. SCHNEIDER:  Can we please display 725?

10       THE COURT:  Yes.

11  BY MS. SCHNEIDER:

12  Q.  On the top message here, when was that posted?

13  A.  It was posted on November 20, 2016.

14  Q.  And what was the content?

15  A.  It is:  *Savage Life got the clout, been had that shit,*

16  *hashtag riplildaedae, hashtag freemybrothers.*

17  Q.  Is that last hashtag an example of the freeing the

18  incarcerated members?

19  A.  Yes.

20  Q.  What is -- and then we have here this next one.  When is

21  that posted?

22  A.  November 18, 2016.

23  Q.  And what is the content?

24  A.  It says:  *Bitch, I'm bar none on folks'nem, hashtag*

25  *RipLilDaeDae.*

BUTT - DIRECT

1    Q.  Can we scroll down, please?

2            What is this one?

3    A.  Posted on November 15, 2016, it says:  *Aye, Kaylo said he*

4    *need some numbers.*

5    Q.  Do you know who Kaylo refers to?

6    A.  I do.

7    Q.  Who is Kaylo?

8    A.  Kaylo Roelandt.

9    Q.  And who is Kaylo Roelandt?

10   A.  Savage Life member.

11          MS. SCHNEIDER:  Thank you.

12          Can we please display 726?

13          THE COURT:  Yes.

14   BY MS. SCHNEIDER:

15   Q.  When was this one posted that I'm marking, kind of the

16   third one down?

17   A.  December 10, 2016.

18   Q.  And what does it say?

19   A.  *OSO to my plug.  I'm,* and then hashtag RipLilDaeDae.

20   Q.  So, again, this was an example of where there were some

21   emojis missing?

22   A.  That's correct.

23          MS. SCHNEIDER:  Can we scroll down, please?

24   BY MS. SCHNEIDER:

25   Q.  And right here it looks like there was a story.  When was

1    that posted?

2    A.   December 14, 2016.

3    Q.   And he indicated he was with who?

4    A.   He is with In Dae Dae We Trust and Big Unk Deeg Gray.

5    Q.   Is that last one the Deeg Gray that we have already spoken

6    about?

7    A.   That is DeMarco Gray.

8    Q.   Did you determine whose account was In Dae Dae We Trust?

9    A.   Yes.

10   Q.   Whose account was that?

11   A.   That account was associated with Austin Ruiz.

12   Q.   What was the message on that story?

13   A.   The message was:  *In Dae Dae We Trust, hashtag ball in*

14   *paradise, little Dae Dae or Bip, little Dae Dae.*

15           MS. SCHNEIDER:  Thank you.

16           Can we please display 727?

17           THE COURT:  Yes.

18   BY MS. SCHNEIDER:

19   Q.   What does the top message -- when was that posted?

20   A.   November 24, 2016.

21   Q.   What does it say?

22   A.   *Who up with a Savage?*

23   Q.   And then some emojis; is that right?

24   A.   That's correct.

25   Q.   And what about this one, I think it's the fifth?

1    A.   November 26, 2016, *On folks'nem fuck all that talking turn*

2    *up, hashtag RipLilDaeDae.*

3            MS. SCHNEIDER:  Thank you.

4            Can we do 728?

5            THE COURT:  Yes.

6    BY MS. SCHNEIDER:

7    Q.   Detective Butt, what is this from Mr. Grandberry's account?

8    A.   So this would be a message string with messages exchanged

9    between the account of Gardner and the account identified as

10   Paige Johnson.

11           MS. SCHNEIDER:  Thank you.

12           Can we scroll all the way down to the bottom, please,

13   of this first page.

14   BY MS. SCHNEIDER:

15   Q.   And what did Mr. Gardner say here on December 4, 2016?

16   A.   He said:  *Have you heard of Savage Life?*

17   Q.   Thank you.

18       And we'll see what Ms. Johnson said on the next page.

19       And what was her response?

20   A.   She responded:  *Yeah.*

21   Q.   And what did Mr. Gardner say in response to that?

22   A.   *I'm one of the five that started Savage Life.  MFS call me*

23   *little man.  I get money and I'm a B.O.N.*

24           MS. SCHNEIDER:  Thank you.

25           Can we do 731?

```
 1            THE COURT:  Yes.
 2   BY MS. SCHNEIDER:
 3   Q.  Detective Butt, what is this image?
 4   A.  This is an image of -- starting on the left-hand side in
 5   the white T-shirt is Darion Gardner.  In the center in the
 6   black T-shirt which says True Religion on the front is Brian
 7   Brand.  And then in the white -- or black and white on the
 8   sleeves shirt is Dimetri Smith.
 9   Q.  And what is Mr. Gardner doing with his hand?
10   A.  He is giving the GD hand sign.
11            MS. SCHNEIDER:  Can we scroll down?
12   BY MS. SCHNEIDER:
13   Q.  What does the image say and where are they?
14   A.  They are in a cemetery, and it says:  *Rip folks'nem, free*
15   *all the guys.*
16            MS. SCHNEIDER:  Thank you.  Can we scroll down?
17            Thank you.
18            Can we go to 733, please?
19            THE COURT:  Yes.
20            MS. SCHNEIDER:  Can we scroll down, please?
21            I think we covered that.  Thank you.
22            Can we do 745?
23            THE COURT:  Yes.
24            MS. SCHNEIDER:  So this is from Mr. Quinn's account.
25            Can we go to the photo, please?
```

1    BY MS. SCHNEIDER:

2    Q.   Can you describe this photo?

3    A.   Yes.  It is a photo containing Olajuwan Culbreath and

4    Najawaun Quinn and a female.  In the photo Quinn, who is in the

5    St. Louis hat, is displaying the Gangster Disciple hand sign

6    and so is Culbreath, who has the Nike shirt on.

7            MS. SCHNEIDER:  Thank you.

8            May we display 746?

9            THE COURT:  Yes.

10   BY MS. SCHNEIDER:

11   Q.   And what do we see in this picture?

12   A.   It is Najawaun Quinn in a Blue Jays jersey displaying the

13   Gangster Disciple hand sign, and then he has a button on his

14   shirt.

15   Q.   Okay.  And the next picture?

16        Pretty similar?

17   A.   Yes.

18   Q.   The next one?

19   A.   Again, this is him seated displaying that Gangster Disciple

20   hand sign.

21           MS. SCHNEIDER:  Thank you.

22           May we do 747?

23           THE COURT:  Yes.

24   BY MS. SCHNEIDER:

25   Q.   What is in this picture?

1    A.  This is a photograph on -- in the black Nike hooded

2    sweatshirt and camouflage mask is Dimetri Smith.  In the red

3    sweatshirt is Darion Gardner.  In the photograph Smith is

4    displaying the Gangster Disciple hand sign.

5            MS. SCHNEIDER:  Thank you.

6            Can we display 755?

7            THE COURT:  Yes.

8    BY MS. SCHNEIDER:

9    Q.  Detective Butt, what do we have in this picture?

10   A.  It is a picture of Najawaun Quinn in the white and black

11   hooded sweatshirt and Frederick Bateman who is in all black.

12   Q.  The same Frederick Bateman we've already talked about?

13   A.  Yes.

14           MS. SCHNEIDER:  Can we scroll down, please?

15   BY MS. SCHNEIDER:

16   Q.  What is the title of this photo?

17   A.  *I just want to tell my mf'ing brother happy G day.  Hashtag*

18   *DaeDaeGang.*

19           MS. SCHNEIDER:  Thank you.

20           Can we do 758, please?

21           THE COURT:  Yes.

22   BY MS. SCHNEIDER:

23   Q.  Detective Butt, what do we have in this picture?

24   A.  We have a pair of red sandals that say Savage on them and

25   then just an amount of U.S. currency.

1   Q.  It appears to be a somewhat large amount?

2   A.  Yes.

3           MS. SCHNEIDER:  Can we scroll down, please?

4   BY MS. SCHNEIDER:

5   Q.  What was the status there that was posted on March 23,

6   2017?

7   A.  *On Larry.*

8           MS. SCHNEIDER:  Thank you.

9           Can we do 760?

10          We'll wait until it gets a little bigger.

11  BY MS. SCHNEIDER:

12  Q.  What is the text related to this photo?

13  A.  It says:  *Ain't shit changed on chief BIH, ball in heaven,*

14  *Fatty.*

15          MS. SCHNEIDER:  And please scroll down.

16  BY MS. SCHNEIDER:

17  Q.  What do we have in this image?

18  A.  So it is a photo montage of Demetrius Allen who was

19  murdered, and Najawaun Quinn is also in the photos, the photo

20  montage, and then it is tagged with Demetrius' nickname, which

21  was King Monster.

22          MS. SCHNEIDER:  Can we scroll down a little bit,

23  please?

24  BY MS. SCHNEIDER:

25  Q.  Do we see Najawaun Quinn right there?

1    A.   Yes.

2    Q.   And by right there, I mean there (indicating).

3    A.   That's correct.

4           THE COURT:  Is that a circle you made on the lower

5    right-hand corner of the photograph?

6           MS. SCHNEIDER:  It is.

7           Can we do 763, please?

8           THE COURT:  Yes.

9           MS. SCHNEIDER:  And scroll up, please.

10   BY MS. SCHNEIDER:

11   Q.   What was the status posted regarding this image?

12   A.   On February 19, 2017, it was posted, and it says:

13   *Broskieee.*

14          MS. SCHNEIDER:  And then can we see the image, please?

15   BY MS. SCHNEIDER:

16   Q.   Who is in that image?

17   A.   Austin Ruiz.

18   Q.   And what is he doing?

19   A.   He is displaying the Gangster Disciple hand sign.

20          MS. SCHNEIDER:  Thank you.

21          May we publish 766?

22          THE COURT:  Yes.

23   BY MS. SCHNEIDER:

24   Q.   And what was the -- before we look at the picture, what is

25   the text associated with this picture?

1   A.   *Tb but blood couldn't make us closer.*

2          MS. SCHNEIDER:   Thank you.

3          Could we see the picture, please?

4   BY MS. SCHNEIDER:

5   Q.   Detective Butt, who is in this picture?

6   A.   On the left with the dreads, sticking his hand out towards

7   the camera is Kaleet (phonetic) Brown, and then in the USA with

8   the C hat on is Najawaun Quinn.

9          MS. SCHNEIDER:   Thank you.

10         Can we scroll down?

11         Thank you.

12         May we publish 767?

13         THE COURT:   Yes.

14         MS. SCHNEIDER:   The second page, please.

15  BY MS. SCHNEIDER:

16  Q.   Detective Butt, what is in this image?

17  A.   This is a photograph.   Again, in the white sweatshirt with

18  the black sleeves and the Sox hat is Demetrius Allen.   And then

19  on the right in the gray Nike sweatshirt is Najawaun Quinn, and

20  he is displaying the Gangster Disciple hand sign.

21         MS. SCHNEIDER:   Thank you.

22         May we please display 774?

23         THE COURT:   Yes.

24  BY MS. SCHNEIDER:

25  Q.   Detective Butt, what are we seeing in this image from --

1   this is now from Mr. Smith's account.

2   A.   This is a photograph of Mr. Smith sitting down covered in,

3   it looks like, $20 bills and other U.S. currency, and then with

4   his right hand, he is displaying the Gangster Disciple hand

5   sign.

6           MS. SCHNEIDER:   Thank you.

7           May we display 775?

8           THE COURT:   Yes.

9   BY MS. SCHNEIDER:

10  Q.   Detective Butt, what do we have here?

11  A.   This is a photograph containing Savage Life members and

12  associates.   In the gray sweatshirt with the hood up is

13  Frederick Bateman.   Behind him in the white shirt is Darion

14  Gardner.   In the middle is Trayvon Oliver.   In the black Nike

15  sweatshirt is Olajuwan Culbreath.   I can't quite see who the

16  one in the jean jacket is.   In the suit is Damarkus Echols.

17  And then at the bottom of the photo in the light-colored sweat

18  suit is Dimetri Smith.

19  Q.   And what is Mr. Smith doing with his hands?

20  A.   He is displaying the Gangster Disciple hand sign.

21  Q.   And who is Damarkus Echols?

22  A.   Again, another Savage Life associate.

23          MS. SCHNEIDER:   Thank you.

24          Actually, can you scroll down to the second page,

25  please?

1    BY MS. SCHNEIDER:

2    Q.   What was the title that Mr. Smith put on that image?

3    A.   The title is "Dem Dae Dae Bois."

4    Q.   And when was that?

5    A.   It was uploaded on January 4, 2017.

6            MS. SCHNEIDER:   Thank you.

7            May we display 782?

8            THE COURT:   Yes.

9    BY MS. SCHNEIDER:

10   Q.   What are we seeing in this image?

11   A.   It is a picture of Austin Ruiz, who is in the black and

12   white.  In the Nike sweatshirt in the middle is Dimetri Smith.

13   And on the right is Trayvon Oliver.

14   Q.   What are Mr. Smith and Mr. Ruiz doing?

15   A.   They are holding up the Savage Life hand sign.

16   Q.   Thank you.

17       Have you seen posts or photos that simply reflect their

18   association of being together?

19   A.   Yes.

20           MS. SCHNEIDER:   Thank you.

21           May we put up Exhibit 713?

22           THE COURT:   Yes.

23   BY MS. SCHNEIDER:

24   Q.   Detective Butt, can you describe this photo?

25   A.   Yes.  So it is a photo of -- kneeling is Dimetri Smith with

```
 1   the hat on backwards.  Then on the left in the Bulls jersey is
 2   Frederick Bateman.  In the middle is Austin Ruiz.  And on the
 3   right is Olajuwan Culbreath.
 4            MS. SCHNEIDER:  Thank you.
 5            May we display 719?
 6            THE COURT:  Yes.
 7   BY MS. SCHNEIDER:
 8   Q.  What are we seeing in this image?
 9   A.  This is a photo from left to right of -- as you're facing
10   it, in the Bulls stocking cap and the black sweatshirt is
11   DeMarco Gray.  In the center is Austin Ruiz.  And then on the
12   right is -- in the Pelle Pelle jacket is Darion Gardner.
13   Q.  I think you said Pelle Pelle?
14   A.  Yes.
15   Q.  Is that P-e-l-l-e P-e-l-l-e?
16   A.  Yes.
17            MS. SCHNEIDER:  Thank you.
18            Can we please display 730?
19            THE COURT:  Yes.
20   BY MS. SCHNEIDER:
21   Q.  Who is in this image?
22   A.  In the gray Nike sweatshirt is Darion Gardner.  In the
23   black and white track suit is Dimetri Smith.
24            MS. SCHNEIDER:  Can we scroll down, please, to the
25   second page?
```

1  BY MS. SCHNEIDER:

2  Q.  Is this user -- the third comment, what was the text there?

3  A.  *Keep that shit up block work.*

4  Q.  So someone is referring to him as Block?

5  A.  That's correct.

6  Q.  Do you know who is associated with the Facebook account

7  Fatty Smith Wesson?

8  A.  Yes.

9  Q.  Who?

10  A.  Jaterius Davis.

11  Q.  And who's Jaterius Davis?

12  A.  Savage Life member.

13       MS. SCHNEIDER:  Thank you.

14       May we display 736?

15       THE COURT:  Yes.

16  BY MS. SCHNEIDER:

17  Q.  When was this posted?

18  A.  It was posted on February 5, 2017.

19  Q.  And this is from Mr. Quinn's account.  What was the status?

20  A.  It says:  *My day one* and the N word.

21       MS. SCHNEIDER:  Can we scroll down to the photo?

22  BY MS. SCHNEIDER:

23  Q.  And what do we have here in the photo?

24  A.  It's a picture of Najawaun Quinn and Dimetri Smith.  Both

25  of them have an amount of U.S. currency.

1          MS. SCHNEIDER:  Thank you.

2          Can we show 735?

3          THE COURT:  Yes.

4          MS. SCHNEIDER:  Can we scroll down, please?

5          Scroll down.

6   BY MS. SCHNEIDER:

7   Q.  Who is in this -- who are in these images?

8   A.  In the black coat is Najawaun Quinn.  In the red sweatshirt

9   is Darion Gardner.

10          MS. SCHNEIDER:  And thank you.

11          Can we scroll down?

12   BY MS. SCHNEIDER:

13   Q.  And what did Mr. Gardner have to say?

14   A.  He said:  *10 year plus N word on Folks'Nem.*

15   Q.  Thank you.

16      Have you seen evidence of Savage Life members' support of

17   incarcerated members on social media?

18   A.  Yes.

19   Q.  Like what?

20   A.  We will see pictures of a member with an incarcerated

21   member tagging on those photos, hashtag tags like, Free this

22   member or free that member with their name specifically, free

23   the guys.

24          MS. SCHNEIDER:  Can we put up 704, please?

25          THE COURT:  Yes.

```
 1          MS. SCHNEIDER:  Can you scroll down, please?

 2          Stop.  Stop.  Sorry.

 3    BY MS. SCHNEIDER:

 4    Q.  On this last post on page 1, this is from Mr. Culbreath's

 5    account.  What is -- on December 13, 2016, what does that say?

 6    A.  It says:  *Free bro out dat jam.*

 7    Q.  And can you describe the photo?

 8    A.  It says:  *Bang bros, free bro out dat jam.*  On the left is

 9    Olajuwan Culbreath in the T-shirt.  On the right is Dmarithe

10    Culbreath who is incarcerated.

11    Q.  Can you spell that?

12    A.  Yes, I can.  It's D-m-a-r-i-t-h-e.

13          MS. SCHNEIDER:   Thank you.

14          Can we display 705?

15          THE COURT:  Yes.

16    BY MS. SCHNEIDER:

17    Q.  And on this December 16, 2016, what did Mr. Culbreath post?

18    A.  It says:  *Free my N word Kane out dat jam.*

19    Q.  Do you know who he is referring to?

20    A.  Yes.

21    Q.  Who?

22    A.  Kanie Bragg.

23    Q.  K-a-n-i-e?

24    A.  Yes.

25    Q.  Who is Kanie Bragg?
```

```
 1   A.   Savage Life member.
 2            MS. SCHNEIDER:  Can we display 741?
 3            THE COURT:  Yes.
 4            MS. SCHNEIDER:  Scroll down.
 5            Thank you.
 6   BY MS. SCHNEIDER:
 7   Q.   On the fifth from the bottom, October 2, 2016, this is from
 8   Mr. Quinn's account.  What does that say?
 9   A.   Free Dar and Bird real hard hittas a be home.
10   Q.   Do you know who that refers to?
11   A.   I do.
12   Q.   Can you tell us?
13   A.   Dar is Darvill Bragg, and Bird is Kevonte Kirk.
14   Q.   K-e-v-o-n-t-e?
15   A.   Yes.
16   Q.   Who are they?
17   A.   Both of them are Savage Life members.
18            MS. SCHNEIDER:  May we display 744?
19            THE COURT:  Yes.
20   BY MS. SCHNEIDER:
21   Q.   Detective Butt, who is in this picture?
22   A.   In the red and horizontal striped sweatshirt is Demetrius
23   Allen, and then in the white AKOO T-shirt is Najawaun Quinn.
24            MS. SCHNEIDER:  Thank you.
25            Scroll down.
```

1   BY MS. SCHNEIDER:

2   Q.   What is the title of this picture?

3   A.   It says:   *#Free Blood.*

4   Q.   And then the comments are what?

5   A.   *Free my boi, free fat boi, and free bro.*

6   Q.   Thank you.

7        Did you find evidence on Facebook of Savage Life members

8   financially supporting incarcerated members?

9   A.   Yes.

10           MS. SCHNEIDER:   May we display Exhibit 756?

11           THE COURT:   Yes.

12           MS. SCHNEIDER:   Please scroll down.

13   BY MS. SCHNEIDER:

14   Q.   So on the bottom here, this is, like, a message thread; is

15   that right?

16   A.   That's correct.

17   Q.   Who are the participants?

18   A.   An account identified as Stephanie St. Clair; an account --

19   Mr. Smith's account, Metri O Block Meech; Mr. Quinn's account,

20   Wayne Perry; Mr. Olajuwan Culbreath's account, Wan Bang Bang

21   Culbreath; and then an account for Darion Gardner, Rambo

22   Ofdatgang Gardner.

23           MS. SCHNEIDER:   Thank you.

24           May we please scroll to the second page?

25           THE COURT:   We can.

1          Recall, Detective Butt, that you know these names

2    well.  My court reporter is an amazing court reporter, but this

3    is very challenging.  So if you could please recall the need to

4    speak slowly.

5          THE WITNESS:  Yes, ma'am.

6    BY MS. SCHNEIDER:

7    Q.  And what is in this image?

8    A.  It is a picture of an account linked to, it appears, Jermil

9    E. Miller.  But the text says:  *Wassup?  This Kaylo.  Wassup*

10   *with the guys?  Let them N word know I need some,* dollar signs

11   for money.  *A N word fucked up and just ain't gave up. you can*

12   *text only on this number.  Hit me back and let me know what's*

13   *up.*

14   Q.  And how do you know or believe that that is a text message

15   from -- sorry.  Strike that.

16         Who do you believe this text message is from?

17   A.  Kaylo Roelandt.

18   Q.  A Savage Life member?

19   A.  Correct.

20   Q.  And why do you -- why would you believe that that is a text

21   message of when Mr. Roelandt was incarcerated?

22   A.  It appears to come from, like, a text account assigned to

23   an inmate.

24   Q.  Thank you.

25         You heard TFO Blackman's testimony about other common

1    traits of neighborhood gangs; is that right?

2    A.   That's correct.

3    Q.   And did you locate evidence in these Facebook accounts that

4    showed that some -- that members of Savage Life or that Savage

5    Life also possessed those traits?

6    A.   Yes.

7    Q.   Like what?

8              MR. BREEDLOVE:   Objection, Your Honor.

9              Objection, Your Honor.   That's improper bolstering.

10             THE COURT:   That objection is overruled.

11   BY MS. SCHNEIDER:

12   Q.   Like what?

13   A.   Can you ask the question again?

14             THE COURT:   And you can frame your question more

15   narrowly.

16             MS. SCHNEIDER:   Sure.

17   BY MS. SCHNEIDER:

18   Q.   You heard TFO Blackman testify yesterday and today that

19   neighborhood gangs, for instance, do not cooperate with police?

20   A.   That's correct.

21   Q.   Did you find evidence in these Facebook accounts regarding

22   Savage Life members also possessing that trait?

23   A.   Yes.

24   Q.   Did you hear TFO Blackman testify about other violent acts

25   such as robbery?

1    A.  Yes.

2    Q.  Did you find evidence that -- from these Facebook accounts

3    that Savage Life also engages in some other violent acts, not

4    just shootings?

5    A.  Yes.

6    Q.  Did you find evidence of firearm possessions?

7    A.  Yes.

8          MS. SCHNEIDER:  All right.  Thank you.

9          May we please display Exhibit 701?

10         THE COURT:  Yes.

11   BY MS. SCHNEIDER:

12   Q.  This is coming from Mr. Culbreath's account.

13       Detective Butt, what is the status associated with this

14   image?

15   A.  It says:  *Y'all N word suckas, free my mf brothers.*

16   *Hashtag Manny, hashtag Dar, hashtag Kanie, hashtag Skeet.*

17   Q.  Okay.  So let's go --

18         THE COURT:  One things that also helps is if after a

19   string of testimony like that you pause a moment before asking

20   your next question.  That also benefits the court reporter.

21         MS. SCHNEIDER:  Thank you.

22   BY MS. SCHNEIDER:

23   Q.  Let's go through those.

24       Do you know who Manny refers to?

25   A.  Yes.

1    Q.   Who?

2    A.   Again, that's Dmarithe Culbreath.

3    Q.   And we talked about Dar and Kanie.  Who does Skeet refer

4    to?

5    A.   DeLandres Thompson.

6    Q.   And who is DeLandres Thompson?

7    A.   DeLandres is deceased.  And he was a 12th Street member.

8            MS. SCHNEIDER:  And can we scroll down, please?

9    BY MS. SCHNEIDER:

10   Q.   What does this picture that Mr. Culbreath posted, what does

11   it say?

12   A.   It says:  *If my brother don't like you... I don't either.*

13   It says then 100 and has a fist up emoji after.

14   Q.   And is it -- would it be fair to characterize this as,

15   like, a meme?

16   A.   Yes.

17           MS. SCHNEIDER:  Thank you.

18           May we please display 761?

19           THE COURT:  Yes.

20           MS. SCHNEIDER:  Please scroll all the way down,

21   please.

22   BY MS. SCHNEIDER:

23   Q.   This is coming from Mr. Quinn's account.  The second to

24   last status there, when was that posted?

25   A.   January 30, 2017.

 1   Q.  And what did he post?

 2   A.  *He ain't robbin no mo.  We getting straight to it*, then

 3   hashtag DDG.

 4         MS. SCHNEIDER:  Thank you.

 5         And can we display 783?

 6         THE COURT:  Yes.

 7         THE WITNESS:  Can we scroll down, please?

 8         MS. SCHNEIDER:  Oh, I'm sorry.  Okay.  Go up.  Sorry.

 9   Go to the first page, but -- okay.  There.  Okay.

10         Thank you.

11   BY MS. SCHNEIDER:

12   Q.  On this last post on the first page from November 21,

13   2016 -- this is coming from Mr. Smith's account -- what did he

14   post?

15   A.  *Lma if you ain't ever took the stand on a N word before.*

16   Q.  So do you know what it means to take the stand on someone?

17   A.  Yes.

18   Q.  What?

19   A.  Tell on them, testify against them.

20         MS. SCHNEIDER:  And now can we go to the next page?

21   BY MS. SCHNEIDER:

22   Q.  And there were some responses; is that fair?

23   A.  That's correct.

24   Q.  Okay.  And what did user Charles Singleton -- do you know

25   that person?

BUTT - DIRECT

1  A.  I do.

2  Q.  Who is that?

3  A.  He would be an older 12th Street member.

4  Q.  And what was his response?

5  A.  *Hunnad....*

6  Q.  And what was Mr. Smith's response?

7  A.  *Rs.*

8  Q.  Are you familiar with sort of the Internet or text speak?

9  A.  Yes.

10  Q.  And what is Rs?

11  A.  Real shit.

12  Q.  And what did Mr. Gardner respond?

13  A.  He responded:  *Onna G, it's a couple hot N word that liked*

14  *dis stat.*

15  Q.  Do you know what "hot N word" -- what that refers to?

16  A.  Hot means -- it has multiple meanings, but people that have

17  the attention of law enforcement.

18  Q.  And then what is Mr. Smith's response?

19  A.  It says:  *Say names bro, laughing but serious, LBS.*

20  Q.  LBS means what?

21  A.  Laughing but serious.

22  Q.  Thank you.

23          MS. SCHNEIDER:  Can we go to 727, please?

24          THE COURT:  Yes.

25

1  BY MS. SCHNEIDER:

2  Q.  The second message there from November 24, 2016 -- this is

3  coming from Mr. Gardner's account -- what did he write?

4  A.  *All out that window with that stick.  Yea, we gonna fuck*

5  *over you Savage Life Dae Dae Gang.*

6  Q.  And did you hear Mr. -- or I'm sorry -- TFO Blackman

7  testify that stick meant firearm?

8  A.  Yes.

9          MS. SCHNEIDER:  Thank you.

10          May we display Exhibit 770?

11          THE COURT:  Yes.

12  BY MS. SCHNEIDER:

13  Q.  And this is coming from Mr. Smith's account.  What was his

14  post?

15  A.  *I stay with the 38.  I won't let nobody take me, and IK* --

16  which means I know -- *you N word plotting so I don't smile up*

17  *in your faces.*

18  Q.  Do you know what a 38 refers to?

19  A.  Typically that refers to a revolver.

20  Q.  Finally, Detective Butt, did you locate evidence in these

21  Facebook accounts of drug trafficking?

22  A.  Yes.

23  Q.  Can you describe that?

24  A.  We see mentions of drug transactions, the sale of

25  marijuana, the sale of lean.

```
 1   Q.  Were there -- sorry.  Strike that.
 2           MS. SCHNEIDER:  May we display 704?
 3           THE COURT:  Yes.
 4   BY MS. SCHNEIDER:
 5   Q.  What is -- this is from Mr. Culbreath's account.  What is
 6   the top status?
 7   A.  It says: GAS, in all caps, so loud I can't even you.
 8   Q.  And did you hear TFO Blackman testify yesterday that gas
 9   referred to marijuana?
10   A.  Yes.
11   Q.  And what did he say loud referred to?
12   A.  Higher-grade marijuana.
13           MS. SCHNEIDER:  Can you scroll down?
14           Thank you.
15           May we please put up 707?
16           THE COURT:  Yes.
17           May I inquire as to the length of time you anticipate
18   continuing this line of inquiry with Detective Butt?
19           MS. SCHNEIDER:  A little bit.
20           THE COURT:  That's a vague response.  Nonresponsive.
21           MS. SCHNEIDER:  Objection?
22           THE COURT:  Objection.  Nonresponsive.  Sustained.
23           Go ahead and rephrase your answer.
24           MS. SCHNEIDER:  Probably a good time to break for
25   lunch if that's what you're referring to.
```

1          THE COURT:  Thank you.

2          Members of the jury, we've been back on the record

3     since about 10:40.  It is just shy of noon.  We'll take our

4     noon lunch break.  We'll have about 30 minutes for lunch.  It

5     is -- I'll ask you to be back and ready to come into the

6     courtroom at 12:30, so a little more than 30 minutes.

7          Please continue to remember the admonition of the

8     Court.  You know that means don't text or talk about this case.

9     Anything that you've heard, anything you've seen during the

10    course of this trial is not a subject you can visit about with

11    your fellow jurors.  You can talk about anything else, and you

12    can communicate with your friends and family as needed, but

13    please continue to abide by the Court's expectations for not

14    communicating about this case.

15         Thank you.  We'll be in recess.

16         (Jury out at 11:57 a.m.)

17         THE COURT:  Thank you.  You may be seated.

18         We're outside the presence of the jury.

19         A couple things.  First, I appreciate the fact that

20    the Government, consistent with the Court's instruction, has

21    changed the names of the exhibits that are being shown.  It is

22    important that the exhibits and the exhibit list that is

23    provided to the jury similarly is changed.  I don't know that

24    that has occurred.

25         I would ask for the paralegal who is handling that to

1  work with Ms. Sands.  I don't think it's appropriate for the

2  Government to expect the Court to go in and change those items.

3  It's going to involve work from my staff regardless, because

4  all of the exhibits that have been admitted we're going to have

5  to go in and readmit them if they were renamed.  But I'd ask

6  for you to make sure that you attend to that.

7          We've had a lot of exhibits admitted.  It will be

8  important at the end of each day for the attorney to take

9  responsibility for looking at the list from Ms. Sands and to

10  check in the realtime that every exhibit you think was admitted

11  was admitted, any exhibit you think wasn't admitted was, in

12  fact, not admitted so that we keep short accounts of that.

13          Any questions about the Court's expectation in that

14  regard from the Government?

15          MS. SCHNEIDER:  No, Your Honor.

16          THE COURT:  Anything about that, Mr. Willett?

17          MR. WILLETT:  No, Your Honor.

18          THE COURT:  Mr. Breedlove?

19          MR. BREEDLOVE:  No, Your Honor.

20          THE COURT:  It would be helpful, I think, to provide

21  us with a list, if you have it, even if it's a screenshot of

22  all your exhibits, or however you've updated that, so that we

23  can see the renaming before you go to the trouble of reloading

24  all of those to determine if there are any issues that remain.

25          Do you understand?

1          MS. SCHNEIDER:  I do.  I just -- I worked on it again

2    last night and sent the new copy to our paralegal so that he

3    could compare, because I actually didn't keep track of which

4    one.  I was just focused on the name.  So I think he was

5    working -- hopefully working on that today, so I'll check with

6    him at lunch.

7          THE COURT:  Okay.  The next comment is reflection of

8    an objection that Mr. Breedlove made.  Detective Butt was in

9    the courtroom when the witness TFO Blackman testified.  So was

10   the jury.  So to ask Detective Butt if he heard what TFO

11   Blackman said is not helpful.  In fact, you can ask Detective

12   Butt about what was seen and what is in the exhibits and his

13   understanding of what those mean.  But in terms of asking him

14   to reflect back on what TFO Blackman said, you can do that in

15   closing should you choose, but at this point, that is not

16   helpful to the jury.

17         Do you understand the Court's instruction?

18         MS. SCHNEIDER:  Yes, yes.

19         THE COURT:  Mr. Breedlove, does that address your

20   concern?

21         MR. BREEDLOVE:  Yes.  Thank you, Your Honor.

22         THE COURT:  Last question I'll ask is about timing.

23         Where are you and where -- as compared to where you

24   expected to be?

25         MS. SCHNEIDER:  Behind is the short answer.  I knew it

1  would take a while to get through -- I didn't think it would

2  take as long to admit the exhibits.  I knew that it would take

3  a while to go through them.  I don't -- we're through most of

4  them, and then we just are going to admit the maps, which won't

5  take -- I don't know about any objections, so I can't speak for

6  that, but I don't anticipate it taking a long time to admit

7  maps.  And then we'll be on to the cross-examination and then

8  the other witnesses.

9          So maybe Mr. Ripley can speak more to that because I

10 know he wanted to talk about it.

11         THE COURT:  Before you do that, there was one set of

12 Facebook profiles that were not admitted.

13         Are you intending to still do that with Detective

14 Butt?

15         MS. SCHNEIDER:  I believe so.  I need the lunch hour

16 to look at that stuff in my office.

17         THE COURT:  Okay.  I just wanted to make sure my notes

18 were correct that that was still outstanding.

19         MS. SCHNEIDER:  Yes.

20         THE COURT:  Okay.  Mr. Ripley, Ms. Schneider indicated

21 you had something you wanted to bring to my attention?

22         MR. RIPLEY:  I just -- Your Honor, as you know, the

23 Government has and will continue to make our best efforts to

24 present the witnesses to the jury in the order in which we've

25 listed them.  The Court is also aware, however -- everyone

1    is -- that we have had some material witness warrants, and

2    we're dealing with some of the issues that underlie that,

3    challenges.  Sometimes if those challenges are resolved, it's

4    best to seek that testimony quick in time after they're

5    resolved.

6            This is me indicating to you and asking for a little

7    bit of latitude potentially this afternoon taking witnesses

8    that are maybe slightly out of order.  Specifically what I am

9    referring to is Ms. Thorpe.  It may be that she comes earlier

10   than listed or it may be that she comes later than listed.

11   And, again, this is not any sort of purposeful conduct on the

12   part of the Government.

13           THE COURT:  My understanding is that Ms. Thorpe is now

14   detained.

15           MR. RIPLEY:  She is.

16           THE COURT:  And that her detention is through the time

17   of her testimony.

18           MR. RIPLEY:  It is, yes.  And so that's an issue.

19   There may -- there may be similar issues as they come up, and

20   we're going to do our best to, at breaks, present these issues

21   to you.  I'm just -- and this is almost like a heads-up and a

22   seeking of a little bit of latitude.

23           Thank you, Your Honor.

24           THE COURT:  I appreciate that.

25           Mr. Willett, would you like to be heard about taking

1  witnesses out of order?

2          MR. WILLETT:  Not at this time.  If I or Mr. Quinn

3  have a problem, we'll bring it to the Court's attention, but

4  right now it's too fluid to comment upon.

5          THE COURT:  I note that yesterday, at the close of the

6  day, the Government indicated that they expected to get through

7  witness 10, Officer Hatfield, and Ms. Thorpe comes before that.

8  So taking her out of order today would not be a burden in terms

9  of someone you weren't expecting to hear from today from the

10  Court's perspective.

11          Mr. Breedlove, would you like to be heard?

12          MR. BREEDLOVE:  No.  Thank you, Your Honor.

13          THE COURT:  An individual being detained on a material

14  witness warrant is a significant burden on their liberty, and

15  the Court, as part of its interest in limiting incursions on

16  people's liberty generally, believes that any efforts to have

17  that time be shorter rather than longer is appropriate.

18          And so to the extent that there is not a burden on the

19  defense posed by taking witnesses out of order, in order to

20  secure their testimony in a timely way, I believe that would be

21  appropriate unless there's a specific objection based upon

22  prejudice to the defense of something that could be supported

23  in the law.

24          I appreciate the Government bringing the issue to my

25  attention.  We will pay attention to how the witnesses are

1    coming in.  I know that there were issues raised by Ms. Thorpe

2    as to timing in front of the magistrate judge, and I know that

3    the magistrate judge informed her that she's not in control of

4    the timing and that she will testify as she testifies.  But I

5    do think that it is appropriate, and I appreciate the

6    flexibility on the part of counsel to be able to get those

7    witnesses' testimony secured in the record in a timely way.

8            Anything else on behalf of the Government,

9    Ms. Schneider?

10           MS. SCHNEIDER:  No, Your Honor.

11           THE COURT:  Mr. Ripley?

12           MR. RIPLEY:  No, Your Honor.  Thank you.

13           THE COURT:  Mr. Willett, anything that you need to

14   bring to my attention?

15           MR. WILLETT:  Not at this time, Your Honor.

16           THE COURT:  Anything, Mr. Breedlove?

17           MR. BREEDLOVE:  Were any of the material witnesses,

18   just so that we know, were they provided attorneys that will

19   also be here as part of that like some of the others that we

20   have discussed?  Are we to expect pleading issues related to

21   them?  I just don't know what's happened with their office, so

22   I don't know --

23           THE COURT:  No.  I mean, to the extent that you're

24   unfamiliar, when someone fails to comply with a subpoena and a

25   material witness warrant is executed on them and the necessary

1   showings are made, they're detained.  As a matter of course,

2   they're appointed counsel.

3           MR. BREEDLOVE:  Right.

4           THE COURT:  I'm aware of no filings in regards to any

5   of those witnesses or those proceedings other than appearing in

6   front of a United States Magistrate Judge for an initial

7   appearance on the material witness warrant and being appointed

8   counsel.

9           I would assume that counsel will either be present or

10  available when they testify.

11          MR. BREEDLOVE:  That was -- that answered my question.

12  Thank you, Your Honor.

13          THE COURT:  Any other record in that regard from the

14  Government?

15          MS. SCHNEIDER:  No, Your Honor.

16          THE COURT:  I told -- it's 12:07 now.  I told the jury

17  12:30.  I'll ask you to also be ready at that time.

18          I wanted to ask.  I want to make sure that defense

19  counsel has space in the courthouse to wait.  The clerk's

20  office informed me that there has been some discussion in that

21  regard.

22          Do you have space in the courthouse that you're

23  comfortable with?

24          MR. WILLETT:  The Federal Public Defender's office in

25  Davenport are a gracious host, Your Honor.  We have their board

1    room.

2         THE COURT:  Thank you.  And that was what I had been

3    told.  Otherwise, we would be trying to find a conference room

4    from the court for you, but -- and, Mr. Breedlove, you have

5    that access as well?

6         MR. BREEDLOVE:  Yes.  Thank you, Your Honor.

7         THE COURT:  Wonderful.

8         Thank you.  We'll be in recess.

9         (Recess taken at 12:08 p.m. until 12:32 p.m.)

10         (In open court, with the defendants present, outside

11    the presence of the jury.)

12         THE COURT:  We're back on the record in the matter --

13    oh, you may be seated.  And we're back on the record in the

14    matter of the United States of America versus Defendants Quinn

15    and Smith, 3:21-cr-91.  We're outside the presence of the jury.

16         I have been informed that there are two new exhibits

17    provided, 717 and 732a.

18         Ms. Schneider, would you like to be heard in regard to

19    those?

20         MS. SCHNEIDER:  Yes, Your Honor.  I'm seeking to

21    replace the 717 that was currently in the book with this 717

22    which is from the actual Facebook records and is not a

23    screenshot.  It is part of the records that came from Facebook

24    that have already been admitted that contains the same exact

25    information that was in the previous purported or offered 717.

1          THE COURT:  And you don't intend to offer the

2     previously identified 717 in any way?  You're only -- you're

3     replacing it with 717 as identified here?

4          MS. SCHNEIDER:  That is correct.

5          THE COURT:  Okay.  And next?

6          MS. SCHNEIDER:  732a, I am seeking to supplement the

7     previously offered 732 because on the bottom -- well, where

8     that post falls, where it says that Rambo Ofdatgang was with

9     Wayne Perry and with four others, it does not say who else is

10    tagged with that "and with four others."  And that is why the

11    Government used a screenshot -- actually, it's two pages that's

12    currently in there -- to reflect what other two people he

13    tagged.  Because that 732a didn't fully reflect the post, the

14    Government used the screenshot.

15         So we now intend to supplement that with the 732a to

16    show that the screenshot is accurate as it is reflected in

17    732a.

18         THE COURT:  And is that because this screenshot was

19    taken separately from the provision of the information from

20    Facebook and you subsequently matched up the two?

21         MS. SCHNEIDER:  That is correct.

22         THE COURT:  And you would lay such a foundation?

23         MS. SCHNEIDER:  Correct.

24         THE COURT:  Okay.  Understanding that you're going to

25    object based upon the previous objections, this at least

1    resolves the issue that Mr. Breedlove raised in terms of the

2    presentation of the evidence as a business record.

3            Mr. Willett, would you like to be heard in any way on

4    717 or 732a?

5            MR. WILLETT:  I don't have any objection to the new

6    717; okay.  I am still concerned about 732a because 732a

7    doesn't appear to link up with what 732 said.  The story line

8    on 732a states:  *Rambo Ofdatgang Gardner is with Wayne Perry*

9    *and four others.*  But if you look at the headline on 732, *Rambo*

10   *Ofdatgang Gardner is with Indaedae Wetrust and two others.*

11   Now, on the second page, it says:  People, *Wayne Perry, Metri O*

12   *Block Meech*, but it says:  *Add friend.*

13           So I am still going to object to 732 -- well, I'm

14   going to object to 732a because I think it misstates what was

15   the content of 732.

16           THE COURT:  Which has not been admitted.

17           MR. WILLETT:  Correct.

18           MR. BREEDLOVE:  May I be heard, Your Honor?

19           THE COURT:  One moment.

20           Thank you.

21           Mr. Breedlove?

22           MR. BREEDLOVE:  I would also note, Your Honor, that

23   732 says February 11, 2017, with no time stamping, and 732a has

24   a February 2nd time stamp of 3:39, which is --

25           THE COURT:  February 12th.

1    MR. BREEDLOVE:  Or excuse me, 12th at 3:39.  Which is

2  different, though I would imagine that's because the screenshot

3  would be based on the time zone of whoever is taking the

4  screenshot versus the business records which are based on the

5  UTC time zone that Facebook uses for all of its records.

6    So it may be a time issue as well for when -- why one

7  appears with different numbers of withs, for lack of a better

8  term.

9    THE COURT:  And, obviously, you can add people, and if

10  the screenshot was taken by a law enforcement officer prior to

11  the end of the adding of people, that would also be

12  something -- well, 732a is a Facebook record similar to all of

13  the other Facebook records, and it doesn't sound like you have

14  any different objections to 732a; correct, Mr. Willett?

15    MR. WILLETT:  Just what I have stated earlier,

16  Your Honor, that my concern is it --

17    THE COURT:  Well, I'm asking about this.  So I'm

18  asking about 732a because you've raised concerns about 732, and

19  we know about that being a screenshot.  But I'm asking about

20  732a as a Facebook record that was produced in the same manner

21  as all of the other exhibits.

22    Do you have any objection to this document other than

23  the 401, 403 objections you've made?

24    MR. WILLETT:  Judge, the only way I can answer your

25  question is I believe 732a misstates 732, and it -- and it's --

```
1            THE COURT:  I understand.  You've already -- I
2    understand your argument.
3            Mr. Breedlove, 732a standing alone you agree is a
4    Facebook record consistent with all the other Facebook records,
5    and you have no objection other than the ones previously
6    raised?
7            MR. BREEDLOVE:  That's correct, Your Honor.
8            THE COURT:  Okay.  It has your boxes, so you can note
9    that.
10           MR. BREEDLOVE:  Yes.
11           THE COURT:  So two things.  I'll take the opportunity.
12   The Court has -- in order to not state the 403 balancing test
13   on the record in front of the jury -- repeatedly said that the
14   balancing test of 403 weighs in favor of admission.  The
15   question is whether or not there is unfair prejudice that
16   substantially outweighs the probative value.
17           There's no unfair prejudice presented by the evidence.
18   It's probative of -- it's relevant because it makes a fact at
19   issue more or less probable, here the existence of the
20   enterprise, the purposes of the enterprise, and the defendants'
21   mental state required for the alleged crimes.
22           So those 403 exhibits as to -- 403 objections as to
23   the social media exhibits are not well made.  And that is what
24   I had meant when I said the 403 balancing test weighs in favor
25   of admission.
```

1          In regards to 732a, assuming the same record is made

2   in regards to its foundation, the Court anticipates the

3   objections under 401 and 403 will be overruled for the reasons

4   I've just stated.

5          I will hear whatever foundation can be laid for 732 in

6   regards to the admissibility of that item separately and will

7   rule on that based upon the foundation that's laid at the time

8   that that is offered.

9          Okay.  Anything else the Government needs to bring to

10  my attention at this time?

11          MS. SCHNEIDER:  No, Your Honor.

12          THE COURT:  Mr. Ripley?

13          MR. RIPLEY:  I'm sorry, Your Honor.  Magistrate Judge

14  Bremer, being advised on the situation with Ms. Thorpe, has

15  given a fairly clear and strong instruction to our office that

16  do everything we can to get her on by 2:00 and, under no

17  circumstances, later than 4:00.

18          In light of that, she will be called immediately

19  following Detective Butt, and I just kind of thought everyone

20  could have a heads-up on that.

21          THE COURT:  Thank you.

22          Anything that the defense needs to bring to my

23  attention?

24          MR. WILLETT:  Not at this time, Your Honor.

25          THE COURT:  Mr. Breedlove?

1        MR. BREEDLOVE:  One thing that I think the Court may

2    want to be aware of, not necessarily for this hearing purposes,

3    but just in looking at Exhibit 732a, a lot of them are happy

4    birthday messages to Dae Dae which is February 10th, which will

5    be this Friday.  So I just wanted to make the Court aware for

6    whatever purposes it feels necessary to know that it appears

7    Dae Dae's birthday is February 10.

8        THE COURT:  Thank you.

9        Defense, any record in regards to taking Ms. Thorpe

10   out of order?  Any objection to that at this time, Mr. Willett?

11       MR. WILLETT:  We've been placed on notice, Your Honor.

12       THE COURT:  Mr. Breedlove?

13       MR. BREEDLOVE:  Nothing, Your Honor.  Thank you.

14       THE COURT:  Okay.  I don't know how much longer we

15   will have Detective Butt on the stand, but I would hope that it

16   would not push us to 4:00.  I know that Judge Bremer has

17   instructed you that -- the Government to do for the same

18   concerns that I have raised in terms of making sure that an

19   individual's liberty is not unduly burdened.

20       That being said, we will proceed in the manner that we

21   have been proceeding.

22       Anything else on behalf of the Government?

23       MS. SCHNEIDER:  No.

24       THE COURT:  On behalf of Defendant Quinn?

25       MR. WILLETT:  Since yesterday the Court announced that

1    Mr. Armstrong would be here at 3:00 tomorrow, which is today.

2    Is that going to be adjusted as well?

3              THE COURT:  I don't know.  I will have very little to

4    say to Mr. Armstrong and Mr. Larson if the Eighth Circuit

5    hasn't provided me any guidance before 3:00.  So we will handle

6    that -- I have been told -- I can't see the Eighth Circuit

7    filings because they're under seal.  So I have been made aware

8    of them, and I know that they have -- I know the substance of

9    the Government's motion to dismiss, but I will not know, unless

10   someone tells me, what the outcome of that has been.

11             I have been informed by the Eighth Circuit's clerk's

12   office that they will give me the courtesy of telling me when

13   they have ruled on that, but that is all the information I

14   have.

15             MR. WILLETT:  Thank you.

16             THE COURT:  Mr. Breedlove?

17             MR. BREEDLOVE:  Just, Your Honor, that given the

18   witnesses that we need to do this afternoon and that Detective

19   Butt will be being called a number of times, if it makes sense

20   timeline wise, I may defer my cross-examination on some of the

21   things that happened today to tomorrow since he would be

22   testifying again tomorrow if that's what the Court wishes or --

23             THE COURT:  That is not.

24             MR. BREEDLOVE:  Okay.

25             THE COURT:  We are going to proceed with -- any

1    questions you have about what he's testified to today will

2    happen today.  And I anticipate that we should have sufficient

3    time to get everything done that we need to today.

4            MR. BREEDLOVE:  Okay.

5            THE COURT:  But I do appreciate the offer of

6    flexibility in order to accommodate the schedule.

7            All right.  With that, we'll bring in the jury.

8            (Jury in at 12:47 p.m.)

9            THE COURT:  Thank you.  You may be seated.

10           We're back on the record in the matter of the United

11   States of America versus Quinn and Smith, 3:21-cr-91.

12           When we left off, Detective Butt was testifying on

13   direct examination.  Ms. Schneider is going to continue her

14   direct examination, and then the defense will have the

15   opportunity of cross-examination.

16           Detective Butt, I'll remind you that you're still

17   under oath.

18           MS. SCHNEIDER:  Thank you.

19           May I approach?

20           THE COURT:  Yes.

21                   DIRECT EXAMINATION RESUMED

22   BY MS. SCHNEIDER:

23   Q.  Detective Butt, I am showing you what has been marked as

24   Exhibit 717.

25       Do you recognize that?

1   A.   I do.

2   Q.   And what is it?

3   A.   It is a series of posts by Darion Gardner's profile.

4   Q.   And did that come to you in the records from Facebook from

5   the Rambo Ofdatgang Gardner -- from the records you got from

6   Facebook from that account?

7   A.   Yes, ma'am.

8           MS. SCHNEIDER:  Your Honor, the Government moves to

9   admit Exhibit 717.

10          THE COURT:  Mr. Willett?

11          MR. WILLETT:  No objection, Your Honor.

12          THE COURT:  Mr. Breedlove?

13          MR. BREEDLOVE:  No objection, Your Honor.

14          THE COURT:  717 is admitted.

15          MS. SCHNEIDER:  May I approach?

16          THE COURT:  Yes.

17          MS. SCHNEIDER:  Permission to publish?

18          THE COURT:  Yes.

19          I am going to remind you and me to make sure we speak

20   into the microphone so the jury can hear us well.

21   BY MS. SCHNEIDER:

22   Q.   Detective Butt, looking at the third message here from

23   November 9, 2016, do you see that?

24   A.   I do.

25   Q.   And what is that post generally?

BUTT - DIRECT

1    A.   It is a series of rules.

2    Q.   And how do you know it's a series of rules?

3    A.   You can tell by the numbers and then from personal

4    knowledge of Gangster Disciple rules.

5    Q.   And what -- are there 18 of them?

6    A.   That is correct.

7    Q.   After 18, Public Smoking, what does it say?

8    A.   It says:  We *Was Standing On Nat Bizzness In DA Feds Gd*

9    *Folks!!!!*

10   Q.   And what does this relate to?

11   A.   Rules while incarcerated.

12        MS. SCHNEIDER:   Thank you.

13        May I approach?

14        THE COURT:   Yes.

15   BY MS. SCHNEIDER:

16   Q.   Detective Butt, I'm showing you 732a.

17        Do you recognize that?

18   A.   I do.

19   Q.   What is it?

20   A.   It is, again, a series of posts from the Rambo Ofdatgang

21   Gardner's Facebook.

22   Q.   And, again, is that from the same account and the material

23   that you received from Facebook from that account?

24   A.   That's correct.

25        MS. SCHNEIDER:   The Government moves to admit

1    Exhibit 732a.

2         THE COURT:  Any objection to 732a?

3         MR. WILLETT:  Same objection previously urged on the

4    record but outside the presence of the jury, Your Honor.

5         THE COURT:  Mr. Breedlove?

6         MR. BREEDLOVE:  Same, Your Honor.

7         THE COURT:  732a is admitted based on the record

8    previously made.  The objection is overruled.

9         MS. SCHNEIDER:  Permission to publish?

10        THE COURT:  732a, yes.

11   BY MS. SCHNEIDER:

12   Q.  This is the third post from the bottom, which, on this

13   record, indicates February 12, 2017, at 3:39 UTC.

14        Do you see that?

15   A.  I do.

16   Q.  And it says it's a story from Rambo Ofdatgang Gardner.  Who

17   does he indicate he's with?

18   A.  He indicates he's with Wayne Perry and four others.

19   Q.  What is the message?

20   A.  *My squad winnin bitch on Folks'Nem.*

21   Q.  And did you see this message elsewhere?

22   A.  So this same post was reconciled with the Facebook account,

23   and when it was reconciled with it, a post was located.

24   Q.  Where?

25   A.  On the Facebook account for Darion Gardner.

1    Q.   The publicly available post --

2    A.   That's correct.

3    Q.   -- or profile?

4    A.   Correct.

5    Q.   And when you -- and when you look at a publicly

6    available -- like, just on the Facebook app; correct?

7    A.   Correct.

8    Q.   Is that what you're referring to?

9    A.   Or desktop.  Through a web.

10   Q.   Does it look different than this?

11   A.   It does.

12   Q.   And if someone's account is public, if you are not friends

13   with them, can you still see posts?

14   A.   Yes.

15   Q.   What time does Facebook use -- what time zone do they use

16   for their records?

17   A.   They use Universal Time.

18   Q.   And what is Universal Time?

19   A.   That is -- I don't know how to describe it.  I know that

20   Central Time is -- has a different time than what Universal

21   Time.  It's either five or six hours behind Universal Time

22   depending on the time of the year.

23   Q.   Sure.  So Universal Time in relation to Central Time is

24   different?

25   A.   Yes.

1    Q.   So in this case, on February 12, 2017, at 3:39 a.m. UTC

2    time, what day would that be in Central Time Zone?

3    A.   That would have been the 11th.

4    Q.   Can you please flip in your binder to Exhibit 732?

5         Does that appear to be the same post that is referenced in

6    732a?

7    A.   It does.

8    Q.   Are there any differences?

9    A.   Yes.  So in this post, in 732a, it identifies two of the

10   other tagged subjects, but it only lists three tagged subjects,

11   where the other one lists a total of five tagged subjects.

12   Q.   Okay.  I'm sorry.  I am not following you.

13        So in 732, which is in your book --

14   A.   Correct.

15   Q.   -- how many tagged people, no -- so how many people are

16   tagged in that post?

17   A.   Three.

18   Q.   Okay.  And in 732a how many people are tagged?

19   A.   In 732a it says five total, Wayne Perry and four others.

20   Q.   And you testified that you get a lot of Facebook records;

21   is that right?

22   A.   That's correct.

23   Q.   And you do a lot of social media monitoring in your job?

24   A.   That's correct.

25   Q.   Can you explain that difference?

1    A.  Yes.  So on a public Facebook profile reference to the

2    tags, if someone's account has privacy settings that are set to

3    be more private, then that tag will not show up to somebody on

4    a public profile.

5            MS. SCHNEIDER:  Your Honor, the Government moves to

6    admit 732.

7            THE COURT:  Any objection to 732?

8            MR. WILLETT:  Just the same objections previously

9    urged, Your Honor.

10           THE COURT:  Based upon the record that was just made,

11   I would like you to make whatever objection you believe is

12   appropriate based upon the foundation that was laid.

13           Do you have a specific objection to this exhibit at

14   this time?

15           MR. WILLETT:  No, Your Honor.

16           THE COURT:  Mr. Breedlove, any objection?

17           MR. BREEDLOVE:  No, Your Honor.

18           THE COURT:  Exhibit 732 is admitted.

19           MS. SCHNEIDER:  Permission to publish?

20           THE COURT:  Yes.

21   BY MS. SCHNEIDER:

22   Q.  Detective Butt, looking at Exhibit 732, we can see that

23   Rambo Ofdatgang Gardner made the post, and this lists one

24   person that is tagged.  What account is that?

25   A.  In Dae Dae We Trust.

1   Q.   And whose is that?

2   A.   That account is associated with Austin Ruiz.

3   Q.   On the second page of this exhibit, who are the other two

4   people or accounts identified as being tagged?

5   A.   The first one is Wayne Perry, the account associated with

6   Najawaun Quinn.  And the second one is Metri O Block Meech, the

7   account associated with Dimetri Smith.

8   Q.   Thank you.

9        Detective Butt, before we left off at lunchtime, we were

10  talking about drug trafficking evidence on Facebook.  Do you

11  remember that?

12  A.   Yes.

13           MS. SCHNEIDER:  Thank you.

14           Can we please display Exhibit 707?

15           THE COURT:  707 may be displayed.

16           MS. SCHNEIDER:  Thank you.

17  BY MS. SCHNEIDER:

18  Q.   This is from Mr. Culbreath's account.  Do you see --

19           THE COURT:  And now that all of the exhibits in

20  regards to Facebook have been admitted, you can display all of

21  those exhibits without further request of the Court.

22           MS. SCHNEIDER:  Thank you.

23  BY MS. SCHNEIDER:

24  Q.   Do you see this post on 10-21 at 6:40?

25  A.   I do.

1  Q.  What does it say?

2  A.  *You got some gas.*

3       MS. SCHNEIDER:  And can you scroll down, please.

4  BY MS. SCHNEIDER:

5  Q.  And then Mr. Culbreath responded with an emoji.

6      What was the next person's response?

7  A.  *You'll get me, right, for 100*?

8  Q.  What did Mr. Culbreath respond?

9  A.  *Yea.*  And then Wya, which means where you at.

10 Q.  What was the next response?

11 A.  *Over here by Sudlow.*

12 Q.  What does Mr. Culbreath say?

13 A.  *You in motion?*

14 Q.  What did the other Facebook user say?

15 A.  *I can see wassup.  Why?  Where you located?*

16 Q.  What did Mr. Culbreath respond?

17 A.  *For 100 I will give you 8.5.*

18 Q.  Thank you.

19     And here on February 7, 2017 --

20      THE COURT:  Counsel, just because you don't have to

21 ask to show them, you still have to tell the jury what you're

22 showing.

23      MS. SCHNEIDER:  Thank you.  I said that too quietly.

24      THE COURT:  Yes.

25

1    BY MS. SCHNEIDER:

2    Q.  On Exhibit 708, on February 7, 2017, at 21:52, what does

3    Mr. Culbreath say?

4    A.  *Gas.*

5    Q.  And what did the user say?

6    A.  *Wya,* where you at.

7    Q.  And what did Mr. Culbreath -- or on the next day, on

8    February 8, what did Mr. Culbreath say?

9    A.  He says:  *You need some gas hnl?*  And then he provides a

10   phone number.

11   Q.  Do you know what hnl means?

12   A.  I think it's a mistype for hml, which is hit my line.

13          THE COURT:  Ms. Schneider, you're reading information

14   and Detective Butt is reading information.  You just need to

15   speak more slowly.  The jury will understand you better and the

16   record will be clear.

17          MS. SCHNEIDER:  This is a common admonition of mine

18   throughout my career, and I apologize.

19          THE COURT:  Thank you.

20          MS. SCHNEIDER:  May we have 709, please?

21   BY MS. SCHNEIDER:

22   Q.  Detective Butt, in Exhibit 709, on October 8, 2016, what

23   did Mr. Culbreath say?

24   A.  He says:  *Gas.*

25   Q.  And then on October 12, 2016?

1    A.   He says: *7.5 for 100,* and then hashtag Thraxxxx.

2    Q.   Do you know what that hashtag means?

3    A.   Yeah, high-grade marijuana.

4    Q.   And on January 13, 2017, what did Mr. Culbreath say?

5    A.   *What you looking for??  Gasss?*

6            MS. SCHNEIDER:  Thank you.

7            Can we have 710, please?

8    BY MS. SCHNEIDER:

9    Q.   In Exhibit 710 before this thread, the message or post

10   May 7, 2017, what does Mr. Culbreath say?

11   A.   *Gas on deck.*

12           MS. SCHNEIDER:  Thank you.

13           Can we have 738, please?

14   BY MS. SCHNEIDER:

15   Q.   These are from Mr. Quinn.

16       And around the middle of the page in 738, on February 6,

17   2017, what does Mr. Quinn say?

18   A.   It says -- there's the series of boxes and then fwm.

19   Q.   Do you know what fwm means?

20   A.   Yeah.  It means fuck with me.

21   Q.   What does the Blockboa Mundo say?

22   A.   *You got gas?*

23   Q.   What does Mr. Quinn respond?

24   A.   It says:  *Yup.  Wya,* which is where you at.

25           MS. SCHNEIDER:  Can we please see 740?

1   BY MS. SCHNEIDER:

2   Q.  Here in this -- in this top thread here in 740, this person

3   asks:  *You mobile?*

4       Do you see that?

5   A.  Yes.

6   Q.  What is Mr. Quinn's response?

7   A.  He says:  *Yup.  What you want?*

8   Q.  What is her response?

9   A.  *.5.*

10  Q.  And what does Mr. Quinn say?

11  A.  *Gassss.*

12      MS. SCHNEIDER:  Can we go to 741?  Wait.  Yeah, go to

13  741.

14  BY MS. SCHNEIDER:

15  Q.  And in 741, kind of the middle of the page, on October 2,

16  2016, at 12:04 or 00:04, what does Mr. Quinn say?

17  A.  It says: *Traffic, traffic, traffic!  Hashtag gassndpatron!*

18      MS. SCHNEIDER:  Can we get 742, please?

19  BY MS. SCHNEIDER:

20  Q.  The sixth message down on April 4, 2017, what does

21  Mr. Quinn say?

22  A.  *Gassss.*

23      MS. SCHNEIDER:  Can we get Exhibit 743?

24  BY MS. SCHNEIDER:

25  Q.  In this main thread on this page on October 3, 2016, what

1    does the Facebook user ask Mr. Quinn?

2    A.   *You got some gas?*

3    Q.   What is the response?

4    A.   *Like what?*

5    Q.   What does the Facebook user ask for?

6    A.   *A g.*

7    Q.   And what does Mr. Quinn say?

8    A.   *You still need some?*

9    Q.   This is now on October 4?

10   A.   Correct.

11          MS. SCHNEIDER:  Can we scroll down, please?

12   BY MS. SCHNEIDER:

13   Q.   On the second page after the missed call on February 19,

14   2017, what does the Facebook user ask Mr. Quinn?

15   A.   *You got some gas?*

16   Q.   What does Mr. Quinn say?

17   A.   *Yup.  What you got?*

18   Q.   And what does the Facebook user ask for?

19   A.   *I just need a blunt.*

20   Q.   Thank you.

21          MS. SCHNEIDER:  Can we pull up 748, please?

22   BY MS. SCHNEIDER:

23   Q.   The second to last message on that page, on February 6,

24   2017, what does Mr. Quinn say?

25   A.   He says:  *Gass fwm.*

1          MS. SCHNEIDER:  Can we get 749?

2   BY MS. SCHNEIDER:

3   Q.  So there's a missed call that starts this page, and then

4   what does Mr. Quinn do?

5   A.  He replies via Messenger after the missed call.

6   Q.  Asking him what he needs?

7   A.  Yes.

8   Q.  And then what does Mr. Quinn say?

9   A.  He says he's on his way, omw, which means on my way.

10  Q.  And what does Stevey Graves -- what is his response?

11  A.  Her response is:  *I got 15.*

12  Q.  Thank you.  Shows what I know.

13          And then what is Mr. Quinn's response?

14  A.  Again, he says:  *Omw,* on my way.

15  Q.  And then what?

16  A.  She says:  *Yup.*

17  Q.  And then what does Mr. Quinn say?

18  A.  He says:  *It ain't all that gas though.*

19  Q.  And then what does he say?

20  A.  *Ima get you right.*

21  Q.  What does she say?

22  A.  *Ok.*

23          And then she says:  *It's some reg?*

24  Q.  And what does Mr. Quinn say?

25  A.  *Nahh.  But that's what you want, I got that too.*

1    Q.   What does she say?

2    A.   *What going give for 15 of some reg?*

3    Q.   And then what?

4    A.   *You.*

5    Q.   And what does Mr. Quinn say?

6    A.   *Two sacks.*

7           MS. SCHNEIDER:   Go to the next page, please.

8           Okay.   Thank you.

9           Can we go to 750?

10   BY MS. SCHNEIDER:

11   Q.   So the top message there from Mr. Quinn says what?

12   A.   *I got the gas.*

13   Q.   And what is the first actual message that Mr. Quinn says?

14   A.   *I got the gas, aunti.*

15          MS. SCHNEIDER:   Can we go to 752, please?

16          Scroll down.

17   BY MS. SCHNEIDER:

18   Q.   Three from the bottom the account, Cobey Frm Lewyville, do

19   you know who that is?

20   A.   Yes.

21   Q.   Who is that?

22   A.   Jacobey Reese-Bolton.

23   Q.   Who is Jacobey Reese-Bolton?

24   A.   Savage Life member.

25   Q.   And is that first name spelled J-a-c-o-b-i?

1   A.   No.

2   Q.   E-y?

3   A.   Yes.

4   Q.   What does he say?

5   A.   He says:  *You got some gas?*

6   Q.   And, in fact, sends that three times?

7   A.   That's correct.

8   Q.   And on different dates?

9   A.   That's correct.

10        MS. SCHNEIDER:  Can we scroll down?

11  BY MS. SCHNEIDER:

12  Q.   On the last date of March 24, 2017, what was Mr. Quinn's

13  response?

14  A.   *What you need?*

15  Q.   What does Mr. Reese-Bolton respond?

16  A.   *I got 10.*

17  Q.   What does Mr. Quinn say?

18  A.   *Gassss.*

19  Q.   Now we're on another day, right, April 4?

20  A.   Correct.

21  Q.   And on April 12th, what does Mr. Reese-Bolton ask for?

22  A.   *I got a dub for you.  Got gas?*

23  Q.   Does it say "for you"?

24  A.   Oh, I'm sorry.  *I got a dub.  You got gas?*

25  Q.   And what does Mr. Quinn say?

1   A.   *Yup.   Wya* for where you at.

2            MS. SCHNEIDER:  May we have 753, please?

3   BY MS. SCHNEIDER:

4   Q.   Here is a message thread between Mr. Quinn and Najaa

5   Chambers.

6        Do you see that?

7   A.   I do.

8   Q.   In the first message, she asks, *Where you at?*

9   A.   Yes.

10  Q.   And what is Mr. Quinn's response?

11  A.   He says:  *Sliden.   Wassup?*

12  Q.   And what does she say?

13  A.   *I need some dope man.*

14  Q.   And what does Mr. Quinn say?

15  A.   *Wya,* where you at.

16  Q.   And where does she say she was?

17  A.   She says:  *Traffic, on my way to Drake crib.*

18  Q.   And what does she say?

19  A.   *With Key Key.*

20  Q.   What does Mr. Quinn respond?

21  A.   *They got the gas, but if he don't, I'll meet up with you,*

22  *G.*

23            MS. SCHNEIDER:  Can we get 762, please?

24  BY MS. SCHNEIDER:

25  Q.   There's a thread here between who we've established is --

1   who you've established is Austin Ruiz's account and Najawaun

2   Quinn; is that right?

3   A.   That's correct.

4   Q.   And what does Mr. Ruiz ask for in the first message?

5   A.   He says:  *You got gas?*

6   Q.   And what is Mr. Quinn's response?

7   A.   *Yup.  Hit me.*

8           MS. SCHNEIDER:  Can we have 780, please?

9           This is now from Mr. Smith's account.

10          Can we scroll down a little bit?

11          Thank you.

12   BY MS. SCHNEIDER:

13   Q.   This is -- appears to be messages between Killalance

14   Savagelife Thegang and Mr. Quinn.

15       Do you see this message on April 1, 2017, at 3:35?

16   A.   I do.

17   Q.   What does -- what is requested of Mr. Smith?

18   A.   *You got some gas?  I need it.*

19   Q.   And what does Mr. Smith respond?

20   A.   He says:  *Yep.  What you neef?*

21   Q.   And what does the other Facebook user request?

22   A.   *Dub go da 1.5?*

23   Q.   And what does Mr. Smith respond?

24   A.   *Yep.  You mobile?*

25          MS. SCHNEIDER:  Can we go to the third page, please,

1  and scroll down?

2  BY MS. SCHNEIDER:

3  Q.  And then on a different day, May 8, 2017, does he also ask

4  for gas again?

5  A.  Yes.

6  Q.  And what is Mr. Smith's response?

7  A.  *Yep.*

8        MS. SCHNEIDER:  Can we have 711?

9  BY MS. SCHNEIDER:

10  Q.  So from Mr. Culbreath's account on May 7, 2017, what is he

11  advertising?

12  A.  *Loud on deck, cuz.*

13        MS. SCHNEIDER:  Can we have 718, please?

14        Scroll down a little bit.

15  BY MS. SCHNEIDER:

16  Q.  This post kind of in the middle of the page on March 24,

17  2017, what does Mr. Gardner post?

18  A.  *Who can I slide on, Dolo, good loud lean zans?*

19  Q.  And does Mr. Quinn respond?

20  A.  He does.

21  Q.  What does he say?

22  A.  *Pull up.*

23        MS. SCHNEIDER:  Can we get 779?

24  BY MS. SCHNEIDER:

25  Q.  On the top of the second page, there's a request from Lìl

1   Yummy from December 17, 2016.

2       Do you see that?

3   A.  I do.

4   Q.  What does he say?

5   A.  *You got some loud, bro?*

6   Q.  And what is Mr. Smith's response?

7   A.  *Yep.*

8   Q.  What does the response ask for?

9   A.  *Can I get 1.5?*

10  Q.  And what does Mr. Smith respond?

11  A.  *Wya,* where you at.

12          MS. SCHNEIDER:  Thank you.

13          Can we get 754?

14  BY MS. SCHNEIDER:

15  Q.  In Exhibit 754, at the top here, the third message, what

16  does Mr. Quinn say that he has?

17  A.  *I got the gas and I'll pull up.*

18          MS. SCHNEIDER:  And then can we scroll down?

19  BY MS. SCHNEIDER:

20  Q.  On the last full message on the first page, what does

21  Mr. Quinn indicate he has?

22  A.  *I got that lean.*

23          MS. SCHNEIDER:  765.

24  BY MS. SCHNEIDER:

25  Q.  In the second thread on this page, the first message, what

1   does Mr. Quinn say on April 1, 2017?

2   A.   *I got the jigs, cuz.*

3   Q.   And what does BJ Haliburton say in response?

4   A.   Where you at and how much you popping them for?

5   Q.   And what does Mr. Quinn say?

6   A.   *10 a pop.  I'm in traffic.*

7            MS. SCHNEIDER:  740.  Can you scroll down?

8            Right there.  Stop.

9   BY MS. SCHNEIDER:

10  Q.   Kind of toward -- the fifth message from the top, Hosa

11  Howard on February 27, 2017, what does he say?

12  A.   *Trying to get this work off.*

13  Q.   And what does Mr. Quinn say?

14  A.   *Ima slide on you.*

15  Q.   Do you know someone named Hosa Howard?

16  A.   I do.

17  Q.   Is he with Savage Life?

18  A.   He's associated.

19  Q.   Do you know what work is in this context?

20  A.   I do.

21  Q.   What is it?

22  A.   It's crack cocaine.

23           MS. SCHNEIDER:  Can we get 703?

24           THE COURT:  If you can state the exhibit number into

25  the microphone, both the jury and Mr. Ripley will be able to

BUTT - DIRECT

1    hear you.

2    BY MS. SCHNEIDER:

3    Q.  At that top of that message in 703, Deandre Nero says:

4    *Traffic.*  Do you see that, the very top?

5    A.  Yes.

6    Q.  What does Mr. Culbreath respond?

7    A.  *Slide man, I trippin.*

8    Q.  And then if we scroll down past that missed call -- or call

9    anyway, Mr. Culbreath -- what does he write?

10   A.  Which post are you --

11   Q.  It is just a bunch of numbers, maybe a phone number.  Do

12   you see that?

13   A.  That's correct.

14   Q.  Okay.  And what is the message after that?

15   A.  It says:  *Give me that half for 100 rn.*

16   Q.  And again, with that text and Internet speak, do you know

17   what "rn" means?

18   A.  Right now.

19   Q.  What is the next message from Mr. Culbreath?

20   A.  *It's gone.*

21   Q.  What is the next message from Mr. Culbreath?

22   A.  *140. I'm with Deeter.*

23   Q.  And the next message from Mr. Nero?

24   A.  *No.  Tell Deeter I need 9 grams like RN, right now.  What's*

25   *the price plug no tax?*

1    Q.   Do you know someone by the name of Deeter?

2    A.   Yes.

3    Q.   Who is that?

4    A.   It's Darrell Williams.

5    Q.   Is he associated with Savage Life?

6    A.   Yes.

7            MS. SCHNEIDER:  Let me get Exhibit 739, please.

8            Actually, I'm going to skip that one.  Can we go to

9    764?

10           Can you scroll down?

11   BY MS. SCHNEIDER:

12   Q.   Do you see this thread between Mr. Quinn and someone with

13   the last name of D-j-b-o-l-o?

14   A.   Yes.

15   Q.   And she sends -- he or she sends a message on February 17,

16   2017?

17   A.   Yes.

18   Q.   What is that message?

19   A.   *You petty ASF for even giving me that shit.  It 1000 that*

20   *that Davenport shit.*

21   Q.   What is -- well, then the next one is just an automated

22   message; is that right?

23   A.   That's correct.

24   Q.   What is Mr. Quinn's response after that?

25   A.   *Wya -- where you at -- g?*

```
 1              MS. SCHNEIDER:  Can you scroll down?

 2   BY MS. SCHNEIDER:

 3   Q.  What does that user say?

 4   A.  Y was up G.  I am over that shit.  I just know you

 5   really -- you was really my bro.

 6   Q.  What does Mr. Quinn say?

 7   A.  Man, I ain't kne.  That shit was fake, but I'm on 6 ghee.

 8   I ain't on that.  You good?

 9              MS. SCHNEIDER:  Thank you.

10              Can I get 729, please?

11              And this is from Mr. Gardner's account.

12              Can you scroll down?

13              No, no.  Sorry.  Oh, yeah, yeah.  Actually, scroll to

14   the second page.

15              Thank you.

16   BY MS. SCHNEIDER:

17   Q.  I think it's the third from the bottom on March 28, 2017.

18   Do you see that post?

19   A.  Yes.

20   Q.  Can you read it?

21              THE COURT:  Slowly.

22   A.  MF done stole my phone.  Won't be catching none of those

23   licks.  I'ma be at iwireless at 9.

24   BY MS. SCHNEIDER:

25   Q.  Thank you.
```

1      Detective Butt, as the case agent and investigator with

2    Davenport, are you familiar with the shooting incidents that

3    have been -- that are part of this case?

4    A.  Yes.

5    Q.  Specifically, are you familiar with an incident that

6    occurred on October 9, 2016?

7    A.  I am.

8    Q.  Where did that occur?

9    A.  In the 1300 block of Iowa Street.

10   Q.  And are you familiar with that area of Davenport?

11   A.  I am.

12   Q.  Can you please turn in the binder to Exhibits 621 and 622.

13       Do you recognize those?

14   A.  I do.

15   Q.  What are they?

16   A.  They are overhead views of the area of 1300 Iowa Street.

17   Q.  Are they fair and accurate representations?

18   A.  Yes.

19           MS. SCHNEIDER:  Your Honor, the Government moves to

20   admit Exhibits 621 and 622 into evidence.

21           THE COURT:  Any objection, Mr. Willett?

22           MR. WILLETT:  No objection, Your Honor.

23           THE COURT:  Mr. Breedlove?

24           MR. BREEDLOVE:  No objection, Your Honor.

25           THE COURT:  621 and 622 are admitted.

1   BY MS. SCHNEIDER:

2   Q.  Are you familiar with a shooting that occurred on

3   October 12, 2016?

4   A.  I am.

5   Q.  Where did that occur?

6   A.  In the area of Kirkwood Boulevard and Jersey Ridge Road in

7   Davenport, Iowa.

8   Q.  Are you familiar with that area of Davenport?

9   A.  Yes.

10  Q.  Please turn to 623, Exhibit 623.

11      What is that?

12  A.  That is an overhead photograph of the area of Kirkwood

13  Boulevard and Jersey Ridge Road in Davenport.

14  Q.  Is that a fair and accurate representation?

15  A.  It is.

16      MS. SCHNEIDER:  Your Honor, the Government moves to

17  admit 623.

18      THE COURT:  Any objection?

19      MR. WILLETT:  No objection, Your Honor.

20      MR. BREEDLOVE:  None, Your Honor.

21      THE COURT:  Thank you.

22      623 is admitted.

23  BY MS. SCHNEIDER:

24  Q.  Are you familiar with a shooting that occurred on

25  October 16, 2016?

1    A.   I am.

2    Q.   Where did that occur?

3    A.   In the 5400 block of Division Street in Davenport, Iowa.

4    Q.   Are you familiar with that area?

5    A.   I am.

6    Q.   Can you please turn to 624 and 625.

7         Do you recognize those?

8    A.   I do.

9    Q.   What are they?

10   A.   Both are overhead views of the area of 5400 Division

11   Street.

12   Q.   Are they fair and accurate representations?

13   A.   Yes.

14        MS. SCHNEIDER:  Your Honor, the Government moves to

15   admit 624 and 625.

16        MR. WILLETT:  No objection, Your Honor.

17        MR. BREEDLOVE:  No objection, Your Honor.

18        THE COURT:  Thank you.

19        624 and 625 are admitted.

20   BY MS. SCHNEIDER:

21   Q.   Are you familiar with a shooting that occurred on

22   December 16, 2016?

23   A.   I am.

24   Q.   Where did that occur?

25   A.   In the 100 block of West Fifth street in Davenport.

1   Q.  Are you familiar with that area?

2   A.  I am.

3   Q.  Can you please turn to Exhibit 626.

4       Do you recognize that?

5   A.  I do.

6   Q.  What is it?

7   A.  It is an overhead view of that area of 100 West Fifth

8   Street.

9   Q.  And is it fair and accurate?

10  A.  Yes.

11      MS. SCHNEIDER:  Your Honor, the Government moves to

12  admit Exhibit 626 into evidence.

13      MR. WILLETT:  No objection, Your Honor.

14      MR. BREEDLOVE:  No objection, Your Honor.

15      THE COURT:  626 is admitted.

16  BY MS. SCHNEIDER:

17  Q.  Are you familiar with a shooting that occurred on

18  January 31, 2017?

19  A.  I am.

20  Q.  Where did that occur?

21  A.  At NorthPark Mall, 320 West Kimberly Road in Davenport,

22  Iowa.

23  Q.  Are you familiar with the mall?

24  A.  I am.

25  Q.  Can you please turn to Exhibits 627 and 628.

```
 1              THE COURT:  Ms. Schneider, you've got to slow down.
 2              MS. SCHNEIDER:  I'm sorry.
 3              THE COURT:  I understand that you're trying to get
 4    exhibits in that are unobjected to, but you need to take a
 5    breath.
 6              MS. SCHNEIDER:  Thank you.
 7              THE COURT:  And just make the record you need to make.
 8              MS. SCHNEIDER:  I'm sorry.  I didn't even realize it
 9    was fast, so thank you.
10    BY MS. SCHNEIDER:
11    Q.  What are those?
12    A.  These are overhead views of NorthPark Mall.
13    Q.  Are they fair and accurate?
14    A.  Yes, they are.
15              MS. SCHNEIDER:  Your Honor, the Government moves to
16    admit Exhibits 627 and 628.
17              MR. WILLETT:  No objection.
18              MR. BREEDLOVE:  No objection.
19              THE COURT:  Exhibits 627 and 628 are admitted.
20    BY MS. SCHNEIDER:
21    Q.  And are you familiar with a shooting that occurred on
22    February 12, 2017?
23    A.  I am.
24    Q.  Where did that occur?
25    A.  It occurred at the Hotel Davenport, 5202 North Brady Street
```

1  in Davenport, Iowa.

2  Q.  Are you familiar with that hotel?

3  A.  I am.

4  Q.  Can you please to turn to 629.

5       What is that?

6  A.  This is, like, a map layout of the Hotel Davenport.

7  Q.  Of the interior?

8  A.  The interior, correct.

9  Q.  Does it appear to be fair and accurate?

10  A.  It does.

11  Q.  Does the Hotel Davenport still exist?

12  A.  It does not.

13  Q.  What happened to it?

14  A.  It was demolished.

15       MS. SCHNEIDER:  Your Honor, the Government moves to

16  admit Exhibit 629.

17       MR. WILLETT:  No objection.

18       MR. BREEDLOVE:  No objection, Your Honor.

19       THE COURT:  629 is admitted.

20  BY MS. SCHNEIDER:

21  Q.  Finally, Detective Butt, are you familiar with a shooting

22  that happened on April 22, 2017?

23  A.  I am.

24  Q.  And where did that occur?

25  A.  At Centennial Park in Davenport.

1    Q.  Are you familiar with that area?

2    A.  Yes.

3    Q.  Can you please turn to Exhibits 630 and 631.

4        Do you recognize those?

5    A.  I do.

6    Q.  What are they?

7    A.  They are overhead views of a portion of Centennial Park.

8    Q.  Are they fair and accurate?

9    A.  Yes.

10       MS. SCHNEIDER:  Your Honor, the Government moves to

11   admit Government's Exhibits 630 and 631.

12       MR. WILLETT:  No objection.

13       MR. BREEDLOVE:  No objection.

14       THE COURT:  630 and 631 are admitted.

15       MS. SCHNEIDER:  Thank you.

16        The Government has no further questions.

17       THE COURT:  Ladies and gentlemen, the Government has

18   asked and the Court has granted the permission to recall

19   Detective Butt through the course of the proceedings to address

20   separate issues at each time.  That's so that you can better

21   understand the evidence as it comes in.

22       In light of that, the defense attorneys are going to

23   ask Detective Butt questions only about the testimony that he

24   has just provided.  He will come back another time and provide

25   different testimony, and they will have the opportunity to ask

 1    questions about that at that time.

 2            Thank you.

 3            Mr. Willett, cross-examination as to the testimony

 4    presented.

 5            MR. WILLETT:  Thank you, Your Honor.

 6            May I use the Court's lectern?

 7            THE COURT:  Of course.

 8            Members of the jury, you may stand and stretch if you

 9    would like.  I know I would benefit from that.

10            Let us know when you're ready to proceed, Mr. Willett.

11            Members of the gallery may also stand and stretch if

12    you'd like.

13            Are you prepared?

14            MR. WILLETT:  Thank you, Your Honor.

15            THE COURT:  Thank you.  You may be seated.

16                          CROSS-EXAMINATION

17    BY MR. WILLETT:

18    Q.  Good afternoon, Detective.

19    A.  Good afternoon, sir.

20    Q.  Several times during the course of direct there was the

21    distinction made between being a member or being an associate.

22        Do you remember that discussion?

23    A.  Correct.

24    Q.  I won't ask you to define a member for the benefit of the

25    jury, but when you're saying that someone is an associate, how

1  is that distinct -- how is that different from being a member?

2  A.  So with people that we say that are associated with a

3  group, we have not determined or made that line of clarity

4  between that they are a member.  They may have direct

5  associations, may socialize with those guys, but they may not

6  be a full-fledged member.

7  Q.  And then you also used the term "affiliated" or

8  "affiliation."  But were you meaning to use that between

9  organizations, or did you mean to use that between individuals

10  as well, that someone might be affiliated with an entity?

11  A.  Can you clarify the question in what context?

12  Q.  Sure.  That was probably a poor question by a lawyer.

13      If you used the term that someone might be affiliated with

14  a criminal gang, pursuant to your opinion, were you referencing

15  another individual or were you referencing a different entity

16  being affiliated with a separate entity?

17  A.  That's a lot.

18      I think I was referencing a person being affiliated with a

19  group.

20  Q.  Thank you.

21      Was I correct in my understanding from your discussion on

22  direct that when you were discussing Mr. Elleck Vesey, that he

23  was a member of a different entity, pursuant to your opinion?

24  A.  He is definitely associated, correct.

25  Q.  And what entity was it your opinion that he was associated

1    with?

2    A.   Fifth Street.

3    Q.   And that's a Rock Island entity; correct?

4    A.   That's correct.

5         (Discussion off the record between Mr. Willett and

6    Mr. Ripley.)

7         MR. WILLETT:  Your Honor, if it would please the

8    Court, Mr. Ripley is gracious enough that if I want to discuss

9    an exhibit with Detective Butt, Mr. Ripley will go on point in

10   order to expedite this process.

11        THE COURT:  Thank you.

12        And thank you, Mr. Ripley.

13   BY MR. WILLETT:

14   Q.   I would direct your attention to Government Exhibit 701.

15        Mr. Quinn is not in that picture, is he, sir?

16   A.   No, sir.

17   Q.   And just for point of reference -- excuse me -- you would

18   agree with me that the exhibits starting at 700 and 700a was

19   the Facebook account person pertaining to one Mr. Olajuwan

20   Culbreath; correct?

21   A.   That's correct, sir.

22   Q.   Okay.  And turning your attention to page 2 of Government

23   Exhibit 702, we are still in the Culbreath account; correct,

24   Detective?

25   A.   That's correct.

1  Q.  Mr. Quinn is not in that photograph, is he, sir?

2  A.  He is not.

3  Q.  And I would direct your attention to Government Exhibit

4  704, page 2.

5      Mr. Quinn is not pictured as either one -- is neither one

6  of those individuals pictured on that page, is he, sir?

7  A.  That's correct.

8  Q.  I would direct your attention to page 2 of Government

9  Exhibit 705.

10     Mr. Quinn is neither one of the two males presented in that

11 picture, is he, sir?

12 A.  He is not.

13 Q.  I would direct your attention to Government Exhibit 712.

14     You previously identified Mr. Quinn as being the individual

15 on the left side of that picture; is that correct?

16 A.  That's correct.

17 Q.  His right hand is not forming a sign associated with Savage

18 Life Boys, is it?

19 A.  That's correct.

20 Q.  Government Exhibit 714 was an account related to

21 Mr. Gardner.  Am I correct, sir?

22 A.  That's correct.

23 Q.  I'm directing your attention to Government Exhibit 719.

24     Mr. Quinn is not in that photograph, is he, sir?

25 A.  That's correct.

1          THE COURT:  One moment, Mr. Willett.

2          Members of the jury, I know you have a screen directly

3    in front of you.  You also have this large screen over here.

4    Can everyone see okay with the lighting the way it is?

5          I see everyone indicating as such.

6          You should note that you will also have these exhibits

7    both in hard copy and in a digital form when you retire to

8    deliberate.

9          Thank you.

10         You may proceed.

11         MR. WILLETT:  Thank you, Your Honor.

12   BY MR. WILLETT:

13   Q.  I would direct your attention to Government Exhibit 721.

14       Although the picture does not have the best lighting, would

15   you agree with me that Mr. Quinn is not in that photograph?

16   A.  I would agree with you.

17   Q.  I would direct your attention to Government Exhibit 723.  I

18   realize you discussed this picture on direct, and I realize,

19   again, the lighting is somewhat poor in regards to the

20   photograph.

21       Would you agree with me that we do not see Mr. Quinn in

22   Government Exhibit 723?

23   A.  I would agree with you.

24   Q.  And directing your attention to Government Exhibit 769,

25   that's the account pertaining to Mr. Smith?

1   A.  Yes, sir.

2   Q.  Directing your attention to Government Exhibit 771,

3   Mr. Quinn is not in that picture, is he, sir?

4   A.  He is not.

5   Q.  Directing your attention to Government Exhibit 773, would

6   it be fair to say that we don't know who's captured in that

7   photograph?

8   A.  I would not agree with that assertion, but your client is

9   not in the photograph.

10  Q.  You anticipated my next question.  Thank you, Detective.

11      And directing your attention to Government Exhibit 775,

12  even though this was discussed on direct, again, the lighting

13  of the photograph is of poor quality, but would you agree with

14  me that Mr. Quinn is not in this picture?

15  A.  I would agree with you, sir.

16  Q.  I would direct your attention to page 2 of Government

17  Exhibit 781.

18      Did I understand your testimony correctly that this

19  business, Jesse's Mart, is in Rock Island?

20  A.  That's correct.

21  Q.  We do not see Mr. Quinn in this picture, do we, sir?

22  A.  That's correct.

23  Q.  Neither do we see him in page 4 of that exhibit, do we?

24  A.  No, sir.

25  Q.  Nor page 6 of that exhibit, do we?

1   A.   No, sir.

2   Q.   I would direct your attention to Government Exhibit 782.

3        We do not see Mr. Quinn in that picture, do we, sir?

4   A.   We do not.

5   Q.   Starting with Government Exhibit 734, that was the account

6   related to Mr. Quinn; correct?

7   A.   That's correct.

8   Q.   I would direct your attention to page 3 of Government

9   Exhibit 735.

10       We do see my client in front of a vehicle, don't we?

11  A.   We do.

12  Q.   Detective Butt, when you were a young man, did you ever

13  have your picture taken in front of a nice car?

14  A.   I did.

15  Q.   I would direct your attention to Government Exhibit 745,

16  page 2.

17       Mr. Quinn is shown in that photograph wearing a -- it

18  appears to be a St. Louis Cardinals baseball cap?

19  A.   I agree.

20  Q.   Would you agree with me that the position of his right hand

21  is not any hand sign for Savage Life Boys?

22  A.   I would agree with that.

23  Q.   And directing your attention to Government Exhibit 746,

24  again, Mr. Quinn's right -- strike that.  Poor question.

25       Would you agree with me that Mr. Quinn is in that

1   photograph?

2   A.  I would.

3   Q.  And would you agree with me that his right hand is not

4   reflecting a hand sign as you know it for the Savage Life Boys?

5   A.  I would agree.

6   Q.  Directing your attention to Government Exhibit 747.

7          MR. WILLETT:  And, excuse me, page 2, Mr. Ripley.

8          Thank you.

9   BY MR. WILLETT:

10  Q.  Even though the individual -- either on the top portion of

11  the photograph or the left-hand portion, whichever way you'd

12  like to orient yourself, even though that person is wearing

13  some sort of hooded garment, that individual is not Mr. Quinn,

14  is it?

15  A.  That's correct.

16  Q.  Directing your attention to Government Exhibit 785, the

17  gentleman in the right half of that photograph is Mr. Vesey?

18  A.  That's correct.

19  Q.  And what he is portraying with his right hand and his left

20  hand is the hand sign as you know it for the Fifth Street of

21  Rock Island?

22  A.  That's correct.

23  Q.  Directing your attention to Government Exhibit 790.

24      And this was the account for Mr. Armstrong; correct?

25  A.  That's correct.

 1   Q.  We're going to discuss the printed word for just a second.

 2       I would direct your attention to the bottom of page 1 of

 3   Government Exhibit 791.

 4            MR. RIPLEY:  I'm sorry, Mr. Willett.  Tell me again.

 5            MR. WILLETT:  The bottom of the page.

 6            MR. RIPLEY:  Of page?

 7            MR. WILLETT:  Page 1 of 791.

 8            MR. RIPLEY:  Okay.

 9            MR. WILLETT:  Thank you very much.

10   BY MR. WILLETT:

11   Q.  Was it your understanding that if we see the name of the

12   author of Willie Earl Jenkins that that translates to

13   Mr. Armstrong based upon your research?

14   A.  That's correct.

15   Q.  It appears that Willie Earl Jenkins sent a message at the

16   bottom of page 1 on October 3 of 2016, 5:47 p.m. Universal

17   Time; correct?

18   A.  That's correct.

19   Q.  And would you please read the body of that text.

20   A.  Yes.  It says:  *Omk, you better not be there when I get*

21   *there.*

22   Q.  And omk would translate to what, based on your research,

23   sir?

24   A.  On my kids.

25   Q.  Okay.  Now, it appears that there's a response after that

1  from Wayne Perry; correct?

2  A.  That's correct.

3  Q.  And based upon your research, Wayne Perry was equated to my

4  client, Mr. Quinn; correct?

5  A.  That's correct.

6  Q.  Now, if we turn to page 2 --

7       MS. SCHNEIDER:  Your Honor, I'm going to object.  This

8  is beyond the scope.  This was not published, and it goes to a

9  later point of the case.

10      THE COURT:  791 wasn't published?  Do you anticipate

11 having this witness testify to this subsequently?

12      MS. SCHNEIDER:  I believe it's a different witness,

13 Your Honor.

14      THE COURT:  Mr. Willett, we've discussed the fact that

15 the cross-examination is limited to what Detective Butt

16 testified to.

17      Do you recall him testifying about this exhibit?

18      MR. WILLETT:  I remember it being admitted,

19 Your Honor, and there's been enough exhibits that virtually

20 every one was published.  So if I made a mistake, I will

21 apologize to the Court.

22      THE COURT:  Thank you.

23      I believe the Government's representation as to the

24 fact that the substance of that exhibit will be discussed

25 later, and I will allow you to pursue that at that time.

 1            MR. WILLETT:  Thank you.

 2            I need to confer with my client, Your Honor.

 3            THE COURT:  Of course.

 4            MR. WILLETT:  Thank you.

 5            (Discussion off the record between Mr. Willett and

 6    Defendant Quinn.)

 7            MR. WILLETT:  Thank you, Your Honor, for allowing me

 8    to confer with my client.

 9            No further cross of Detective Butt at this time,

10    Your Honor.

11            THE COURT:  Thank you, Mr. Willett.

12            On behalf of Defendant Smith, Mr. Breedlove?

13            MR. BREEDLOVE:  Yes.  Thank you.

14            THE COURT:  You can stretch if you wish.

15            MR. BREEDLOVE:  Apologies, there's a lot of exhibits

16    and paper, Your Honor, and to the jury.

17            THE COURT:  Take the time you need.

18                          CROSS-EXAMINATION

19    BY MR. BREEDLOVE:

20    Q.  We've discussed Elleck Vesey.  You know who that is;

21    correct?

22    A.  I do.

23    Q.  And you mentioned he was related to my client; correct?

24    A.  That's correct.

25    Q.  They have the same mother; correct?

1    A.   Correct.

2    Q.   And is it a fair understanding that she did the majority of

3    raising them and they were very close growing up, to your

4    knowledge?

5    A.   I don't have any knowledge of that situation.

6    Q.   You alleged Elleck is in the Fifth Street Boys; is that

7    correct?

8    A.   He is associated with them; correct.

9    Q.   Okay.  And you believe that the Fifth Street Boys and

10   Savage Life have a feud; is that correct?

11   A.   I would assert that they don't go by the Fifth Street Boys.

12   They go by Fifth Street or Zone Fifth.

13   Q.   Fifth Street.  Sorry.

14   A.   And, yes, they have had ongoing issues.

15   Q.   You talked about territories for gangs, that you believe

16   different groups associate with different territories.

17        Do you recall that?

18   A.   I don't think that I termed it as territories, sir.

19   Q.   Okay.

20   A.   I think I said geographical areas that they frequent.

21   Q.   Okay.  But you did -- you recall that; correct?

22   A.   I do.

23   Q.   And Jesse Mart is a Fifth Street/Zone Fifth/Elleck Vesey

24   location?

25   A.   I would say that's an area frequented by, yes, Fifth

1   Street.

2   Q.  So if Mr. Smith was in Savage Life and he was at Jesse

3   Mart, do you believe that Elleck Vesey would have an obligation

4   to harm Mr. Smith?

5   A.  I think that you're talking about familial ties, which is

6   completely different than discussion.

7   Q.  So they're in separate -- you believe they're in separate

8   groups; correct?

9   A.  But they're also half brothers.

10  Q.  And so, to be colloquial, blood is thicker than water?

11  A.  I would say so, yes.

12  Q.  Okay.  So if there are rivals amongst groups of people, the

13  familial tie is going to carry more weight than that?

14  A.  I can't speak on what the ebb and flow of Mr. Vesey and

15  Mr. Smith's relationship has been over the years or growing up.

16  Q.  You've mentioned a number of different hand signals that

17  you've discussed today.  I want to make sure I understand them

18  all.

19      There is the GD hand signal; is that correct?

20  A.  That's correct.

21  Q.  And that's one that you're familiar with in this area?

22  A.  That's correct.

23  Q.  And that is the Gangster Disciples?

24  A.  That's correct.

25  Q.  There's -- and it's okay if you don't because I can't -- I

1  have deformed hands, so I couldn't make any of them.  But can

2  you make the GD sign?  Are you able to do that?

3  A.  I'm not -- as I testified earlier, I'm just not very good

4  at it.

5  Q.  Okay.  Then there's 12th -- what are they called again?

6  A.  They are an older set of gentlemen that have referred to

7  themselves as 12th Street.

8  Q.  Okay.  So 12th Street is not some older gentlemen.  I don't

9  want to get in trouble with anybody, so let's not use "older

10  gentlemen."  What age do you think the 12 Street folks

11  generally are?

12  A.  These guys are in their mid to late 30s now.

13  Q.  We'll call them mid to late 30s instead of older.  Fair?

14  A.  Okay.

15  Q.  What's the 12th Street sign look like?

16  A.  The same as the Savage Life, so the one and then the two

17  fingers.

18       MR. BREEDLOVE:  As before, Mr. Ripley with the

19  Government has agreed to pull up their exhibits for me, so I

20  appreciate that.

21       Mr. Ripley, could you please pull up 746 and scroll

22  down to the image, please?

23       The next image.

24       You can take that off, Mr. Ripley.  I apologize.

25  That's not the...

```
 1          Sorry.  736.
 2   BY MR. BREEDLOVE:
 3   Q.  All right.  Who is the gentleman that you see seated?
 4   A.  Dimetri Smith.
 5   Q.  And do you see any -- do you see tattoos on Mr. Smith?
 6   A.  He has a tattoo on his chest.
 7   Q.  Are you familiar with Mr. Smith's tattoos?
 8   A.  I know that he doesn't have any Savage Life related
 9   tattoos.
10   Q.  Okay.  So you had testified about --
11          MR. BREEDLOVE:  Thank you, Mr. Ripley.  You can take
12   that one down.
13   BY MR. BREEDLOVE:
14   Q.  You had testified about a number of Savage Life members
15   having Savage Life tattoos as a gang marker; correct?
16   A.  That's correct.
17   Q.  And Mr. Smith does not have one of those; is that correct?
18   A.  That's correct.
19          MR. BREEDLOVE:  Mr. Ripley, could you please show 765?
20   BY MR. BREEDLOVE:
21   Q.  This is a text -- a series of messages between an account
22   called Wayne Perry and an account called BJ Haliburton; is that
23   correct?
24   A.  That's correct.
25   Q.  And BJ Haliburton is a Zone Fifth member or Fifth Street;
```

1   is that correct?

2   A.  I will not testify to that.

3   Q.  Do you believe he is associated with any organization?

4          MS. SCHNEIDER:  Objection.  The witness says he will

5   not testify as to this account.

6          THE COURT:  That's not what the witness said.  The

7   objection is overruled.

8          You may ask the question -- or you may answer the

9   question if you recall the question, Detective Butt.

10          MR. BREEDLOVE:  I can rephrase it, Your Honor.

11          THE COURT:  Thank you.

12   BY MR. BREEDLOVE:

13   Q.  In your policing, you discussed how you associate different

14   people with different groups.

15          Is there an association that, in your police work, you

16   identified BJ Haliburton with?

17   A.  BJ is from Rock Island, and I will not testify to an

18   affiliation for him.

19   Q.  You will not testify to one or you don't know of one?

20   A.  I guess maybe that's a better answer.  I'll say that I

21   don't know.

22   Q.  But that would include, then, that he is not Savage Life?

23   A.  Correct.

24          MR. BREEDLOVE:  Thank you, Mr. Ripley.

25          775, please.

1          If you could zoom in a little bit, please, Mr. Ripley.

2    BY MR. BREEDLOVE:

3    Q.   The gentleman in all white, who is that?

4    A.   Dimetri Smith.

5    Q.   And the sign that he appears to be showing is associated

6    with Gangster Disciples; is that correct?

7    A.   That's correct.

8    Q.   The gentleman next to him in the black suit and tie, who is

9    that?

10   A.   That's Damarkus Echols.

11   Q.   Pardon?

12   A.   Damarkus Echols.

13   Q.   And he is displaying a sign different than that which

14   Mr. Smith is displaying; is that correct?

15   A.   With which hands are you articulating?

16   Q.   I can only see one of his hands, and he appears to have on

17   his left hand, which is visible, his pointer finger and middle

18   finger together and pointing.  And Mr. Smith, in neither hand,

19   does he have his pointer finger and middle finger straight and

20   together.

21   A.   If you look behind Mr. Smith's head, you can see Damarkus

22   Echols' right hand.  Damarkus is displaying the Gangster

23   Disciple hand sign with his right hand.

24   Q.   I'm asking about the left hand.

25   A.   I think he has just got the left hand up there.

1   Q.   Okay.   So you don't view that as a different sign?

2   A.   No.

3   Q.   So sometimes people are doing things with their hands and

4   it's not a sign?

5   A.   That's correct.

6        MR. BREEDLOVE:   You can close that one, please,

7   Mr. Ripley.

8        740, please, Mr. Ripley.

9   BY MR. BREEDLOVE:

10  Q.   These messages you discussed --

11       MR. BREEDLOVE:   If you could scroll down, please.

12  BY MS. SCHNEIDER:

13  Q.   -- are with a Hosa Howard; is that correct?

14  A.   That's correct.

15  Q.   And Hosa Howard is 12th Street; is that correct?

16  A.   Yes.

17       MR. BREEDLOVE:   You can close that one.   Thank you,

18  Mr. Ripley.

19  BY MR. BREEDLOVE:

20  Q.   Some of these groups operate in Rock Island County,

21  Illinois; is that correct?

22  A.   That's correct.

23  Q.   Is it common and a bit on the nose, since it's the state of

24  Illinois, even though it's my county, for Rock Island County to

25  be referred to as R-I-C-O or RICO?

1    A.  As in, like, the Rock Island County Sheriff's Department

2    or --

3    Q.  Do people use RICO as an abbreviation for Rock Island

4    County?

5    A.  It can be.

6    Q.  Okay.  And so sometimes references to RICO is a reference

7    to Rock Island County, Illinois; is that fair?

8    A.  I would say that it could be.

9           MR. BREEDLOVE:  Mr. Ripley, can you open 745 for me,

10   please?

11   BY MR. BREEDLOVE:

12   Q.  Who is the woman in that photograph?

13   A.  I am not entirely sure.  I think it is Shevanika Howard

14   Rogers, but I'm not positive.

15   Q.  And are you able to read her tattoo?

16   A.  Yes.

17   Q.  And what does it say?

18   A.  It says Dae Dae on the chest.

19           MR. BREEDLOVE:  You can close that one.

20           Thank you, Mr. Ripley.

21   BY MR. BREEDLOVE:

22   Q.  Mr. Willett asked you briefly about member versus associate

23   versus affiliate.

24        Do you recall that?

25   A.  I recall discussing member and associate.

1    Q.  In your experience, are the rules for a member different

2    than those for a nonmember; that is, do members have rules?

3    A.  I would say that there is expectations, not rules.

4    Q.  So your experience with Savage Life Boys is that there are

5    no rules?

6    A.  I would say that there are expectations.  But when you say

7    rules, I think like written things down, and I would say no,

8    there are not.  There's expectations.

9    Q.  And those are different based on those classifications?

10   A.  Yes.

11   Q.  You talked about the relationships between the various

12   groups in the Quad Cities that you referenced, Maniacs, Savage

13   Life, Fifth Street, Zone Fifth, 12th Street, Dae Dae.  Those

14   are all -- when you do your police work and you group people

15   together to understand your investigations, those are all

16   separate groups; is that correct?

17   A.  Those aren't all separate groups that you just named.

18   Q.  Do they -- are they separate groups -- are they separate

19   names that you give with overlapping membership?

20   A.  No.

21   Q.  Okay.  Do any of those groups have overlapping membership?

22   A.  I think that it's more complicated than that.

23   Q.  Okay.

24   A.  You cited several groups in there that are one in the same.

25   You cited Savage Life and Dae Dae Gang, but that's one in the

1    same.  That's not two separate groups.

2    Q.  Okay.

3    A.  Do we see 12th Street and then associations of 12th Street

4    members with Savage Life members?  Yes.  Do we see Savage Life

5    members associating with 12th Street members?  Yes.

6    Q.  And yet they remain distinct?

7    A.  What we see is, yes, a generational distinction.

8          MR. BREEDLOVE:  Okay.  Can I have a moment,

9    Your Honor, to look at my other notes?

10          THE COURT:  Yes.

11          Any more questions, Counsel?

12          MR. BREEDLOVE:  Yes, Your Honor.

13          THE COURT:  Thank you.

14          You may proceed.

15    BY MR. BREEDLOVE:

16    Q.  We discussed Hosa Howard who you said was affiliated with

17    12th Street; correct?

18    A.  I said that -- earlier in my testimony I said that he

19    associates with Savage Life, but --

20    Q.  Go ahead.  Sorry.

21    A.  But we have always classed him as a 12th Street.

22    Q.  Okay.  And that's because he's of the 12th Street

23    generation, for lack of a better term?

24    A.  I would say so.

25    Q.  Okay.  And he's 31 years old?

 1   A.   I'm not sure how old Hosa is.   Sometimes it has to do

 2   with -- we will see younger --

 3   Q.   That's okay.   If you don't know how old he is, I just --

 4   A.   No.

 5           MR. BREEDLOVE:   Okay.   Thank you, Your Honor.   Nothing

 6   further.

 7           THE COURT:   Thank you.

 8           Redirect?

 9           MS. SCHNEIDER:   Briefly.

10                    REDIRECT EXAMINATION

11   BY MS. SCHNEIDER:

12   Q.   Detective Butt, back when Mr. Willett was asking you the

13   affiliation question, when you were speaking of people or other

14   gangs, can I break that down -- can we break that down?

15   A.   Of course.

16   Q.   Can a person be affiliated with a gang?

17   A.   Yes.

18   Q.   When you say that, are you referring, then, to that person

19   being a member or an associate?

20   A.   An associate.

21   Q.   Okay.   And can one gang affiliate with another gang?

22   A.   Yes.

23   Q.   Can you describe that?

24   A.   So we can see -- we have seen historically some of these

25   neighborhood gangs associate with other neighborhood gangs.   A

1   classic example for us is that there is a neighborhood gang out

2   of Rock Island that refers to themselves as Boom Gang.  They

3   have a good relationship or associate, do not feud with our

4   Savage Life/12th Street guys.

5   Q.  Mr. Breedlove was asking you about Mr. Smith and Mr. Vesey.

6       Do you remember that?

7   A.  Yes.

8   Q.  I'm not asking you about knowledge of the course of their

9   relationship, which you testified you don't know about, but

10  have you seen evidence of Mr. Vesey being able to safely

11  associate with Savage Life members?

12  A.  Yes.

13  Q.  And why is that if he is associated with Fifth Street?

14  A.  I believe it's because he is Dimetri's brother.

15  Q.  To your knowledge -- in your knowledge and experience, do

16  all Savage Life members have Savage Life related tattoos?

17  A.  They do not.

18  Q.  Do you know where Brian Brand is from?

19  A.  He's from Rock Island.

20  Q.  So it is fair to say that even outside of familial

21  relationships, people from Rock Island are associated with

22  Savage Life?

23  A.  Yes.

24  Q.  And, in fact, Savage Life -- does Savage Life feud with the

25  entire city of Rock Island?

1   A.   They do not.

2           MR. BREEDLOVE:  Objection.  Never mind.

3           THE COURT:  Withdrawn?

4           MR. BREEDLOVE:  Withdrawn, Your Honor.

5           Thank you.

6   BY MS. SCHNEIDER:

7   Q.   You spoke about the generational aspect of 12th Street and

8   Savage Life.  Approximately what age range would you put Savage

9   Life in?

10  A.   So I would base it on at this point from -- we would say

11  Mr. Smith and Mr. Quinn's age and on down younger.

12  Q.   And do you know approximately what that is?

13  A.   I assume they're right around 30 years of age at this

14  point.

15  Q.   And on down.  Is there another group that has split off of

16  Savage Life that are younger?

17  A.   We've seen multiple cliques of Savage Life members that

18  have their own -- now identify within that group as -- and it's

19  generational.  We see a group that is calling themselves KMG or

20  King Monster Gang in memory of Demetrius Allen, and that group

21  is all around a certain age.  And then there's other groups now

22  that are associating with even younger members who have died

23  who are referring to themselves as Bell Gang or Snoop Gang for

24  two 14- and 15-year-olds that were killed in the last couple of

25  years.

1   Q.  So it's very -- even though they all kind of came sort of

2   12th Street and on down, it's very generational?

3   A.  Yes.

4   Q.  Do they sometimes have alliances with one another?

5   A.  Yes.

6           MS. SCHNEIDER:  Thank you.

7           Nothing further.

8           THE COURT:  Recross limited to redirect, Mr. Willett?

9           MR. WILLETT:  No thank you, Your Honor.

10          THE COURT:  Mr. Breedlove?

11          MR. BREEDLOVE:  No.  Thank you, Your Honor.

12          THE COURT:  Thank you, Detective.  You may step down.

13          I will remind the jury that you will hear from

14  Detective Butt again and that this questioning was limited to

15  the topics that were discussed on direct.

16          Is the Government prepared to call your next witness?

17          MR. RIPLEY:  We are, Your Honor.  The Government calls

18  Dejarvae Thorpe.

19          THE COURT:  Thank you.

20          Members of the jury, you can stand and stretch while

21  we wait for this witness to appear.

22          MR. WILLETT:  Your Honor, before the next witness

23  walks in, could counsel approach and -- I want to take care of

24  an issue at sidebar very quickly before this witness takes the

25  stand.

```
1              THE COURT:  You may.

2              (Sidebar discussion, not reported.)

3              THE COURT:  Ma'am, would you please raise your right

4    hand, to the extent you're able, and prepare to be sworn.

5              DEJARVAE THORPE, GOVERNMENT'S WITNESS, SWORN

6              THE COURT:  You may be seated, ma'am.

7              Ma'am, would you please state and spell your full name

8    for the record?

9              THE WITNESS:  Dejarvae Thorpe, D-e-j-a-r-v-a-e, then

10   T-h-o-r-p-e.

11             THE COURT:  Thank you.

12             Your witness, Counsel.

13             MR. RIPLEY:  Thank you, Your Honor.

14                          DIRECT EXAMINATION

15   BY MR. RIPLEY:

16   Q.  How old are you, ma'am?

17   A.  Thirty-one.

18   Q.  And where do you live?

19   A.  In Davenport.

20   Q.  Okay.  How long have you lived in Davenport?

21   A.  I've been back about two years now.

22             MR. WILLETT:  Your Honor, could the witness please

23   speak up?

24   A.  I've been back about two years now.

25
```

1   BY MR. RIPLEY:

2   Q.   Back from where?

3   A.   Texas.

4          THE COURT:  Ma'am, you can also lower that microphone

5   to make it easier for you.

6   BY MR. RIPLEY:

7   Q.   The whole base moves too, if that make it more comfortable

8   for you but we do need to hear you.  Okay?

9   A.   Okay.

10  Q.   Thank you.

11         You are here this morning -- excuse me -- this afternoon

12  pursuant to a subpoena; is that right?

13  A.   Yes.

14  Q.   Let me just ask you something.  Do you see the gentleman

15  seated over here in the black shirt and the white polka dots?

16  A.   Yes.

17  Q.   Do you know him?

18  A.   Yes.

19  Q.   What do you know him as?

20  A.   I went to school with him.  I know him around here.

21  Q.   Do you know his name?

22  A.   Yes.

23  Q.   What's his name?

24  A.   Marcus.

25  Q.   Do you know his last name?

1    A.   Yes.

2    Q.   What do you know his last name to be?

3    A.   Quinn.

4    Q.   Do you know any other names for him?

5    A.   (Witness shook head negatively.)

6    Q.   Is that a no?

7    A.   I wouldn't, like -- yeah.  Marcus Quinn.

8    Q.   And how long have you known him?

9    A.   A long time.

10   Q.   Okay.  There's a whole lot of other people in this

11   courtroom.  Would you agree with me?

12   A.   Yeah.

13   Q.   We've got a whole series of people over here, a bunch of

14   people back here.  There's me.

15       Mr. Quinn is not the only person in this courtroom that

16   you're familiar with.  Would you agree with that?

17   A.   Yes.

18   Q.   I just want to take you back, if I could, to October of

19   2016.  It was quite a few years.  But do you recall an incident

20   during that month involving Mr. Quinn?

21   A.   Kind of.

22   Q.   Okay.  Let's get into that a little bit.

23       On particularly October 9 of 2016, where were you living

24   then?

25   A.   I believe I was living with my mom, me and my mom and my

1    grandmother.

2    Q.  Okay.  Do you recall where that was?

3    A.  With my mom?  She stays -- yeah, I know where she lives.

4    On 13th and Iowa.  My grandmother at the time, she was staying

5    on Ninth and Brown.

6    Q.  Okay.  Let's talk about the 13th and Iowa address.  Whose

7    house did you refer to that as?

8    A.  My mom's.

9    Q.  Well, let's talk about that afternoon.  The afternoon of

10   the 9th, did you have occasion to call the police related to

11   that residence?

12   A.  Yeah, we did.

13   Q.  Okay.  Who is "we" in that sentence?

14   A.  Me, my mom, and her boyfriend.

15   Q.  Were you all present at that residence?

16   A.  Yeah.  There was quite a few people there.

17   Q.  Okay.  The three of you that you already mentioned.  Who

18   else was there?

19   A.  Of what I recall, I know my brother, my kids, a cousin, and

20   some of my mom's boyfriend's people.

21   Q.  If I say the address 1311 Iowa Street, does that sound

22   right?

23   A.  Yeah.

24   Q.  That's the house we're talking about and referring to?

25   A.  Yes.

1    Q.   Okay.  Why did you call the police?

2    A.   There were shots fired.  My mom actually was the one that

3    called.  They came out to talk to us.  My daughter was outside,

4    and the bullet basically went past her as she say.  So she

5    called the police to the residence.  There were some shots that

6    hit the house as well.

7    Q.   Okay.  So there were some shots fired at the house; is that

8    correct?

9    A.   Yeah.

10   Q.   Some of them hit the house?

11   A.   Yes.

12   Q.   Okay.  And some of them got really, really close to some of

13   the people that were at that house?

14   A.   Yes.

15   Q.   Did you see who fired the shots?

16   A.   Vaguely.

17   Q.   Did you see who fired the shots?

18   A.   Yeah, somewhat.

19   Q.   Who fired the shots?

20   A.   Marcus.

21   Q.   Okay.  You told us earlier that you had known -- you just

22   referred to him as Marcus.  I'm going to refer to him as

23   Mr. Quinn.  You've known Mr. Quinn for years?

24   A.   Yeah.

25   Q.   That includes -- so you knew him for years leading up to

1    October of 2016 as well; is that right?

2    A.   Yes.

3    Q.   So did you see how he arrived?  Let's help the jury

4    understand this.  How did he arrive to get there to the 1300

5    block of Iowa Street?  What did you see?

6    A.   I pretty much just seen someone come running through the

7    alley shooting.  Others believed that there was a vehicle that

8    kept riding back and forth around the house through the alley.

9    Q.   Okay.  Let's limit this to what you saw.  Okay?

10   A.   (Witness nodded her head affirmatively.)

11   Q.   So --

12          THE COURT:  Ma'am, I saw you just nod your head, and

13   earlier I saw you gesture with your head when you were

14   identifying Mr. Quinn.  You must answer out loud.  If it's a

15   yes answer, you have to say yes, and if it's a no answer, you

16   have to say no.

17          Do you understand?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.  Thank you.

20          Your witness, Counsel.

21          MR. RIPLEY:  Thank you, Your Honor.

22   BY MR. RIPLEY:

23   Q.   Specifically, what did you see?

24   A.   I seen someone come up the alley, aim towards the house,

25   get to shooting.  Everybody just, like, took off running.  I

1  know my brother, he grabbed my baby.  He ran in the house.  And

2  that's when, you know, everybody got to yelling.  And my mom

3  was, like, Call the police, call the police.  And so we then

4  called the police.

5  Q.  Okay.  Your answer included, I seen somebody come up to the

6  house, basically point a gun at the house, and start firing?

7  Who is the somebody in that sentence?

8  A.  Marcus.

9  Q.  How do you know it was Marcus?

10  A.  We seen him.

11  Q.  I'm sorry?

12  A.  We seen him.

13  Q.  Okay.  I want to know about you.  I understand that --

14  A.  Yes, I seen him.

15  Q.  Okay.  And you saw his face?

16  A.  Yes.

17  Q.  So that was on the 9th.  When police responded out, did you

18  tell the patrol officer essentially what you just told this

19  jury?

20  A.  Yeah.  For the most part, yeah.

21  Q.  Okay.  The next day do you recall police coming out again?

22  A.  I don't recall that.

23  Q.  Okay.  If I say the term "lineup," does that mean something

24  to you?

25  A.  No.

1   Q.  Okay.  I'll tell you what, just here right there on the

2   counter, there's a white piece of paper that's got a little tab

3   on it.  It says 635.

4   A.  Uh-huh.

5   Q.  And underneath it is a photograph.  Would you take a look

6   at that?

7   A.  Yes.

8          MR. RIPLEY:  Proposed 635, Your Honor.

9   BY MR. RIPLEY:

10  Q.  Do you recognize what that is?

11  A.  Yes.

12  Q.  Is there some handwriting on it?

13  A.  Yes.

14  Q.  Whose handwriting is that?

15  A.  Mine.

16  Q.  Okay.  What do you remember about the circumstances of you

17  making that handwriting?

18  A.  Them asking if I knew who it was.

19  Q.  If you can help us understand, the handwriting that you

20  made there, that was meant to indicate what?  In other words,

21  what are you trying to convey with your handwriting there?

22  A.  Who I seen.

23  Q.  Who you seen do what?

24  A.  Aim towards the house.

25  Q.  And after they aimed towards the house, what did this

1   person do?

2   A.  Honestly, after that, we -- I just took off.  Like, we all

3   ran into the house after that and then --

4   Q.  Immediately after that, did you hear gunshots?

5   A.  But no, not -- afterwards?

6   Q.  I mean -- I'll pose a new question.

7       Is that -- do you recognize what's Government's proposed

8   Exhibit 635 to be a lineup that you engaged in with the

9   Davenport Police Department?

10  A.  Yes.

11  Q.  Okay.  Do you know someone named Romance Armstrong?

12  A.  Yes.

13  Q.  Do you know someone named Tiaesha Florence?

14  A.  Yes.

15  Q.  Is there a connection between those two people?

16  A.  With -- well, Tiaesha is my sister.  Romance is her child's

17  father.

18  Q.  Okay.  Good, yeah.  So the connection between Mr. Armstrong

19  and Ms. Florence is what?

20  A.  That's her child's father, and she is my sister.

21  Q.  And she is your sister.

22      At the time we're talking about here, October of 2016,

23  where did Mr. Armstrong and Ms. Florence live, generally?

24  A.  Yeah, I think she was staying on Division at the time in a

25  duplex.

1 Q. They lived in the city of Davenport; is that right?

2 A. Yes.

3 Q. Did they live together?

4 A. I don't know if they personally did.  I know they were

5 dealing with each other at the time, though.

6 Q. Fair enough.

7  You referred to Marcus a few times when I would ask you who

8 shot at this house, 1311.  You even gestured a little bit one

9 of the times you did it.

10  If you could, point at the person that shot at the house on

11 October 9th and describe what he's wearing.

12 A. Marcus, the black with polka dots.

13   MR. RIPLEY:  Your Honor, I would ask the record

14 reflect the witness identified Defendant Quinn.

15   THE COURT:  Yes.

16 BY MR. RIPLEY:

17 Q. You told us that your sister is Tiaesha Florence.  Do you

18 have other siblings?

19 A. Yeah, I do.

20 Q. Can you tell us who they are?

21 A. I have a lot of them, honestly.  My dad has, like, 15 kids.

22 Q. Okay.  Talk to me about your brothers.

23 A. Dee Thorpe, Jr., Deandre McAllister, Deshandre McAllister,

24 Devon McAllister, Derrick Thorpe.  It's a lot.

25 Q. Say that first brother's name again.

```
 1   A.  Dee Thorpe, Jr.

 2   Q.  Dee Thorpe, Jr.?

 3   A.  Uh-huh.

 4          THE COURT:  Is that a "yes"?

 5          THE WITNESS:  Yes.  Sorry.

 6   BY MR. RIPLEY:

 7   Q.  Which brother was at the house on October 9th?

 8   A.  Dee Thorpe, Jr.

 9          MR. RIPLEY:  Thank you, ma'am.  I don't have any other

10   questions for you.

11          MR. WILLETT:  May I use the Court's lectern?

12          THE COURT:  Yes.

13          MR. WILLETT:  Thank you.

14          May I proceed, Your Honor?

15          THE COURT:  Yes.  I'm sorry.  I'm taking my own notes.

16          You may cross-examine the witness.

17          MR. WILLETT:  Thank you, Your Honor.

18                         CROSS-EXAMINATION

19   BY MR. WILLETT:

20   Q.  Good afternoon, Ms. Thorpe.

21   A.  Good afternoon.

22   Q.  My name is Al Willett.  I'm an attorney from Cedar Rapids,

23   and I represent Mr. Quinn.

24       You stated on direct that -- when you were asked at the

25   beginning of your testimony about an incident in October of
```

1    2016, you said you kind of remember.

2         Do you remember that testimony?

3    A.   Yes.

4    Q.   Okay.  Are there things you can't remember anymore?

5    A.   Yeah.  Like, him mentioning, like, how it all happened,

6    like -- the only thing I really remember was the shots fired,

7    honestly, my mother calling the police, everybody running and

8    everything.

9    Q.   Okay.  You described a lot of family members and friends

10   being at your mother's house at 13th and Iowa on that

11   particular afternoon.

12        Did I understand that correctly?

13   A.   Yes.

14   Q.   Was it a party of some sort or a celebration of some sort

15   or just a gathering of family and friends on that particular

16   day?

17   A.   I'm pretty sure just a gathering.  At the time I was

18   actually pregnant.  I believe we were barbecuing.

19   Q.   Okay.  So if you were barbecuing, did you have anything to

20   drink of an alcoholic nature before the incident?

21   A.   No.  And I was pregnant.  I was literally going in for a

22   C-section a few days before [sic] that.

23   Q.   I understand.

24        My understanding is, based upon your testimony with

25   Mr. Ripley, you remember shots being fired at the house?

1    A.   Yes.

2    Q.   My understanding of your testimony -- bless you.

3         My understanding of your testimony on direct is you don't

4    remember anything about a car circling the house or anything of

5    that nature; am I correct?

6    A.   Correct.

7    Q.   Okay.  I've not had the pleasure of being to your mother's

8    house, and I don't know the geography around that neighborhood

9    that well, so you're going to have to help somebody from out of

10   town a little bit.  Okay?

11   A.   Okay.

12   Q.   You testified to Mr. Ripley on direct that a car came down

13   the alley or came down a side street, and that's when you

14   realized someone was shooting at the house?

15   A.   No.  They weren't in the vehicle.

16   Q.   Weren't in the vehicle.  Okay.  And you said "they."  Are

17   we talking about --

18   A.   The person wasn't in a vehicle.

19   Q.   The person was not in a vehicle.  Okay.

20        Was the person coming down -- strike that.  Poor question.

21        The location of your mother's house, is it on a corner?

22   A.   Yeah -- well, like on a corner of an alley.  It's, like,

23   her house, an alley, and then a house.

24   Q.   So your testimony regarding a person shooting at the house,

25   was the person coming down the alley?

1    A.   Yes.

2    Q.   Now, did you hear the shots first, or did you see something

3    first that drew your attention?

4    A.   Heard the shots first, looked over, and then that's when we

5    looked up.  And then everybody, like, took off running.

6    Q.   Okay.  So you heard shots first.  So you weren't looking in

7    the direction of where the shots were coming from; correct?

8    A.   Correct.

9    Q.   Okay.  And where were you?  Were you in the front yard, the

10   backyard, on a porch, on the sidewalk?

11   A.   The front porch -- like, the front porch by the front door.

12   Q.   Okay.  Some people have very large front porches.  Some

13   people have what I refer to as stoops.

14   A.   She had, like, a large front yard with, I guess, a stoop,

15   if that's what you say.

16   Q.   Are you comfortable with that term or would you rather say

17   porch or veranda or --

18   A.   Yeah, porch.

19   Q.   Porch, okay.

20   A.   Yeah.

21   Q.   So from where you were standing -- and you heard the shots

22   first, before you turned, how far is this alleyway away from

23   where you were standing?

24   A.   It's not too far.  It's quite close to where -- it's almost

25   by the driveway --

1  Q.  Okay.

2  A.  -- of the house.

3  Q.  And is the driveway next to the alley?

4  A.  Yes.

5  Q.  So there's the alley, there's a driveway, and then there's

6  the house?

7  A.  The driveway -- yeah, the driveway is like -- the porch is

8  connected to the side of the house -- I mean, excuse me.  The

9  driveway and garage is connected to the porch.  So, like, the

10  driveway is basically in the yard right to the porch.

11  Q.  So when you say not too far away, feet, yards, whatever

12  estimate you're comfortable with, how far away?

13  A.  A couple feet.

14  Q.  So just six feet between where you were and you hearing

15  shots?

16  A.  Six to -- yeah, about six I would say.

17  Q.  Let's use where I'm standing as a point of reference.

18      When you heard the shots, were they further away than where

19  I'm standing?

20  A.  A little bit.

21  Q.  Okay.

22      MR. WILLETT:  Would the Court allow me to back up just

23  a little bit if I keep my voice up?

24      THE COURT:  No.  You can use many of the various

25  points of reference in the courtroom without yourself moving,

1   and you can stay at the lectern with the microphone.

2           MR. WILLETT:  Thank you, Your Honor.

3   BY MR. WILLETT:

4   Q.  As far away as the table where Mr. Ripley is sitting?

5   A.  Yeah, similar to that.

6   Q.  Similar to that.

7       As far away as that first row of benches where no one is

8   sitting?

9   A.  The first row of bench would probably be the start of the

10  alley.  Where you're at is the garage, and then where this

11  podium is -- like, where this table is is basically the front

12  porch next to the driveway.

13  Q.  So the front row where no one is sitting is the start of

14  the alley.  We'll use the second row just for one more point of

15  designation.  Okay.

16      Would you have heard the shots from the distance of the

17  second row?

18  A.  Yeah.

19  Q.  Okay.  And we're just trying to find an end point,

20  Ms. Thorpe.

21      Would you have heard the shots -- would it have been as far

22  away as the third row?

23  A.  Yeah.

24  Q.  Okay.  Would it have gone back as far away as the fourth

25  row?

1   A.   Probably not.

2   Q.   Okay.  So you're comfortable with saying the third row of

3   these benches in this courtroom, that's about the location of

4   where you heard the shots coming from?

5   A.   Yeah, about the second, third row.

6           THE COURT:  I'm sorry.  Can you clarify?  You were

7   asking in a hypothetical term, "Would you have heard?"  And she

8   had said earlier that the shooter was only a few feet away, so

9   I don't understand the question as being hypothetical or

10  actual.

11          Can you rephrase so that I can understand?

12          MR. WILLETT:  Thank you, Your Honor.  Thank you,

13  Your Honor.

14  BY MR. WILLETT:

15  Q.   Ms. Thorpe, to the best of your memory --

16  A.   Uh-huh.

17  Q.   -- in actuality, when you heard the shots from the position

18  where you're -- excuse me -- from where you remember standing

19  at your mother's home, were the shots that you heard as far

20  away from the third row going back into the gallery of this

21  courtroom?

22  A.   No.  It was probably like the first or second row.

23  Q.   Now it's the first or second row?

24  A.   Yeah.  You said hearing shots, though.  If it went back

25  that far, I would have heard shots.

1              MR. WILLETT:  I need --

2              THE COURT:  She said she would have heard those shots,

3     meaning that she was capable of hearing shots that were fired

4     that far away.  And that's why I asked you to clarify.

5              Thank you, Mr. Willett.

6     BY MR. WILLETT:

7     Q.  So when you heard the shots, what did you do immediately

8     after hearing the shots?

9     A.  Like, I turned around, looked, seen somebody shooting, and

10    we took off running.  My mom was the first one to run in --

11    Q.  Hang on just a second.  Let's break it down a bit step by

12    step.  Okay.

13              You heard the shots?

14    A.  Uh-huh.

15    Q.  And that's a "yes"?

16    A.  Yes.

17    Q.  And people started running?

18    A.  Not, like, right, right away.  It was kind of, like, a

19    spur-of-the-moment thing.  Everybody looked -- like, the more

20    shots went off, that's when everybody took off running.

21    Q.  And you've already disclosed to us that you were almost

22    ready to deliver your baby?

23    A.  Yes.

24    Q.  So did you try to run initially, or did you stay still

25    where you were at?

1   A.   No.  I ran.

2   Q.   Okay.  And which direction did you run?

3   A.   Straight into the front door to the house and then through

4   the living room.

5   Q.   So in running through the front door of the house, you were

6   running away from the shots?

7   A.   Yeah.

8   Q.   Okay.  So you heard the shots, and then you started to run;

9   correct?

10  A.   Well, I looked around and then started hearing more shots,

11  took off running.  Everybody else, like, all started taking off

12  running.

13  Q.   And when you looked around, how many seconds approximately

14  did you take just to look around?

15  A.   About ten, I would say.  And then more started going off,

16  and I started screaming, "My baby, my baby."  My brother

17  grabbed my baby, and we all took off running.

18  Q.   So you think roughly ten seconds you're looking around?

19  A.   Yeah.

20  Q.   Okay.  Now, when you were speaking with Mr. Ripley again on

21  direct, he was asking if you saw the person that you heard the

22  shots being fired by.

23       Do you remember that testimony?

24  A.   Yes.

25  Q.   Okay.  I have in my notes that you initially responded:

1   Vaguely and somewhat.  Was that your testimony?

2   A.  I vaguely remember a vehicle going around the house.

3   Q.  Okay.  And in term of somewhat remember, was that in

4   relation to the shooter?

5   A.  I have no idea.  The vehicle going around the house, that

6   was the testimony that my mother and them gave, that they

7   believed that a vehicle kept going around through the alley and

8   everything.

9   Q.  Okay.  And you don't seem to know anything about that or

10  remember anything about that; would that be correct?

11  A.  Yeah, I wasn't really paying attention to a vehicle

12  circling around.

13  Q.  So what you're here to testify about today are these shots

14  coming from the alley and you reacting to those shots; correct?

15  A.  Correct.

16  Q.  Okay.  And we've established the approximate distance based

17  upon your testimony with me; correct?

18  A.  Yes.

19  Q.  And we've sort of established the time frame of how much

20  time you had to look before you ran into the house; correct?

21  A.  Yes.

22  Q.  Okay.  And when you were looking around before you ran into

23  the house, what did you see?

24  A.  I seen someone aiming and shooting towards the way of the

25  house.

1   Q.   Someone aiming and shooting?

2   A.   Yes.

3   Q.   And you're saying "someone" right now; correct?

4   A.   Yes.

5   Q.   Okay.  So do you know who "someone" is?

6   A.   Yes.

7   Q.   Okay.  And who do you think it is?

8   A.   I believe it was Marcus.

9   Q.   And when you say "believe" --

10  A.   I seen it was Marcus.

11  Q.   Okay.

12  A.   But at the time when shooting was happening, I was more

13  worried about my baby that was sitting on the porch, so...

14  Q.   Okay.  How did you see it was Marcus from your point of --

15  from your vantage point?

16  A.   We could see him.  He was standing behind our -- or the

17  trash can right there in the alley.

18  Q.   Okay.  So he was standing behind a trash can in the alley?

19  A.   Yes.

20  Q.   Okay.  Approximately the same distance we've been

21  discussing, the first or second row?

22  A.   Yes.

23  Q.   Okay.  Big recycling can, big yard can, small aluminum

24  trash can, what?  I've never been to your house.  What kind of

25  trash can?

1    A.   It was a green trash can.

2    Q.   Okay.  Do you remember tall, short, wide, skinny?

3    A.   The trash can?

4    Q.   Yeah.

5    A.   The normal city trash can that they have.

6    Q.   So whatever the City of Davenport produces in terms of

7    green trash cans --

8    A.   Yes.

9    Q.   -- that's what your mother had?

10   A.   Yes.

11         THE COURT:  So another rule that Mr. Willett knows

12   that I will share with you is that only one person can be

13   talking at a time, because the court reporter is writing down

14   everything that is said.  So if you could please wait until

15   Mr. Willett finishes asking the question before answering, and,

16   Mr. Willett, if you could please refrain from asking a new

17   question until the witness has finished.

18         MR. WILLETT:  Thank you.

19   BY MR. WILLETT:

20   Q.   So your testimony is, based upon the time you took to look

21   around before you ran inside the house, you believe you saw

22   Mr. Quinn standing behind this green City of Davenport trash

23   can?

24   A.   Yes.

25   Q.   Shooting at the house?

```
 1   A.   Yes.
 2   Q.   Okay.  And was there anything distinctive that made you go,
 3   That's Marcus, that's Mr. Quinn?
 4   A.   What do you mean?
 5   Q.   Well --
 6   A.   Like --
 7   Q.   Did you realize immediately, or did you see something that
 8   made you go, oh, it's him?
 9   A.   Yeah.  Like, I realized immediately.
10   Q.   You just realized?
11   A.   Yeah.
12   Q.   Okay.  You didn't hear any conversation during all this
13   shooting; correct?
14   A.   No.  As soon as everything happened, like, we instantly
15   called the police to the house.
16   Q.   Okay.  You don't know why the shooting took place, do you,
17   Ms. Thorpe?
18   A.   No.
19            MR. WILLETT:  Your Honor, if you'll let me check my
20   notes?
21            THE COURT:  Yes.
22            MR. WILLETT:  I'll have to retrieve one set of notes
23   from my table here.
24            THE COURT:  Thank you.
25            MR. WILLETT:  No further questions at this time,
```

1    Your Honor.

2              THE COURT:  Thank you.

3              Cross-examination on behalf of Defendant Smith?

4              MR. BREEDLOVE:  None, Your Honor.

5              THE COURT:  Thank you.

6              Any redirect?

7              MR. RIPLEY:  Briefly, Your Honor.

8                         REDIRECT EXAMINATION

9    BY MR. RIPLEY:

10   Q.  Ma'am, I want to draw your attention again to what's been

11   marked as Government's Exhibit 635 in front of you there.  Is

12   there a date on that?

13   A.  Yeah.  It says 10-10-16.

14   Q.  So that would be the day after the shooting?

15   A.  Yes.

16   Q.  As opposed to the five and a half years or so since the

17   shooting until today; is that right?

18   A.  Yes.

19   Q.  At that time on the 9th when you talked to the patrol

20   officer and the next day on the 10th, was there any doubt in

21   your mind that Mr. Quinn was the one who shot at that house?

22   A.  No.

23   Q.  Here today, is there?

24   A.  No, I have it circled and signed.

25   Q.  Okay.  And there's no doubt today that he was the one that

1   shot at the house back on October 9th of 2016; is that right?

2   A.   Right.

3           MR. RIPLEY:  Thank you, ma'am.

4           THE COURT:  Mr. Willett?

5           MR. WILLETT:  Nothing further.

6           THE COURT:  Does the government intend to rely upon

7   this witness again?

8           MR. RIPLEY:  No, Your Honor.  Thank you.

9           THE COURT:  Does the defense intend to call this

10  witness at any point?

11          Mr. Willett?

12          MR. WILLETT:  No, Your Honor.

13          THE COURT:  Mr. Breedlove?

14          MR. BREEDLOVE:  No, Your Honor.

15          THE COURT:  Any objection to the Court releasing the

16  defendant from her subpoena?

17          MR. RIPLEY:  None at all, Your Honor.

18          THE COURT:  The defendant -- excuse me -- the witness

19  is released from her subpoena and has no obligation to remain

20  at the Court's discretion.

21          Thank you, ma'am, for being here today.

22          It's just before 3:00.  What's the Government's intent

23  as to your next witness?

24          MS. SCHNEIDER:  I'm sorry?

25          THE COURT:  What is your intent as to your next

1  witness?

2          MS. SCHNEIDER:  We have one witness who should be very

3  fast, but --

4          THE COURT:  For the rest of the day?

5          MS. SCHNEIDER:  Oh.

6          THE COURT:  But just your next witness is very fast?

7          MS. SCHNEIDER:  Yes.

8          THE COURT:  Okay.  So we'll go ahead and have that one

9  witness, and then we'll take our afternoon break.

10          MS. SCHNEIDER:  The Government calls Corporal Michael

11  Schneider.

12          THE COURT:  Thank you.

13          MS. SCHNEIDER:  I think I didn't hear the plural,

14  Your Honor.

15          THE COURT:  I had just asked what your next witness

16  was, so thank you, you were correct.

17          MS. SCHNEIDER:  Okay.

18          THE COURT:  Thank you, sir.  You may come forward.

19          You'll be here.  If you'll please just raise your

20  right hand and please prepare to be sworn.

21          MICHAEL SCHNEIDER, GOVERNMENT'S WITNESS, SWORN

22          THE COURT:  Thank you.  You may be seated.

23          Sir, would you please state and spell your full name

24  for the record?

25          THE WITNESS:  Michael Schneider, M-i-c-h-a-e-l

 1   S-c-h-n-e-i-d-e-r.

 2            THE COURT:  Your witness, Counsel.

 3            MS. SCHNEIDER:  Thank you.

 4                       DIRECT EXAMINATION

 5   BY MS. SCHNEIDER:

 6   Q.  Corporal Schneider, if you could just make sure you're

 7   sitting up and speaking into the microphone.

 8        Good afternoon.

 9   A.  Good afternoon.

10   Q.  There's no relation here, is there?

11   A.  No.

12   Q.  All right.  How are you employed?

13   A.  City of Davenport Police Department.

14   Q.  How long have you been with the City of Davenport Police

15   Department?

16   A.  Twenty-one years.

17   Q.  How long have you been in law enforcement?

18   A.  Thirty-one years.

19   Q.  Where were you before you were with Davenport?

20   A.  Wilton, Columbus Junction, Winfield, and the government.

21            THE COURT:  Ms. Schneider, I'm going to ask you to

22   focus on speaking slowly and clearly for the benefit of the

23   jury and my court reporter.

24   BY MS. SCHNEIDER:

25   Q.  You said the government at the end?

1    A.   Yes.

2    Q.   What does that mean?

3    A.   I was a police officer at the Arsenal.

4    Q.   Were you with Wilton, Columbus Junction, and Winfield

5    before or after the Arsenal?

6    A.   Before.

7    Q.   Did you graduate from the Iowa Law Enforcement Academy?

8    A.   Yes.

9    Q.   And did you attend that through one of those other

10   departments or Davenport?

11   A.   Wilton.

12   Q.   And when you then started with Davenport, did you go

13   straight to patrol?

14   A.   Yes.

15   Q.   Did you have any type of training initially?

16   A.   I went through the FTO program with the City.

17   Q.   What is FTO?

18   A.   Field training officer.

19   Q.   Over the course of your career as a police officer with

20   Davenport, what assignments have you had?

21   A.   I worked as an evidence tech.  I worked in the crash

22   investigation unit, field training officer, and bicycle

23   officer.

24   Q.   So pretty much all patrol type roles; is that right?

25   A.   Yes.

1   Q.   In October of 2016, what was your assignment?

2   A.   Day shift patrol.

3   Q.   And what is your current role?

4   A.   Day shift patrol.

5   Q.   Are you a corporal, though?

6   A.   Yes.

7   Q.   Can you describe where that is in the hierarchy with

8   Davenport?

9   A.   I'm one rank above regular police officers.

10  Q.   What are some of your responsibilities back in 2016 as day

11  shift patrol?

12  A.   I was a beat officer handling calls for service.

13  Q.   And were you on duty on the afternoon of October 3, 2016?

14  A.   Yes.

15  Q.   And as someone who was responding to calls for service, did

16  you receive a call regarding a residential burglary that day

17  shortly after noon?

18  A.   Yes.

19  Q.   To where were you dispatched?

20  A.   5402 North Division Street.

21  Q.   What did you do when you arrived?

22  A.   I spoke with the complainant and took a report.

23  Q.   Did anyone else respond to the residence?

24  A.   I requested an evidence tech respond to process the scene.

25  Q.   And when you say "process the scene," what does that

1    generally mean?

2    A.   They come out, photograph any damage, take fingerprints, if

3    possible.

4    Q.   And did that basically conclude your involvement in this

5    call?

6    A.   Yes.

7            MS. SCHNEIDER:   Thank you.

8            Your Honor, I have no further questions.

9            THE COURT:   Thank you.

10           Cross-examination on behalf of Defendant Quinn?

11           MR. WILLETT:   No thank you, Your Honor.

12           THE COURT:   On behalf of Defendant Smith?

13           MR. BREEDLOVE:   None, Your Honor.

14           THE COURT:   Thank you, Corporal.   You may step down.

15           THE WITNESS:   Thank you.

16           THE COURT:   Ms. Schneider was true to her word.   That

17   was a very brief witness.

18           We'll go ahead and take our afternoon recess at this

19   time.   It's 2:58.   I'll ask for you to be back and ready to

20   come into the courtroom at 10 after 3:00.   Please continue to

21   remember the admonition of the Court -- actually, I'm going to

22   tell you 3:15, and we'll proceed at that time.   Please continue

23   to remember the admonition of the Court.

24           We'll be in recess.

25           (Jury out at 2:58 p.m.)

1          THE COURT:  Thank you.  You may be seated.

2          We're outside the presence of the jury.

3          One of the things that I did before trial is asked the

4   parties for the names of witnesses or subjects of testimony

5   that may come up at trial.  I believe we have far exceeded the

6   list that I was provided.  Perhaps not.  But perhaps you could

7   please give a listing to Ms. Wheeler of the names of the

8   individuals who have been identified by Detective Butt so that

9   she can input those.  You will undoubtedly have a listing of

10  who is matching up with which photograph as you examined them.

11  In light of the rapidity of the questions, it would be very

12  helpful to the record to go ahead and have those names for her

13  so that she can make sure the record is as accurate as

14  possible.

15         Can you help the Court with that, Ms. Schneider?

16         MS. SCHNEIDER:  Yes, Your Honor.

17         THE COURT:  The other record I need to make is right

18  before Ms. Thorpe was coming into the courtroom, Mr. Willett

19  asked for a sidebar.  Counsel came up.  Mr. Willett asked about

20  the Government's intention to talk about her subpoena and her

21  status in failing to appear or to otherwise inquire about that.

22         Mr. Ripley indicated that he intended to talk with her

23  about getting here and the fact that she was under subpoena.

24  Mr. Willett asked if it was appropriate cross-examination to

25  ask about that, and I said that Mr. Willett could ask about any

1    questions that would go to motive or bias and that any such

2    cross-examination would -- he can do.

3         I then admonished Mr. Willett that that's the type of

4    subject that needs to be brought up not at a sidebar but at one

5    of the conferences where I asked if there's anything else that

6    needs to be brought to my attention.  We talked about

7    Ms. Thorpe a number of times today, and we could have addressed

8    that at those times.

9         I don't like having the jury waiting.  I don't like

10   having to -- it's not considerate to the jury because then

11   we're having them wait twice, and then also it is cumbersome to

12   have no record able to be made at those sidebars.

13        This is the first time since 2020 in March that I have

14   allowed counsel to come up to the bench at all because of the

15   fact that we had so many technical difficulties with the

16   headsets the first day of trial.  It is not a practice that

17   I -- that is good for the record, and it is not something that

18   I want moving forward, and I explained that to Mr. Willett.

19        I appreciate wanting to bring items to the Court's

20   attention, but it is the expectation of the Court, as I said at

21   the final pretrial conference, that those items need to be

22   brought to the Court at the earliest time and at certainly one

23   of the times when I ask if there is anything else to be brought

24   to the Court's attention.

25        With that, is there anything that the Government needs

```
1    to bring to the Court's attention?
2           MS. SCHNEIDER:  I don't see anything in my emails
3    regarding Mr. Armstrong.  It is -- subject to the Court and
4    other order or approval, I intend to speak with Mr. Larson and
5    ask them to come back tomorrow, which was always something that
6    was a possibility, depending on how far we got today and just
7    proceeding with the witnesses we have here today.
8           THE COURT:  I note that Mr. Armstrong isn't on the
9    list today anyway from 1 through 10.  He is listed -- and so he
10   wouldn't have been someone you noticed the defense counsel of
11   yesterday when I asked you how far you would get.  I am -- I
12   likewise have received no communication about Mr. Armstrong's
13   status either.
14          Mr. Ripley, you were the person at the sidebar before.
15   Did the Court's recitation of the sidebar earlier comport with
16   your recollection?
17          MR. RIPLEY:  Yes.  The one involving potential inquiry
18   into -- with Ms. Thorpe?
19          THE COURT:  Yes.
20          MR. RIPLEY:  Yes, that was accurate, Your Honor.
21          THE COURT:  Okay.  I meant to ask that before.
22          So I don't intend to take a break to deal with the
23   Armstrong issue because, as I said this morning, I don't know
24   that I have anything that I can do at this time.  But thank you
25   for mentioning that because we had set 3:00 as the time for
```

1  that.

2         To the extent that you are in contact with Mr. Larson,

3  it would be helpful to have him be present tomorrow morning

4  with Mr. Armstrong at 8:30 assuming we hear something.  If it's

5  not at 8:30, then we'll do it at noon.  If it's not at noon,

6  we'll do it at 4:00 so as to not interrupt the flow of trial.

7         MS. SCHNEIDER:  I'm not sure if this has changed, but

8  when Mr. Larson and I were discussing this, he anticipated

9  potentially having to come back tomorrow.  He may have had one

10  thing -- Mr. Larson may have had one court appearance in the

11  morning briefly, so whether it's at 8:30 or noon may depend on

12  Mr. Larson's schedule as well.

13         THE COURT:  Thank you for keeping us apprised of that

14  and any developments in that regard.  You all are getting

15  CM/ECF notices.  You are the only ones in this courtroom that

16  are receiving CM/ECF notices from the Eighth Circuit, so you'll

17  be the first to know and provide us that information.

18         Mr. Willett, does the Court's recitation of the

19  sidebar comport with your recollection?

20         MR. WILLETT:  Yes.

21         THE COURT:  Anything that you need to bring to my

22  attention at this time?

23         MR. WILLETT:  No.  I just want to know when we're

24  expected back in the courtroom.

25         THE COURT:  Thank you.

1          Mr. Breedlove, anything that you need to bring to my

2     attention at this time?

3          MR. BREEDLOVE:  No, Your Honor.

4          THE COURT:  It's 3:05.  Does 3:15 work for the

5     marshals or do you need additional time?

6          DEPUTY MARSHAL:  3:15 is fine, Your Honor.

7          THE COURT:  Okay.  We'll be back in here at 3:15.

8          We'll be in recess.

9          (Recess taken at 3:05 p.m. until 3:15 p.m.)

10         (In open court, with the defendants present, outside

11    the presence of the jury.)

12         THE COURT:  Thank you.  You may be seated.

13         We're back on the record, outside the presence of the

14    jury, in the matter of the United States of America versus

15    Quinn and Smith, 3:21-cr-91.

16         Anything the Government needs to bring to my attention

17    before we proceed?

18         MR. RIPLEY:  Other than, Your Honor, I think myself

19    and Mr. Willett might need a couple minutes.  Can we have like

20    two or three minutes to make certain he has retrieved some

21    *Jencks* material?

22         THE COURT:  Of course.

23         MR. RIPLEY:  Yeah.

24         (Discussion off the record.)

25         THE COURT:  Is the Government prepared to proceed?

1          MR. RIPLEY:  Yes, Your Honor.

2          THE COURT:  Is the defense, Mr. Willett?

3          MR. WILLETT:  Yes, Your Honor.

4          THE COURT:  Mr. Breedlove?

5          MR. BREEDLOVE:  Yes.  Thank you, Your Honor.

6          THE COURT:  Anything the Government needs to bring to

7   my attention?

8          MR. RIPLEY:  Not at this time, Your Honor.  Thank you.

9          THE COURT:  Mr. Willett?

10         MR. WILLETT:  No thank you, Your Honor.

11         THE COURT:  Mr. Breedlove?

12         MR. BREEDLOVE:  No.  Thank you, your Honor.

13         THE COURT:  All right.  We'll bring in the jury.

14         (Jury in at 3:20 p.m.)

15         THE COURT:  Thank you.  You may be seated.

16         We're back on the record, in the presence of the jury,

17   in the matter of United States of America versus Defendants

18   Quinn and Smith, Case No. 3:21-cr-91.

19         Is the Government prepared to call your next witness?

20         MR. RIPLEY:  We are, Your Honor.  The Government next

21   calls Tiaesha Florence.

22         THE COURT:  Thank you.

23         Thank you, ma'am.  Please come forward and step this

24   way.

25         Ma'am, would you please raise your right hand and

1   prepare to be sworn.

2          TIAESHA FLORENCE, GOVERNMENT'S WITNESS, SWORN

3          THE COURT:  You may be seated.

4          If you can just scoot forward and speak into the

5   microphone.  And if you can please state and spell your full

6   name for the record.

7          THE WITNESS:  It's Tiaesha Florence, T-i-a-e-s-h-a

8   F-l-o-r-e-n-c-e.

9          THE COURT:  And you can scoot your chair up, and then

10  you can also adjust that microphone so it's easy for you to be

11  heard.

12         Your witness, Mr. Ripley.

13         MR. RIPLEY:  Thank you, Your Honor.

14                         DIRECT EXAMINATION

15  BY MR. RIPLEY:

16  Q.  Ms. Florence, where do you live?  Just the state.

17  A.  Texas.

18  Q.  How long have you lived in Texas?

19  A.  About to be seven years.

20  Q.  Okay.  And where did you live in October of 2016?

21  A.  I lived in Iowa.

22  Q.  Okay.  So how long after October of 2016 did you move to

23  Texas?

24  A.  I moved in April of 2017.

25  Q.  April of 2017?

1    A.    Uh-huh.

2    Q.    Very well.

3              THE COURT:  Ms. Florence, I heard you just say

4    "uh-huh" when you answered the question.  One of the rules of

5    the Court is that you have to answer with "yes" or "no"

6    statements so the record is clear.  So if Mr. Ripley or any of

7    the other attorneys ask you a question, if you can say "yes" or

8    "no" if it's a yes or no question.

9              Do you understand my instructions?

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  Thank you.

12             Mr. Ripley.

13             MR. RIPLEY:  Thank you, Your Honor.

14   BY MR. RIPLEY:

15   Q.    So let's rewind the clock to October of 2016.  You said you

16   lived in Iowa at that time?

17   A.    Uh-huh.

18   Q.    Where specifically?

19   A.    I lived on North Division.

20   Q.    Do you remember the house number?

21   A.    No, sir.

22   Q.    Okay.  Was it near 53rd Street?

23   A.    Yes.

24   Q.    Just north of 53rd Street?

25   A.    Yes.

1  Q.  I've got a record here indicating there was an incident

2  reported at 5402 North Division Street.  Does that sound like

3  your house at that time?

4  A.  Yes, sir.

5  Q.  Who -- did anyone else live -- let's get real specific here

6  now.  I want to talk about October 3 of 2016.  Did anyone else

7  live with you at 5402 North Division?

8  A.  It was me, my two kids, and my daughter's dad.

9  Q.  You, two children, and your daughter's dad?

10  A.  Yes, sir.

11  Q.  How old were those children in 2016, approximately?

12  A.  My daughter was two, and my son was about seven.

13  Q.  And your daughter's father, what's his name?

14  A.  Romance Armstrong.

15  Q.  Were you two together at that time?

16  A.  Yes, sir.

17  Q.  Are you still together at this time?

18  A.  No, sir.

19        MR. WILLETT:  Your Honor, excuse me.  I didn't get the

20  answer.

21        THE COURT:  She said -- well, so two things.  If you

22  could please make sure you speak clearly into the microphone,

23  and you can repeat the answer.  I heard you, but I'm very close

24  to you.

25        Mr. Ripley, do you want to ask the question again?

1          MR. RIPLEY:  Can we have it read back?  I'm sorry.

2          THE COURT:  That's fine.

3          Ms. Wheeler.

4          (The requested portion of the record was read back by

5    the court reporter.)

6    BY MR. RIPLEY:

7    Q.  So did you -- on that date of 2016, did you suffer a

8    burglary?

9    A.  Yes.

10   Q.  Can you tell the jury what it is -- what happened?  How

11   were you alerted to the fact that you suffered a burglary?

12   A.  I had returned home from work, and my front door was wide

13   open.

14   Q.  And that was -- it may seem like a silly question, but that

15   was unusual?

16   A.  Yes.

17   Q.  Okay.  And so did you go inside?

18   A.  I did.

19   Q.  Did you see anything that was out of place or missing or

20   anything that was noteworthy?

21   A.  My bedroom TV was on my living room floor, and my

22   daughter's bank was wide open, and none of the cash was in it.

23   Q.  There was a TV that's normally in place in your bedroom?

24   A.  Uh-huh.  Yes, sir.

25   Q.  And so -- it's hard, but thank you.

1       Instead of being there, you found it on the living room

2   floor?

3   A.   Yes.  It was by the front door.  Like, as soon as I walked

4   in the door, the TV was sitting there.

5   Q.   Okay.  Tell us about your daughter's bank.  What do you

6   mean by that?  What is that?

7   A.   She had one of the bottle banks, and the top was off, but

8   all the cash was out of it.  And the bank was thrown on the

9   floor, but it's usually in her bedroom.

10  Q.   Okay.  A bottle bank.  So is that a bottle that's -- it's a

11  container shaped like a bottle that can hold --

12  A.   Yes.  Yes, sir.

13  Q.   And it can hold either coins or paper money?

14  A.   Yes.

15  Q.   And that was both out of place and missing its lid and

16  empty?

17  A.   Yes.

18  Q.   So what did you do, then, when you went inside and saw all

19  that?

20  A.   I called the police.

21  Q.   Did the police respond?

22  A.   They did.

23  Q.   Okay.  Among other things, did the police take some

24  photographs?  Do you recall that?

25  A.   They did, and they took fingerprints off the TV.

1          MR. RIPLEY:  Okay.  Your Honor, may I approach?

2          THE COURT:  Yes.

3    BY MR. RIPLEY:

4    Q.  Ms. Florence, I placed in front of you a set of

5    photographs.  They're marked proposed Exhibits 100 through 106,

6    100 through 106.  Do you mind flipping through each of those

7    photographs?  There's, like, a divider between each.  Flip

8    through each just real quickly, and then I'm going to ask you

9    if you recognize them.

10        Do you recognize what is depicted in each of those?

11   A.  Yes.

12   Q.  Is it fair to describe it as a portion of your house there

13   at 5402 North Division?

14   A.  Yes, sir.

15   Q.  Do you recognize these to be photographs of the condition

16   of certain areas of your house following the burglary on

17   October 9th --

18   A.  Yes, sir.

19   Q.  -- excuse me -- 30?

20   A.  Yes, sir.

21        MR. RIPLEY:  Okay.  Very well.

22        Your Honor, I would ask to admit each 100 through 106,

23   inclusive.

24        THE COURT:  Any objection to 100 through 106?

25        MR. WILLETT:  No objection, Your Honor.

1        THE COURT:  Mr. Breedlove?

2        MR. BREEDLOVE:  No objection, Your Honor.

3        THE COURT:  100 through 106 are admitted and may be

4   displayed.

5        MR. RIPLEY:  I think I heard you, Your Honor, but did

6   you indicate I could publish them?

7        THE COURT:  Yes.

8        MR. RIPLEY:  I'm sorry.

9        THE COURT:  I am as guilty as others.  I will try to

10  be better.

11       MR. RIPLEY:  Let's take them in order.  We'll start

12  with 100.

13  BY MR. RIPLEY:

14  Q.  So these are going to show up to your left on the screen.

15  Can you describe for us, Ms. Florence, what are we looking at

16  here?

17  A.  That's my front door.

18  Q.  Okay.  Is that the door that was standing open that first

19  alerted you to a problem?

20  A.  Yes, sir.

21  Q.  Thank you.

22       Moving on to 101, is that just another angle of the front

23  door, ma'am?

24  A.  Yes.

25  Q.  Thank you.

1        And then No. 102?

2   A.   Yes.

3   Q.   Is that a portion of what we commonly refer to as a

4   doorjamb?

5   A.   Yes, sir.

6   Q.   Okay.  And 103?

7        Now, based on your earlier testimony, I think everyone in

8   the room knows what this is, but what is this?

9   A.   This is my bedroom TV.

10  Q.   And this is out of place on the living room floor?

11  A.   Yes, sir.

12  Q.   Thank you.

13       No. 104, what are we looking at here?

14  A.   It was a curio cabinet I had in my house.

15  Q.   And what -- was there something missing or out of place on

16  that?

17  A.   No, sir.

18  Q.   Very well.

19       No. 105, what part of the house is this?

20  A.   That's my living room.

21  Q.   Okay.  And No. 106, what are we looking at here?

22  A.   That's my bedroom.

23  Q.   Now, is that a table on which the TV would normally be?

24  A.   Yes, sir.  It sat in the middle of those two nightstands.

25  Q.   Okay.  Was there another incident that you recall --

1  fast-forwarding now to October 16 of that same year, so really

2  about two weeks later, do you recall an incident involving

3  Romance?

4  A.  Yes, sir.

5  Q.  What generally was that incident?  Describe it for the

6  jury.

7  A.  He had been involved in a shooting out --

8  Q.  How were you -- I'm sorry.  I cut you off.

9  A.  He had been involved in a shooting outside of our house.

10  Q.  Outside of that house at 5402 North Division Street?

11  A.  Yes.

12  Q.  How were you alerted to the fact that Romance Armstrong was

13  involved in a shooting outside of your house?

14  A.  I was asleep, and he came running in and woke me up and

15  told me to call --

16          MR. WILLETT:  Objection.  Hearsay.

17  BY MR. RIPLEY:

18  Q.  Let's not get into anything Mr. Armstrong said to you just

19  yet.

20          THE COURT:  Mr. Ripley, thank you for asking a new

21  question.

22          Are you asking the Court to take any additional

23  action?

24          MR. WILLETT:  I just wanted my objection to precede

25  what I believe was almost going to be the next answer.

```
 1              THE COURT:  Thank you.
 2              Mr. Ripley, you can ask your next question, and I
 3    appreciate your instruction to the witness.
 4    BY MR. RIPLEY:
 5    Q.  At some point were you awakened by Mr. Armstrong?
 6    A.  I was.
 7    Q.  Can you describe his mood, his condition?
 8    A.  I really don't remember because I was fresh -- he woke me
 9    up out of my sleep.
10    Q.  Okay.  Do you remember anything about his voice?
11    A.  It was the same to me.
12    Q.  Okay.  How about -- was he injured at all?
13    A.  He was.
14    Q.  Okay.  And did you observe those injuries yourself?
15    A.  I did not.
16    Q.  You did not?
17    A.  No.
18    Q.  How do you know he was injured then?
19    A.  I seen the blood.
20    Q.  Very well.  What part of his body was the blood on?
21    A.  His arm.  I'm sorry.
22    Q.  And it was your understanding, then, based on all those
23    observations, that he had been shot?
24              MR. WILLETT:  Objection.  Calls for speculation,
25    Your Honor, and lack of foundation.
```

1          THE COURT:  Objection is overruled.

2          You may answer the question.

3    A.  Yes.

4          MR. RIPLEY:  Okay.  I don't have any other questions

5    for you, ma'am.  Thank you very much.

6          THE COURT:  Mr. Willett, cross-examination?

7          MR. WILLETT:  Let me confer with my client for one

8    moment, Your Honor.

9          (Discussion off the record between Mr. Willett and

10   Defendant Quinn.)

11         MR. WILLETT:  May I proceed, Your Honor?

12         THE COURT:  Yes.

13                        CROSS-EXAMINATION

14   BY MR. WILLETT:

15   Q.  Ms. Florence, you did not see how Mr. Armstrong sustained

16   any injury on October 16, 2016, did you?

17   A.  No, sir.

18         MR. WILLETT:  Thank you.

19         No further questions.

20         THE COURT:  Mr. Breedlove?

21         MR. BREEDLOVE:  Thank you, Your Honor.  May I proceed?

22         THE COURT:  Yes.

23                        CROSS-EXAMINATION

24   BY MR. BREEDLOVE:

25   Q.  You are not in a gang and were not in 2016 in a gang; is

```
1    that correct?

2    A.  No, sir.

3           MR. BREEDLOVE:  Thank you, Your Honor.  No further

4    questions.

5           THE COURT:  Redirect?

6           MR. RIPLEY:  Nothing based on either of those

7    questions, Your Honor.

8           Thank you.

9           THE COURT:  Thank you.

10          Thank you, Ms. Florence.  You may step down.

11          Additional evidence on behalf of the United States?

12          MS. SCHNEIDER:  Yes.  The Government calls Detective

13   Emily Rasche.

14          THE COURT:  Members of the jury and gallery, you can

15   stand and stretch if you wish during the witnesses.

16          Are you Detective Rasche?  Please come forward.

17          Ma'am, please raise your right hand and prepare to be

18   sworn.

19            EMILY RASCHE, GOVERNMENT'S WITNESS, SWORN

20          THE COURT:  Thank you, ma'am.  You may be seated.

21          Ma'am, would you please state and spell your full name

22   for the record?

23          THE WITNESS:  Emily Rasche, E-m-i-l-y R-a-s-c-h-e.

24          THE COURT:  Detective Rasche, do you have chewing gum?

25          THE WITNESS:  I don't.
```

1          THE COURT:  Thank you.

2          Your witness, Counsel.

3          MS. SCHNEIDER:  Thank you.

4                    DIRECT EXAMINATION

5    BY MS. SCHNEIDER:

6    Q.  Good afternoon, Detective Rasche.

7    A.  Good afternoon.

8    Q.  How are you employed?

9    A.  I'm currently employed with the Davenport Police

10   Department.

11   Q.  How long have you been employed by the Davenport Police

12   Department?

13   A.  A little over seven years.

14   Q.  Did you graduate from the Iowa Law Enforcement Academy?

15   A.  Yes.

16   Q.  What is your current assignment with the Davenport Police

17   Department?

18   A.  I am currently assigned to the narcotics unit.

19   Q.  As a detective?

20   A.  Yes.

21   Q.  What are some of your responsibilities with that unit?

22   A.  I predominantly investigate narcotics-related offenses,

23   prostitution, and gun crimes.

24   Q.  Was that your assignment in October of 2016?

25   A.  It was not.

1   Q.   What was?

2   A.   I was assigned to first shift patrol.

3   Q.   And what were some of your responsibilities as a patrol

4   officer?

5   A.   Just handle calls for service, your day-to-day operations.

6   Q.   Were you on duty on the afternoon of October 9, 2016?

7   A.   Yes.

8   Q.   Did you respond to a shots-fired call at approximately

9   1:37 p.m.?

10  A.   Yes.

11  Q.   To where were you dispatched?

12  A.   1311 Iowa Street.

13  Q.   Were other officers on scene as well?

14  A.   Yes.

15  Q.   What did you do when you arrived?

16  A.   I began checking the area for a scene, so any casings or

17  anything like that.

18          MS. SCHNEIDER:   And, actually, before we get into

19  that, can we please pull up 621 and 622?   I apologize.

20          THE COURT:   Those maps have been admitted and may be

21  displayed.

22  BY MS. SCHNEIDER:

23  Q.   Detective Rasche, we're showing what is Exhibit 621.

24      Do you recognize that?

25  A.   Yes.

1    Q.   What is it?

2    A.   It's an overview of the general location of the shots

3    fired.

4    Q.   And is there a little balloon on a house that's labeled

5    1311 Iowa Street?

6    A.   Yes.

7              MS. SCHNEIDER:   Thank you.

8              Can we have 622?

9    BY MS. SCHNEIDER:

10   Q.   Do you recognize that?

11   A.   Yes.

12   Q.   And what is that?

13   A.   It's just a closer-up view of the front exterior of the

14   residence.

15   Q.   Is it facing the residence?

16   A.   Yes.

17   Q.   What is to the left right next to the residence?

18   A.   It's an alley that runs east and west.

19   Q.   Thank you.

20       So you said when you first arrived you were looking for a

21   scene such as casings?

22   A.   That is correct.

23   Q.   Can you please review in the binder in front of you

24   Exhibits 107 through 131.

25   A.   You said 131; correct?

 1   Q.   That's correct.

 2        Did you review those?

 3   A.   I did.

 4   Q.   Do you recognize them?

 5   A.   I do.

 6   Q.   What are they?

 7   A.   They were photographs that were taken at the scene during

 8   that day.

 9   Q.   And do they appear to be a fair and accurate representation

10   of the scene at 1311 Iowa Street on October 9, 2016?

11   A.   Yes.

12        MS. SCHNEIDER:   Your Honor, the Government moves to

13   admit Exhibits 107 through 131.

14        MR. WILLETT:   No objection.

15        THE COURT:   Mr. Breedlove?

16        MR. BREEDLOVE:   No objection, Your Honor.

17        THE COURT:   107 through 131 are admitted and may be

18   displayed.

19        MS. SCHNEIDER:   Thank you.

20        Mr. Ripley, if I could get 107, please?

21   BY MS. SCHNEIDER:

22   Q.   Detective Rasche, can you please describe what we're seeing

23   in Exhibit 107?

24   A.   That's the front of the residence of 1311 Iowa Street.

25   Q.   And is that the front door and the steps?

1    A.   That's correct.

2            MS. SCHNEIDER:  Mr. Ripley, can I get 108, please?

3    BY MS. SCHNEIDER:

4    Q.   Detective Rasche, what are we seeing here?

5    A.   Just another overall photograph of the front of the

6    residence and a portion of the alley.

7    Q.   Do you see that red SUV-type vehicle that is to the very

8    left of the image?

9    A.   Yes.

10   Q.   Where is that parked?

11   A.   It's parked in the alley.

12           MS. SCHNEIDER:  Thank you.

13           Can I get Exhibit 110, please?

14   BY MS. SCHNEIDER:

15   Q.   Detective Rasche, what is this image?

16   A.   It's basically another overview that's showing the

17   east-west alley facing back out to Iowa Street.

18   Q.   Detective Rasche, did law enforcement collect any shell

19   casings from this scene?

20   A.   Yes.

21           MS. SCHNEIDER:  Can I get Exhibit 111, please?

22           Can we try 112?

23   BY MS. SCHNEIDER:

24   Q.   Detective Rasche, what is this?

25   A.   It's a close-up photograph of a shell casing located at the

1  scene.

2  Q.   And what is next to the shell casing?

3  A.   A marker.

4  Q.   And what is the purpose of the marker?

5  A.   Just to identify the location.  So, basically, this is a

6  close-up.  If you see in prior photographs, there's overall

7  photographs, so it's just marking the location, showing you a

8  close-up and putting a scale next to it if it's needed at all.

9  Q.   And, in fact, Detective Rasche, is one of your roles with

10  the Davenport Police Department an evidence technician?

11  A.   Correct.

12       MS. SCHNEIDER:  Can I have 113, please?

13  BY MS. SCHNEIDER:

14  Q.   What is 113?

15  A.   It's a close-up of the shell casing, just the headstamp on

16  the shell casing.

17       MS. SCHNEIDER:  Can I have 114, please?

18  BY MS. SCHNEIDER:

19  Q.   What do we have here?

20  A.   It's a second shell casing located at the scene, and it's

21  marked by an evidence marker.

22  Q.   So the first marker was marker 4, and this one is marker 3?

23  A.   Correct.

24  Q.   Is that how they're used to distinguish?

25  A.   Yeah.  They're just distinguishing two different shell

1    casings.

2            MS. SCHNEIDER:  And can I have 115, please?

3    BY MS. SCHNEIDER:

4    Q.  And now what do we have in 115?

5    A.  Just a close-up of the headstamp for marker No. 3.

6    Q.  Thank you.

7        Detective Rasche, were there any injuries or property

8    damage as a result of this shooting?

9    A.  I believe there was some property damage to the exterior

10   north side of the residence.

11           MS. SCHNEIDER:  Can we have 118, please?

12   BY MS. SCHNEIDER:

13   Q.  Can you describe what we're seeing in 118?

14   A.  It's a close-up of a bullet strike to a trash can, I

15   believe, that was located in the alley.

16           MS. SCHNEIDER:  Can we have 120, please?

17           Oh, I'm sorry.  Well, that's fine.  We'll just do it

18   here.

19   BY MS. SCHNEIDER:

20   Q.  Detective Rasche, what are we seeing in 120?

21   A.  Just a close-up of a bullet strike to the trash can.

22   Q.  And what is the letter marking?

23   A.  It's just -- these are just stickers that -- they're

24   utilized on things where you can't place a physical marker,

25   like, on the ground.  So that's all it is.

1   Q.  So it's similar to those yellow 3 and 4 that we saw

2   previously?

3   A.  Correct.

4          MS. SCHNEIDER:  124, please.

5   BY MS. SCHNEIDER:

6   Q.  What is this?

7   A.  Just a close-up of another bullet strike on -- I believe

8   that's a recycle bin.

9   Q.  And did you say you believed there was also damage to the

10  house?

11  A.  Yeah.  I think in some overall photographs there's some

12  bullet strikes to the north side of the residence.

13          MS. SCHNEIDER:  And 129, please.

14  BY MS. SCHNEIDER:

15  Q.  What do you see in this picture, Detective Rasche?

16  A.  On the -- can I mark on this?

17  Q.  Yes.

18  A.  So two circles.  One is a bullet strike.  The other is an

19  evidence marker.

20  Q.  And it looks like in the -- just -- it looks like there are

21  two gutter or downspouts in the middle of this image.

22      Do you see that?

23  A.  Yeah.

24  Q.  One has some -- I don't know if it's ribbing or what you

25  would call it, and one is plain; is that right?

1    A.   I think that's just, like -- almost like a trim piece on

2    the siding right there on the left.  This one on the left-hand

3    side, this is your gutter.

4    Q.   So the one that is plain you are calling a trim piece?

5    A.   I would call it siding, yes.

6    Q.   Okay.  And the trim piece, then, is dividing the letter

7    marker and the bullet strike?

8    A.   Yes.

9              MS. SCHNEIDER:  Can I have Exhibit 130, please?

10   BY MS. SCHNEIDER:

11   Q.   What do we see there?

12   A.   Same thing; just the bullet strike, it looks like, and it's

13   marked by an evidence marker.

14   Q.   Thank you.

15        Detective Rasche, I'm going to approach and hand you

16   Exhibits 1 and 2 and ask you to open them and look at the

17   contents.

18             MS. SCHNEIDER:  May I approach?

19             THE COURT:  Yes.

20   BY MS. SCHNEIDER:

21   Q.   Detective Rasche, what is -- what are Exhibits 1 and 2?

22   A.   The two shell casings collected at the scene.

23   Q.   How do you know that?

24   A.   Item description on Item No. 1 states one 9-millimeter

25   casing, marker No. 3.  Item No. 2 item description states one

1    9-millimeter casing, marker No. 4.

2    Q.   And is it also reflective of the date of this offense?

3    A.   It is.

4    Q.   As well as the -- I saw you looking at the headstamps; is

5    that right?

6    A.   That's correct.

7            MS. SCHNEIDER:  Your Honor, the Government moves to

8    admit Exhibits 1 and 2.

9            THE COURT:  Any objection to 1 and 2?

10           MR. WILLETT:  No objection, Your Honor.

11           THE COURT:  1 and 2?

12           MR. BREEDLOVE:  No, Your Honor.

13           THE COURT:  1 and 2 are admitted.

14           MS. SCHNEIDER:  May I approach?

15           THE COURT:  Yes.

16           MS. SCHNEIDER:  Thank you, Your Honor.

17           The Government has no further questions.

18           THE COURT:  Cross-examination of this witness,

19   Mr. Willett?

20           MR. WILLETT:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22   BY MR. WILLETT:

23   Q.   Good afternoon, Detective.

24   A.   Good afternoon.

25   Q.   Excuse me a second.  A lot of tall people.

1     I don't believe we've met.  I'm Al Willett from Cedar

2  Rapids.

3     I believe you made it clear in your very last answer to

4  Ms. Schneider, but I wanted to make sure there was no

5  confusion.

6     Earlier photographs you discussed, we saw two shell casings

7  with marker 4 and marker 3.  I assume there was a marker 1 and

8  a marker 2 somewhere during your investigation of the scene.

9  A.  There's no marker 1 or 2.

10 Q.  You just used 3 and 4 for the two shell casings you found?

11 A.  I was not the crime scene tech during this.  I was just a

12 patrol officer at the time.

13 Q.  Okay.

14 A.  However, it's very common that when you mark things that

15 they don't always start at 1.  It kind of just depends on

16 what's available or, you know, kind of what you have at the

17 time.

18 Q.  Forgive me.  Different law enforcement entities, different

19 procedures.  Forgive me.

20    There were only two shell casings that were found at the

21 scene; correct?

22 A.  That is correct.

23         MR. WILLETT:  Thank you.

24         Mr. Ripley, would you be so kind as to bring up

25 Government's Exhibit 116, which has been admitted.

1    BY MR. WILLETT:

2    Q.   And do you see that photograph there, Detective?

3    A.   Yes.

4    Q.   If you had to be asked to estimate the height of either one

5    of those two Davenport cans -- I assume the green one is

6    garbage and the blue one is recycling -- what would you

7    estimate the height of either one of those cans to be?

8    A.   They're definitely shorter than me, and I'm about 5 foot 4,

9    so maybe 3 feet.

10   Q.   I wasn't going to ask that question, but I appreciate the

11   point of reference.

12        So you would say that either can is approximately three

13   feet in height?

14   A.   It's definitely smaller than me, and I'm 5 foot 4.

15            MR. WILLETT:   Thank you.   Nothing further.

16            THE COURT:   Mr. Breedlove, any questions for this

17   witness?

18            MR. BREEDLOVE:   No.   Thank you, Your Honor.

19            THE COURT:   Thank you, Detective.   You may step down.

20            Oh, unless you have redirect.

21            MS. SCHNEIDER:   I sure don't.

22            THE COURT:   Okay.   Thank you, Detective.   I shouldn't

23   assume.

24            Is the Government prepared to call your next witness?

25            MR. RIPLEY:   Yes, Your Honor.   We would next call Seth

 1   Farley.

 2            THE COURT:  Thank you.

 3            You may stand and stretch, if you wish.

 4            Detective Farley, you can come forward, please.

 5            Sir, if you would please raise your right hand and

 6   prepare to be sworn.

 7               SETH FARLEY, GOVERNMENT'S WITNESS, SWORN

 8            THE COURT:  Thank you.  You may be seated.

 9            Sir, would you please state and spell your full name

10   for the record.

11            THE WITNESS:  My name is Seth Farley, S-e-t-h

12   F-a-r-l-e-y.

13            THE COURT:  Your witness, Counsel.

14            MR. RIPLEY:  Thank you, Your Honor.

15                         DIRECT EXAMINATION

16   BY MR. RIPLEY:

17   Q.  Where are you employed, sir?

18   A.  City of Davenport Police Department.

19   Q.  How long have you been employed with Davenport Police?

20   A.  It will be 17 years in April.

21   Q.  Okay.  What's your current, I guess, rank and role in the

22   department?

23   A.  Corporal for the vice/narcotics unit.

24   Q.  So someone could call you detective, and that would be

25   accurate?

1   A.  Yes, sir.

2   Q.  Okay.  So you are -- you hold the rank of corporal and

3   you're currently a detective?

4   A.  Yes, sir.

5   Q.  In which unit?

6   A.  The narcotics unit.

7   Q.  How long have you been in that role?

8   A.  Since March of 2018.

9   Q.  How about prior to that?

10  A.  Prior to that I was in the NETS unit, which is no longer

11  now.

12  Q.  NETS, is that an acronym?

13  A.  Yeah.  It stands for Neighborhoods Energized To Succeed.

14  Q.  Under what umbrella?  In other words, kind of the

15  investigations detective umbrella, patrol umbrella, under what

16  umbrella was NETS?

17  A.  That was under the services division.

18  Q.  And as part of that unit, were you typically wearing a

19  uniform or were you typically dressed like you are today?

20  A.  Wearing a uniform.

21  Q.  How long -- was there a focus for that unit?

22  A.  Yeah.  We just kind of worked the problematic areas within

23  the city.

24  Q.  So the NETS unit had a particular maybe -- you focused on

25  certain neighborhoods?

FARLEY - DIRECT

1  A.  Yes, sir.

2  Q.  How long were you in the NETS unit?

3  A.  The last time I was in there was four years, and then prior

4  to that I was in patrol because I was promoted.  But prior to

5  being promoted, I was in the NETS unit the first time for a

6  couple years.

7  Q.  Okay.  Let's rewind the clock all the way, then.  What was

8  your first role with Davenport Police?

9  A.  Patrol officer.

10  Q.  And how long did you hold that role until your first

11  change?

12  A.  I think that was roughly 2010 sometime I went to the NETS

13  unit.

14  Q.  And you still at that point had the rank of officer?

15  A.  Yes, sir.

16  Q.  While you were in the NETS unit, you were promoted to

17  corporal; is that right?

18  A.  Yes.

19  Q.  What was your first shift in duty, then, upon that

20  promotion?

21  A.  It was night shift from, roughly, 2012 to 2013.

22  Q.  And then did you shift -- your role shifted again?

23  A.  Yes, sir.

24  Q.  Back to the NETS unit?

25  A.  Yes, sir.

1   Q.  As a corporal this time?

2   A.  Yes, sir.

3   Q.  Very well.  So I want to direct your attention, if I could,

4   to October 10 of 2016.

5       Do you recall that date?

6   A.  Yes, sir.

7   Q.  You were -- you just told us kind of your history with

8   Davenport.  Part of which unit were you at that time?

9   A.  The NETS unit.

10  Q.  And were you a corporal by then?

11  A.  Yes, sir.

12  Q.  Do you recall a response to the 1300 block of Iowa Street

13  on that date?

14  A.  Yes, sir.

15  Q.  And why is it that you responded out to that area at that

16  time?

17  A.  We were -- my partner and I at the time, Officer Lovelady,

18  while they were doing just follow-up on a shooting which

19  happened the day prior at that location, so we were going to

20  interview a witness at that location.

21  Q.  Who was that witness that you were responding to talk to?

22  A.  I don't know if I'm pronouncing the name right, but

23  Dejarvae Vesey.

24  Q.  If your report indicates it was Dejarvae Thorpe --

25  A.  Thorpe.  Sorry.

FARLEY - DIRECT

1   Q.   -- does that sound accurate?

2   A.   Yes.

3   Q.   What was your understanding -- you said that the

4   incident -- the shooting incident that you were following up on

5   had occurred the day before.   What was your understanding?

6   A.   It was our understanding that a silver SUV had drove by.

7   Then one of the occupants in that vehicle had walked through

8   the alley and fired a few rounds towards the residence as the

9   victim, Ms. Thorpe, was standing on the front patio or porch.

10  Q.   Was it -- had -- and I'm not looking for you to tell the

11  jury what Ms. Thorpe had to say.

12       What I am wondering is, did she identify someone?

13  A.   Yes, she did.

14  Q.   And because she did, what did you do before you responded

15  or as part of that response the next day?

16  A.   Before we had responded there, Officer Lovelady and I went

17  to the detective bureau and had a photo lineup drafted up for

18  Mrs. Thorpe.

19  Q.   And I'm going to ask you to -- do you see that big binder

20  there kind of by your right arm?

21  A.   Yes.

22  Q.   If you wouldn't mind, flip to the tab which is 635, which

23  you don't have.   Sorry.

24            MR. RIPLEY:   May I approach, Your Honor?

25            THE COURT:   Yes.

1    BY MR. RIPLEY:

2    Q.   Do you recognize what that is?

3    A.   That is a photo lineup that we had created.

4    Q.   When you say "we," that's you and then your colleague,

5    Officer Lovelady?

6    A.   Yeah, and a detective at the time.  I can't remember which

7    one helped us out.

8    Q.   And so is that a series of six different photographs?

9    A.   Yes, sir.

10   Q.   Okay.  I'll tell you what, let me ask you, what's marked

11   there as 635, is that a true and accurate copy of the lineup

12   that you presented to Ms. Thorpe?

13   A.   Yes, sir.

14   Q.   Did she ultimately choose someone as the person who had

15   shot at her residence?

16   A.   Yes, sir.

17   Q.   Did she make markings on that consistent with that choice?

18   A.   Yes, sir.

19          MR. RIPLEY:  I would ask to admit at this time,

20   Your Honor, 635.

21          THE COURT:  Mr. Willett, any objection to 635?

22          MR. WILLETT:  No, Your Honor.

23          THE COURT:  Mr. Breedlove?

24          MR. BREEDLOVE:  No.  Thank you, your Honor.

25          THE COURT:  635 is admitted.

1          MR. RIPLEY:  May I publish it?

2          THE COURT:  Yes.

3  BY MR. RIPLEY:

4  Q.  So we're looking at the top half of the piece of paper

5  which is Government's 635 here.  Is that right, Detective

6  Farley?

7  A.  Yes, sir.

8  Q.  And can you tell the jury how it is that you and Officer

9  Lovelady presented this piece of paper to Ms. Thorpe?

10  A.  Just provided her with the photo lineup and just explained

11  to her that the suspect may or may not be on the photo lineup

12  and she had to circle and date and sign if the suspect that she

13  identified as the shooter the previous day was on that photo

14  lineup.

15  Q.  And so I'm seeing on here in and around photo 2, which is

16  the center photo of the top row, a circle.

17          Who made that circle?

18  A.  That was Ms. Thorpe.

19  Q.  And then the handwriting that is essentially underneath

20  photo No. 2, whose handwriting is that?

21  A.  That's her handwriting.

22  Q.  Did you watch her make all those marks?

23  A.  Yes, sir.

24  Q.  So am I reading this right, there's a date on there?

25  A.  Yes, sir.

1    Q.   What's the date?

2    A.   The date is 10-10 of '16.

3    Q.   Is there a time that accompanies the date?

4    A.   Yeah, 5:05 p.m.

5    Q.   And then I'm seeing a D.T. and then a name.  Am I seeing

6    that right?

7    A.   Yes, sir.

8    Q.   Was she asked to both initial and then, I guess, sign her

9    name?

10   A.   Yes, sir.

11   Q.   So all those markings are hers?

12   A.   Yes, sir.

13   Q.   And what did you take all these markings to mean?

14   A.   Her identifying and signing and dating it as the person

15   that was the shooter the previous day.

16   Q.   Okay.  And who is that person there in photograph No. 2?

17   A.   It is Marcus Quinn.

18   Q.   Najawaun Marcus Quinn?

19   A.   Yes, sir.

20        MR. RIPLEY:  Very well.  I don't have any further

21   questions for you, sir.

22        Thank you.

23        THE WITNESS:  Thank you.

24        THE COURT:  Cross-examination, Mr. Willett?

25        MR. WILLETT:  Thank you, Your Honor.

```
 1                        CROSS-EXAMINATION
 2   BY MR. WILLETT:
 3   Q.  Good afternoon, Detective.
 4   A.  Good afternoon.
 5   Q.  I'm not sure we've met.  I'm Al Willett from Cedar Rapids.
 6   A.  Nice to meet you, Al.
 7   Q.  I take it that Ms. Thorpe signed the time when she was done
 8   reviewing the photographic lineup?
 9   A.  Correct.
10   Q.  Do you have any memory of what time she arrived at the
11   Davenport Police Department to perform this task?
12   A.  That I arrived, sir?
13   Q.  No; that Ms. Thorpe arrived.  On the day of the 10th, do
14   you know when Ms. Thorpe arrived to go through the task of the
15   photographic lineup?
16   A.  She never arrived.  We went to -- we were at her residence.
17   Q.  I see.  Okay.
18        Do you know what time you arrived at her residence?
19   A.  I believe it was shortly after 1 p.m. according to my
20   report.
21   Q.  Okay.  Do you know when the photographic lineup was
22   presented to her?
23   A.  That, I don't know exactly what time it was presented to
24   her.
25   Q.  Okay.  Do you have any idea as to the time frame it took
```

FARLEY - CROSS

1  for her -- from the moment she was handed the lineup until she

2  signed off on the lineup at 5:05, do you have any idea what

3  that time frame was?

4  A.  I do not, sir.

5           MR. WILLETT:  That's all the questions I have.

6           Thank you, Your Honor.

7           THE COURT:  Mr. Breedlove?

8           MR. BREEDLOVE:  No questions, Your Honor.

9           THE COURT:  Redirect?

10          MR. RIPLEY:  May I have a moment, Your Honor?

11          THE COURT:  Yes.

12          MR. RIPLEY:  I do not have anything further,

13  Your Honor.  Thank you.

14          THE COURT:  Thank you, Detective.  You may step down.

15          THE WITNESS:  Thank you.

16          THE COURT:  Additional evidence on behalf of the

17  United States?

18          MS. SCHNEIDER:  The Government calls retired Detective

19  Brian Morel.

20          THE COURT:  Thank you.

21          Thank you.  Please come forward.

22          Step this way.  Thank you, sir.

23          If you would please raise your right hand and prepare

24  to be sworn.

25              BRIAN MOREL, GOVERNMENT'S WITNESS, SWORN

1    THE COURT:  Thank you.  You may be seated.

2    Sir, would you please state and spell your full name

3 for the record.

4    THE WITNESS:  Brian, B-r-i-a-n, Morel, M-o-r-e-l.

5    THE COURT:  Your witness, Counsel.

6    MS. SCHNEIDER:  Thank you.

7                    DIRECT EXAMINATION

8 BY MS. SCHNEIDER:

9 Q.  Good afternoon.

10 A.  Hi.

11 Q.  So you were called to the stand as retired Detective Morel.

12 From where did you retire?

13 A.  Davenport Police Department.

14 Q.  When did you retire?

15 A.  April of last year.

16 Q.  How long were you a Davenport police officer?

17 A.  Davenport, I started in the year 2000, so 22-plus years.

18 Q.  Do you have law enforcement experience before you were with

19 Davenport?

20 A.  Prior to that I was in -- with the Rock Island Police

21 Department from 1993 until 2000.

22 Q.  Did you graduate from the Iowa Law Enforcement Academy?

23 A.  I did.

24 Q.  Did you also have some training when you started with Rock

25 Island?

1  A.  Yes.  I attended the police -- Illinois Police Academy in

2  Springfield, Illinois.

3  Q.  During your career as a police officer with Davenport, what

4  different assignments did you have?

5  A.  My first special assignment, I think, was my second year

6  in.  I was assigned to the Quad Cities Metropolitan Enforcement

7  Group, which is a multi-jurisdictional drug task force.  I did

8  that for approximately three years, came back and did patrol

9  work, and then a couple of years later was assigned as an

10  undercover detective within the Tactical Operations Bureau.

11      I performed that task working narcotics investigations for

12  just about eight years and then was promoted to corporal, went

13  back to the patrol division for a year, and then was assigned

14  to the Criminal Investigations Division in the major case unit.

15      During that tour, I did work as a liaison officer with the

16  ATF, which is Bureau of Alcohol, Tobacco, and Firearms.  I did

17  that assignment for approximately three years and then came

18  back to do detective work and eventually was assigned to a

19  different operation that we had started, which was a gun

20  investigation unit.

21  Q.  Thank you.

22      So, in all of that, we're going to focus on October of

23  2016.  What was your assignment then?

24  A.  During that time, I would have been a detective with the

25  major case unit within CID.

1   Q.  What were some of your responsibilities in that role?

2   A.  That was predominantly investigating our version of major

3   cases, which was homicides, robberies, violent burglaries,

4   shootings that occurred where there were victims, that type of

5   crimes.

6   Q.  So did you participate in an investigation of a shooting

7   that occurred on October 12, 2016?

8   A.  Yes.

9   Q.  Where did that shooting occur?

10  A.  The general area of Kirkwood Boulevard and Bell Avenue.

11  Q.  Did any Davenport police officers -- excuse me.  Strike

12  that.

13      Did Davenport police officers collect any evidence from

14  that scene?

15  A.  Yes.

16  Q.  What evidence?

17  A.  At the scene, it would have been -- six 9-millimeter

18  casings were recovered from that scene.  There was a victim

19  vehicle on scene where a projectile was taken from that

20  vehicle, what we consider kind of an innocent bystander.  And

21  then eventually a projectile was taken from the shooting victim

22  during that date, during the 12th.

23  Q.  So you referenced a victim vehicle.  Can you describe that

24  vehicle?

25  A.  I know it was a yellow Ford Fusion [sic].  I don't recall

1    the license plate.

2    Q.  Of course.  And you also referenced, I think, a person who

3    was injured?

4    A.  Correct.

5    Q.  So there was also injuries?

6    A.  Yes.  Another -- a second vehicle arrived during their

7    initial investigation at the hospital, and they determined

8    there was a shooting victim, and then a victim vehicle.

9    Q.  And what kind of vehicle was that injured person in?

10   A.  It would have been a silver Dodge Charger, Texas plates.

11   It was a rental vehicle.

12   Q.  Through your investigation, did you identify the person who

13   suffered that gunshot wound?

14   A.  Yes; Cleo Young.

15   Q.  And which vehicle was he in?

16   A.  He was in the Charger.

17   Q.  Okay.  Did law enforcement photograph that shooting scene

18   at Kirkwood and Jersey?

19   A.  Yes.

20   Q.  Did they photograph the yellow Ford?

21   A.  Yes.

22   Q.  And then did detectives obtain a search warrant for the

23   Dodge Charger?

24   A.  I did.

25   Q.  You did?

MOREL - DIRECT

1    A.   Yes.

2    Q.   Were photos taken during that search warrant process?

3    A.   Yes, the following day.

4    Q.   Can you please review --

5           MS. SCHNEIDER:  I need to switch binders.  May I

6    approach?

7           THE COURT:  Yes.

8    BY MS. SCHNEIDER:

9    Q.   Could you please turn to Exhibit 132 and review up to 180,

10   please?

11   A.   One by one or --

12   Q.   Yeah.  Just review them to yourself --

13   A.   Oh, gotcha.

14   Q.   -- and I'll ask you when you're finished.

15          THE COURT:  Detective, if you need water, there's

16   water in the pitcher behind the monitor.

17          THE WITNESS:  Are you noticing me?

18          THE COURT:  I just want to make sure everyone is

19   comfortable.

20          THE WITNESS:  Thank you.

21   A.   Okay.

22   BY MS. SCHNEIDER:

23   Q.   Do you recognize those?

24   A.   Yes.

25   Q.   What are they?

1   A.   It's a combination of scene photos that were taken on the

2   12th and then photos during my search warrant.

3   Q.   Of the Charger?

4   A.   Correct.

5        MS. SCHNEIDER:   Your Honor, the Government moves to

6   admit Government's Exhibits 132 to 180, with the exceptions of

7   136, 171, and 172 as those are blank.

8        THE COURT:   136, 172, and --

9        MS. SCHNEIDER:   171.

10       THE COURT:   -- 171.

11       Mr. Willett, any objection to the Exhibits 132 through

12  180, with the three identified blank exhibits not included?

13       MR. WILLETT:   The only objections I have, Your Honor,

14  are objections to 179 and 180 as to hearsay.

15       THE COURT:   Mr. Breedlove, any objections?

16       MR. BREEDLOVE:   I would just join in the objections on

17  179 and 180, Your Honor.

18       THE COURT:   The Court will admit 132 through 180,

19  exclusive of 136, 171, and 172.   I will allow the Government

20  the opportunity to provide additional foundation for 179 and

21  180 and withhold ruling on those.

22       MS. SCHNEIDER:   Thank you.

23  BY MS. SCHNEIDER:

24  Q.   Detective Morel, can you turn to Exhibits 179 and 180,

25  please?

1   A.   Okay.

2   Q.   Just in general, what is that a photograph of?

3   A.   This would have been, I believe, part of a rental agreement

4   that I would have located inside that rental vehicle.

5   Q.   You previously testified that this Charger was a rental; is

6   that right?

7   A.   Correct.

8   Q.   And so you're saying that for 179.  And is it the case for

9   180 as well?

10  A.   Yes.

11  Q.   Is that the rental agreement that you located within that

12  vehicle?

13  A.   Correct.

14          MS. SCHNEIDER:  Your Honor, the Government offers 179

15  and 180.

16          THE COURT:  The Court will hear argument about that

17  outside the presence of the jury at the conclusion of the

18  testimony.

19          MS. SCHNEIDER:  Thank you.

20          May we publish the other exhibits, Your Honor?

21          THE COURT:  Yes, everything except for 179 and 180

22  that was identified and admitted may be published.

23          MS. SCHNEIDER:  Thank you.

24          Mr. Ripley, can I have 135, please?

25

 1    BY MS. SCHNEIDER:

 2    Q.   Detective Morel, what do you see in Exhibit 135?

 3    A.   That is a fired casing, and it's an RNP 9-millimeter round.

 4    Q.   And what else is there with it?

 5    A.   Placed on an identifying marker that the evidence tech

 6    used.

 7    Q.   And what is the purpose -- do you know the purpose of those

 8    markers?

 9    A.   One, to show where evidence is, and then I would assume

10    it's for scale.

11         MS. SCHNEIDER:  Can we have 139?

12    BY MS. SCHNEIDER:

13    Q.   And what do we have in 139?

14    A.   Same; spent -- or a fired casing, RNP 9-millimeter round.

15    Q.   And these yellow evidence markers have numbers on them; is

16    that right?

17    A.   Correct.

18    Q.   And are those numbers important?

19    A.   I think it may be important for the evidence person to

20    determine which piece of evidence applies to that scale marker,

21    which would then indicate where it was in reference to probably

22    scene location.

23    Q.   And then will that casing also then be marked -- be in

24    evidence as having been placed on marker 4?

25    A.   Yes.  I would assume so, yes.

```
 1              MS. SCHNEIDER:  141, please.

 2    BY MS. SCHNEIDER:

 3    Q.  What do we have here?

 4    A.  A fired 9-millimeter RNP casing set upon a scale marker.

 5    Q.  Marker 5?

 6    A.  Correct.

 7              MS. SCHNEIDER:  143, please.

 8    BY MS. SCHNEIDER:

 9    Q.  What do we have here?

10    A.  That is a 9-millimeter RNP casing fired set on -- I think

11    that's supposed to be No. 6, would be my guess, for that

12    particular scale marker.

13    Q.  And there's a line at the top of the digit which -- does

14    that generally indicate the bottom of the number?

15    A.  I don't know.

16    Q.  You don't know?  Okay.

17              MS. SCHNEIDER:  145, please.

18    BY MS. SCHNEIDER:

19    Q.  What do we have here?

20    A.  Scale marker No. 7 and a 9-millimeter RNP fired casing.

21    Q.  And 147?

22    A.  It would be No. 8 scale marker and another RNP 9-millimeter

23    casing that's been fired.

24              MS. SCHNEIDER:  Can we have 150, please?

25
```

1   BY MS. SCHNEIDER:

2   Q.   Do you recognize that?

3   A.   That is a very yellow Ford Focus.

4   Q.   Is that the other vehicle that you testified about

5   previously?

6   A.   Yes.

7        MS. SCHNEIDER:   Can we have 155?

8   BY MS. SCHNEIDER:

9   Q.   Do you see what we have in this picture?

10  A.   So that's going to show the suspected fired round damage

11  in -- that's the top of the vehicle where they have an upper

12  brake light, and it passed through that.

13  Q.   So we're talking about kind of over to the middle right of

14  that brake light right there?

15  A.   Right.  And then right above that starts the hood of the

16  vehicle, to give you an idea where that's at.

17       MS. SCHNEIDER:   158, please.

18  BY MS. SCHNEIDER:

19  Q.   Detective Morel, what do we have here?

20  A.   So that's another strike.  That's the interior of the

21  vehicle, the inner roof portion, I suppose.

22       MS. SCHNEIDER:   159.  Oh, sorry.

23  A.   And I would speculate there that based on where that was

24  located, that's probably the same round that passed through the

25  brake light.

1              MS. SCHNEIDER:  Oh, that's fine.  Actually, 162.

2    BY MS. SCHNEIDER:

3    Q.  What do we have there?

4    A.  That's a projectile that the victim driver had told

5    officers she believed she had been seated on it, and it was

6    recovered from the front seat of that vehicle.

7    Q.  And this vehicle, the yellow Ford, is the bystander victim

8    that you testified about previously?

9    A.  Correct.

10             MS. SCHNEIDER:  Could I have Exhibit 134, please?

11   BY MS. SCHNEIDER:

12   Q.  What do we have here, Detective Morel?

13   A.  That's the Dodge Charger that I performed the search

14   warrant on.

15   Q.  And this lighting is kind of terrible, but can you see

16   anything in the rear trunk area?

17   A.  Yeah.  If you look, just as you're looking at that picture,

18   go below the D in Dodge and then drop to the left, you'll see a

19   hole.  And then the same thing on the G.  You'll see a second

20   hole there.  And those are suspected bullet holes, and then it

21   appears to have one to the left of the license plate on the

22   bumper, it is a third strike.

23             MS. SCHNEIDER:  Can we have 166, please?

24   BY MS. SCHNEIDER:

25   Q.  What are we seeing here?

1   A.  That is a hole passing through the back portion of the

2   front driver's seat.

3          MS. SCHNEIDER:  168.

4   BY MS. SCHNEIDER:

5   Q.  What do we have here?

6   A.  And then it shows the round coming through that front

7   driver's seat.

8          MS. SCHNEIDER:  One moment, Your Honor.

9          (Discussion off the record between counsel for the

10  Government.)

11         MS. SCHNEIDER:  173, please.

12         We already talked about that.  That's fine.

13  BY MS. SCHNEIDER:

14  Q.  Detective Morel, I'm going to approach and show you what

15  has been marked as Exhibits 3 and 4, two envelopes.  And I'll

16  ask that you open them and look at their contents.  Okay?

17  A.  Excellent.

18         MS. SCHNEIDER:  Thank you.

19         May I approach?

20         THE COURT:  Yes.

21         THE WITNESS:  Okay.

22  BY MS. SCHNEIDER:

23  Q.  Okay.  Thank you.

24         And Exhibit 3 -- what is Exhibit 3?

25  A.  These would have been the six recovered casings from that

1    shooting scene that were secured into evidence.

2    Q.   And how do you know that?

3    A.   Based on the markings of the envelope and then the markings

4    of the smaller envelopes within this bigger envelope.

5    Q.   And what is Exhibit 4?

6    A.   That is going to be the projectile that was located on the

7    Ford Focus --

8    Q.   Thank you.

9    A.   -- driver's seat.

10           MS. SCHNEIDER:  Thank you.

11           The Government moves to admit Exhibits 3 and 4.

12           THE COURT:  Any objections to 3 or 4?

13           MR. WILLETT:  No objection, Your Honor.

14           MR. BREEDLOVE:  No.  Thank you, Your Honor.

15           THE COURT:  3 and 4 are admitted.

16    BY MS. SCHNEIDER:

17    Q.   Detective Morel, what did the Davenport Police Department

18    do with the shell casings after collecting them?

19    A.   So after collection from the scene, they're brought back to

20    the station and then secured within the evidence room of the

21    Davenport Police Department.  These casings were then

22    eventually requested to be sent to the DCI lab for microscopic

23    testing from a firearms expert.

24           MS. SCHNEIDER:  Thank you.

25           May I approach?

1          THE COURT:  Yes.

2          MS. SCHNEIDER:  Thank you.

3          I have nothing further.

4          THE WITNESS:  Thank you.

5          THE COURT:  Cross-examination?

6          MR. WILLETT:  May I have a moment, Your Honor?

7          THE COURT:  Yes.

8          (Discussion off the record between Mr. Willett and

9   Defendant Quinn.)

10          MR. WILLETT:  Thank you, Your Honor.

11          No questions of retired Detective Morel, Your Honor.

12          THE WITNESS:  Bless you.

13          THE COURT:  Thank you, Mr. Willett.

14          Mr. Breedlove?

15          MR. BREEDLOVE:  No questions, Your Honor.

16          THE WITNESS:  You too, sir.

17          THE COURT:  Thank you, Detective.

18          THE WITNESS:  Thank you.

19          THE COURT:  Retired detective, you may step down.

20          THE WITNESS:  Thank you.

21          THE COURT:  Additional evidence on behalf of the

22   United States?

23          MR. RIPLEY:  Thank you, Your Honor.

24          The Government next calls Wiley Ross.

25          THE COURT:  Thank you.

 1          It goes without saying that you can stretch between

 2   witnesses.

 3          Thank you, sir.  Please come forward this way.  Thank

 4   you.

 5          Sir, if you would please raise your right hand and

 6   prepare to be sworn.

 7              WILEY ROSS, GOVERNMENT'S WITNESS, SWORN

 8          THE COURT:  Thank you, sir.  You may be seated here.

 9          Sir, would you please state and spell your full name

10   for the record.

11          THE WITNESS:  Wiley Russell Ross, Jr., W-i-l-e-y

12   R-u-s-s-e-l-l R-o-s-s, J-r.

13          THE COURT:  Thank you, sir.

14          I'll ask you to scoot forward if you can and speak

15   into with the microphone.  The microphone is adjustable there.

16          Your witness, Counsel.

17          MR. RIPLEY:  Thank you, Your Honor.

18          Before I inquire, can I just approach and just clear

19   some space for Mr. Ross, get that binder out of there?

20          THE COURT:  Oh, of course.  Thank you.

21                     DIRECT EXAMINATION

22   BY MR. RIPLEY:

23   Q.  How old are you, sir?

24   A.  Sixty.

25   Q.  And in what community do you live?

```
 1   A.   Davenport.

 2   Q.   Can you get -- I think there might be some folks having a

 3   hard time hearing you.  That whole thing moves.  It also moves

 4   like this (indicating).

 5   A.   Okay.  Is that better?

 6   Q.   It is.  Thank you.

 7        Remind me where you live.

 8   A.   Davenport, Iowa.

 9   Q.   How long have you lived in Davenport?

10   A.   Oh, at least 20 years.

11   Q.   Let me ask you a slightly broader question.  How long have

12   you lived in the Quad Cities?

13   A.   All my life.

14   Q.   Okay.

15   A.   Except a couple years.

16   Q.   Where were those couple years?

17   A.   Omaha, Nebraska.

18   Q.   Are you employed?

19   A.   Yes.

20   Q.   Where do you work?

21   A.   Nestle Purina.

22   Q.   What do you do for Nestle Purina?

23   A.   I'm an operator.

24   Q.   Help me understand what that means.  What do you operate?

25   A.   Forklift operator.
```

1   Q.   How long have you held that job?

2   A.   I've been there almost a year now.

3   Q.   Did you have a different job with Purina before a year ago

4   or did you have a different job entirely?

5   A.   I had a different job entirely.

6   Q.   What was that?

7   A.   Prior to that I worked for the Salvation Army.

8   Q.   How long were you with the Salvation Army?

9   A.   Two years.

10  Q.   Did you have a job prior to that?

11  A.   Yes.

12  Q.   What was that?

13  A.   That was at Aldi Foods and the Salvation Army.

14  Q.   Were those both part-time?  Was one full-time and the other

15  part-time?

16  A.   At that time Aldi was part-time and Salvation Army was

17  full-time.

18  Q.   And how long did you work kind of those two jobs, I guess?

19  A.   Well, when Purina started forcing overtime, I had to let

20  Aldi go.  So I did it for about six months, both jobs,

21  something like that.

22  Q.   Did you work anywhere before Aldi?

23  A.   Yes; Fresh Thyme Foods.

24  Q.   Any other food or grocery --

25  A.   Hy-Vee, Hy-Vee.

1  Q.  When did you work for Hy-Vee?

2  A.  From about 2012 to about 2016 or '17.

3  Q.  What type of jobs did you hold before that 2012, when you

4  started working for Hy-Vee?

5  A.  I worked for United Truck and Equipment and U.S.

6  Auctioneers.

7  Q.  What did you do for them?

8  A.  I worked in the maintenance shop.

9  Q.  How long did you work for them?

10  A.  Oh, man.  I don't know.  At least maybe eight years or so,

11  something like that.

12  Q.  Okay.  So now we're back kind of to the early 2000s?

13  A.  Yes, yes.

14  Q.  All right.  Have you worked more or less one place or

15  another your -- predominantly your whole adult life?

16  A.  Rephrase that.

17  Q.  It was a terrible question.  Thank you.  I'm sorry.

18      Your whole adult life, have you worked?

19  A.  Yes.  Oh, yes.  Held a job?

20  Q.  Yes.

21  A.  Oh, absolutely, yes.

22  Q.  Now, it's been a series of them?

23  A.  Yes, yes.

24  Q.  Okay.  Where did you go to high school?

25  A.  United Township, East Moline.

ROSS - DIRECT

1   Q.   So here in the Quad Cities area?

2   A.   Yes.

3   Q.   And did you start working straight out of high school?

4   A.   Pretty much, yeah.  I went to Black Hawk College for two

5   years right out of high school, but yeah.  Yeah, pretty much

6   right out of high school working.

7   Q.   What did you study at Black Hawk College?

8   A.   Journalism.

9   Q.   Okay.  At some point during all that working, did you

10  develop a drug habit?

11  A.   Yes.

12  Q.   Can you help the jury understand when that might have been?

13  A.   Oh, in my 30s.  I didn't, you know -- well, it was -- I

14  smoked weed in high school, I mean, so I guess that's the

15  starting point.

16  Q.   Okay.

17  A.   But it didn't get serious until my 30s when it went to

18  cocaine.

19  Q.   Okay.  Let's talk about that, when it got serious.

20  A.   Okay.

21  Q.   When you say "it went to cocaine," what type of cocaine are

22  we talking about?

23  A.   Crack.

24  Q.   And what is the typical method of ingestion of crack

25  cocaine?

1  A.  I smoked it.

2  Q.  So in your 30s you began smoking crack cocaine?

3  A.  Yes.

4  Q.  Can you help us understand how frequently you used?

5  A.  I binged, weekend warrior, you know.  Occasionally during

6  the week, but mostly when I -- on the weekend.

7  Q.  And was that a function of you wanting to keep it to that?

8  Was it a function of you only having money to do it that often?

9  A.  That was exactly it.  That was the only time I could afford

10  it, when I got paid.

11  Q.  When is the last time you used crack cocaine?

12  A.  August of 2019.

13  Q.  What changed?  What happened then?

14  A.  Oh, man.  I guess you just hit a point of no return.

15  There's nowhere else but up.  You know, I had lost my

16  apartment, lost my job.  You know, it was -- basically, I was

17  homeless.  Yeah, I was -- I was -- I had nothing.

18  Q.  Did you get any help?

19  A.  Yeah, absolutely.

20  Q.  Who helped you?

21  A.  Salvation Army.

22  Q.  Here in Davenport?

23  A.  Yes.

24  Q.  Is that a location where people who need help can stay; in

25  other words, they can live there?

1   A.   Yeah.   I went through the whole six-month program.

2   Q.   That program includes assistance with sobriety, in addition

3   to a roof?

4   A.   A host of a whole lot of things, Jesus Christ, everything,

5   the whole getting the Lord involved, all of it, yes.

6   Q.   Okay.   And you've been -- you have not used crack

7   cocaine --

8   A.   Since -- yep, since 2019.

9   Q.   Excellent.

10       I want to talk to you about some of the years leading up to

11   then, leading up to 2019.   Okay?

12   A.   Yep.

13   Q.   Help the jury understand, if you could, how you -- as

14   someone who has a crack cocaine habit as you've described --

15   A.   Uh-huh.

16   Q.   -- how do you get the crack?

17   A.   Well, when I first moved here, I didn't know anybody.   When

18   I say "moved here," I mean across the river.   I didn't know

19   anybody, so you just took a shot.   Downtown it was -- back

20   then, I guess, it was pretty available downtown, but it's not

21   like that anymore.   So you just, you know, walked -- you know,

22   asked somebody who you thought would know.

23   Q.   Okay.

24   A.   Yeah.

25   Q.   When did you move -- excuse me.   When did you move from

```
 1   Rock Island over to Davenport?
 2   A.   You mean from East Moline?
 3   Q.   East Moline.  I'm sorry.
 4   A.   Yep, yep.  When I got married, so -- oh, man.  When did we
 5   get married?  Oh, gosh.  Embarrassing as it is, I can't
 6   remember that date.
 7   Q.   That's all right.  She's not here.
 8           THE COURT:  Although you're under oath, she's not in
 9   the courtroom.
10   BY MS. SCHNEIDER:
11   Q.   I'm not sure I asked you a great question.
12   A.   Okay.
13   Q.   You in one of your answers indicated -- I asked you to help
14   the jury understand how you get crack.
15   A.   Yeah.
16   Q.   And you said, Well, when I first got over here, I didn't
17   know anyone.
18   A.   I didn't, yeah.
19   Q.   What's that time frame?  "When I first got over here," what
20   do you mean?
21   A.   Well, moved over to Davenport, because when I lived in East
22   Moline, I -- I used in East Moline too.  Don't get me wrong.  I
23   used in East Moline, so I had a better connection there.  Over
24   here I didn't know anybody to connect me, so I had to do it on
25   my own.
```

1  Q.  Do you know somebody named Tim Angstrom?

2  A.  Yes.

3  Q.  How would you describe who that person is?  Who is he to

4  you?

5  A.  Tim and I worked together at Sexton Ford.  We were 18, 19

6  years old.  So I've been knowing Tim for 30 years.

7  Q.  Okay.

8  A.  That's how I know Tim.

9  Q.  Does Tim also --

10  A.  I don't know what he's doing now.

11  Q.  -- have a drug habit?

12  A.  I don't know what he's doing now.  I haven't seen him since

13  '19.

14  Q.  Since when?

15  A.  Since 2019.

16  Q.  Correct.

17  A.  Yes.

18  Q.  But in the years prior to that --

19  A.  Yes, yes.

20  Q.  -- did Tim help you -- in other words, did he introduce you

21  to some people that could get you crack cocaine?

22  A.  Yes, he did.

23  Q.  Among others, who did he introduce you to?

24  A.  A guy named Ace was the first one.  And so after that it

25  just kind of went on from there.  I met guys that he knew.

1   Q.  Ace -- do you know a name other than Ace --

2   A.  I don't.

3   Q.  -- for the person you refer to as Ace?

4   A.  I do not.

5   Q.  What did Ace call you?

6   A.  Unc.

7           THE COURT:  One moment.  One important thing is that,

8   Mr. Ripley, you need to make sure you wait until the witness is

9   done speaking before you ask a new question.

10          And, sir, if you could just wait until Mr. Ripley is

11  done asking the question before you answer so that my court

12  reporter can write one person talking at a time.

13          THE WITNESS:  Okay.  Great.

14          THE COURT:  Do you understand my instructions, sir?

15          THE WITNESS:  Yes.  Yes, I do.  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          THE WITNESS:  Yes.

18          THE COURT:  Mr. Ripley.

19          MR. RIPLEY:  Thank you, Your Honor.

20  BY MR. RIPLEY:

21  Q.  Did you know any other name for Ace?

22  A.  I did not.

23  Q.  And I think when we broke I asked you what he called you.

24  A.  Uh-huh.

25  Q.  What was that?

```
1   A.   Unc as in uncle.

2   Q.   U-n-c?

3   A.   Yes.

4   Q.   Did you meet anyone associated with Ace?

5   A.   Yes.

6   Q.   Who else did you meet?

7   A.   Again, I don't know a lot of names.  A guy named -- I could

8   just tell you their street names, Lil Man, Block.  Any other

9   names I don't recall.

10  Q.   Okay.  So you remember somebody named Lil Man?

11  A.   Yeah.

12  Q.   And somebody named Block?

13  A.   Yes.

14  Q.   Let me ask you:  Do you see -- do you see Block here today?

15  A.   Yes.

16  Q.   Okay.  If you wouldn't mind, point out who you know as

17  Block to the jury.

18  A.   In the black suit.

19  Q.   The black suit seated at the table directly to my left; is

20  that right?

21  A.   Yes.

22  Q.   Okay.  He's wearing a tie.  Are you able to tell the color

23  of the tie from where you are?

24  A.   It looks like a gray and black mix.

25  Q.   Okay.
```

1   A.   Maybe a paisley print.

2          MR. RIPLEY:  Your Honor, I would ask that the record

3   reflect the witness identified Mr. Smith as Block.

4          THE COURT:  Yes.  The record shall so reflect.

5   BY MR. RIPLEY:

6   Q.   Do you recognize anyone else in the room?

7   A.   When you say "the room," what do you mean by "the room"?

8   Q.   Okay.  You and I met last week.  That's a good point.

9        Do you recognize anyone else seated at any table in the

10  room?

11  A.   Well, yeah.

12  Q.   Besides Block?

13  A.   The detective.

14  Q.   Good.  Good start.  The detective.  You recognize this

15  gentleman?

16  A.   Yes.

17  Q.   Do you recognize anyone else?

18  A.   I guess it's the district attorney, if that's her position,

19  and yourself.

20  Q.   Okay.  Is that it?

21  A.   Yeah.

22  Q.   Okay.

23  A.   He looks familiar.  I mean, I -- he looks familiar.

24  Q.   Familiar in what sense?

25  A.   Like I've seen him before.

1  Q.  Like, can you help ground where you might have seen him, in

2  what circumstance?

3  A.  In that group of guys I just mentioned earlier.

4  Q.  The group of guys being Ace -- my understanding, Ace, Lil

5  Man, and Block?

6  A.  Yes.

7  Q.  And you've seen -- who are you pointing at over here?

8  A.  The guy in the checked -- like a black, charcoal shirt.

9  He's got, it looks like dreads, what looks like dreads.

10  Q.  Okay.

11  A.  Yeah.

12  Q.  Good.  Thank you, sir.

13  A.  Yep.

14  Q.  So your friend, Mr. Angstrom, introduced you to Ace?

15  A.  Uh-huh.

16  Q.  Yes?

17  A.  Yes.

18  Q.  What was the point of that introduction?

19  A.  Well, because where I was getting it, according to him, he

20  said he could connect with somebody better who could plug me.

21  Q.  All right.  Let's talk about a couple things.

22      You used a pronoun in there.  You used the word "it."

23  What's "it"?

24  A.  The drug.

25  Q.  What drug are we talking about?

1  A.  The crack.

2  Q.  Okay.

3  A.  Yes.

4  Q.  You used the phrase "plug."

5  A.  Better deal.

6  Q.  Is that what plug means to you?

7  A.  Yes.

8  Q.  Okay.  So if someone is a plug, that's somebody who can get

9  you a deal on drugs?

10  A.  Yes.

11  Q.  Did that turn out to be true, what Tim told you?  Did you

12  get a better deal?

13  A.  I think so, yeah.

14  Q.  I --

15  A.  Yes.

16  Q.  I probably am guilty at sticking extra words at the end of

17  my questions, and that's hard, but we're getting into that

18  thing that the judge warned us about again.  I'm going to do my

19  best to let you finish.  Try to let me finish.  She's got a

20  hard job.  Okay?

21      Thank you, sir.

22      Did you ultimately start purchasing or -- yeah, purchasing

23  crack cocaine from who you knew as Ace?

24  A.  Yes.

25  Q.  Okay.  When -- help us understand, if you could.  When did

1  that start, approximately?

2  A.  I want to say at least 2017 or maybe -- no.  I was working

3  at Hy-Vee.  I was working at Hy-Vee at that time, so that could

4  have been 2015.

5  Q.  All right.  So it was around 2015.  Were you -- and in

6  2015, were you working with your friend Tim?

7  A.  No.

8  Q.  No.  But you've had him in your life now for a long time?

9  A.  Oh, yeah.

10  Q.  And you and Tim, would you occasionally help each other out

11  when it comes to helping find drugs?

12  A.  Yeah.

13  Q.  Yeah.  Okay.

14  A.  Yes.

15  Q.  And so around --

16  A.  Yes.

17  Q.  -- in approximately 2015, when you were working at Hy-Vee,

18  he pointed you to somebody that you know as Ace?

19  A.  Yes.

20  Q.  How frequently did you then begin purchasing crack cocaine

21  from this person you know as Ace?

22  A.  Only on the weekend.

23  Q.  Indeed.  How -- was it every weekend?

24  A.  Yeah.  Yes, yes.

25  Q.  And approximately how much would you buy?

```
 1   A.   I'd blow my whole check.

 2   Q.   Help us understand what that means.

 3   A.   Spent the whole check.

 4   Q.   Right.  How much money is that?

 5   A.   Well, I got paid every two weeks at Hy-Vee, so probably

 6   over $1,000.

 7   Q.   Where were you living then in 2015, 2016?

 8   A.   I was living at 1922 Jersey Ridge Road, apartment 13.

 9   Q.   I was about to ask what kind of building that is.  Was it

10   an apartment building?

11   A.   Apartment complex.

12   Q.   How many apartments were there?

13   A.   It was a pretty big complex.  My -- the complex I lived in

14   was, like, a six-plex, and there were other buildings.

15   Q.   Did you live with anyone at the time?

16   A.   No.

17   Q.   How were you -- was it always that you received crack

18   cocaine in exchange for money, currency?

19   A.   No, no.

20   Q.   What else would you provide to Ace and anyone else in

21   exchange for crack cocaine?

22   A.   My vehicle.

23   Q.   Your vehicle?

24   A.   My vehicle.

25   Q.   Okay.  Do you recall what kind of vehicle that was?
```

1    A.   I had a 2004 Ford Explorer.

2    Q.   Do you recall what color it was?

3    A.   Red, cranberry.

4            MR. RIPLEY:  May I approach, Your Honor?

5            THE COURT:  Yes.

6    BY MR. RIPLEY:

7    Q.   I just placed a very large binder in front of you, sir.

8    Would you flip to tab No. 383.

9            MR. WILLETT:  I apologize.  The exhibit number again?

10           MR. RIPLEY:  383.

11           MR. WILLETT:  Thank you so very much.

12   A.   Let's see, 383.  381, 382 -- oh, here we go.  Yes.  Okay.

13           THE COURT:  There (indicating), see the number.

14           THE WITNESS:  Oh, there.  Okay.  There we go.  Yes.

15           THE COURT:  I just directed the witness to the exhibit

16   number.

17           MR. RIPLEY:  Thank you, Your Honor.

18   BY MR. RIPLEY:

19   Q.   That's a photograph; is that right?

20   A.   Uh-huh.  Yes, yes.

21   Q.   Do you recognize what's depicted in the photograph?

22   A.   My Ford Explorer.

23   Q.   So that, Government's Exhibit 383, is a photograph of the

24   Ford Explorer that you were driving in 2015 and 2016?

25   A.   Yes, yes.

1              MR. RIPLEY:  Excellent.

2              I would ask to admit 383, Your Honor.

3              THE COURT:  Any objection to 383?

4              MR. WILLETT:  No, Your Honor.

5              THE COURT:  Mr. Breedlove?

6              MR. BREEDLOVE:  No, Your Honor.

7              THE COURT:  Thank you.

8              383 is admitted.

9              Mr. Ripley, before you continue with this witness,

10   what is your intent as to the length of your direct examination

11   moving forward?

12             MR. RIPLEY:  I'm not -- I don't imagine that I'll

13   finish before 5:00.

14             THE COURT:  Okay.

15             MR. RIPLEY:  If I do before, it will be a minute

16   before.

17             THE COURT:  So we're going to go ahead and take a

18   break.  We just admitted 383, and we will conclude for the day.

19             I like to make sure that everyone can be out of the

20   building by 5:00.  I don't always get that accomplished, but

21   that's generally the goal.

22             First, I am going to speak with you, sir.

23             Mr. Ross, you have testified here today, and you're

24   under oath, and you're going to come back tomorrow and testify.

25   It's the Court's rules that you cannot talk to anyone about

 1    your testimony overnight.

 2              Do you understand that?

 3              THE WITNESS:  Yes.  Yes, ma'am.

 4              THE COURT:  And you'll report here tomorrow morning,

 5    and you'll check in with the U.S. Attorney's Office, and you'll

 6    be on the stand for questioning between 8:45 and 9:00.

 7              Do you understand that instruction?

 8              THE WITNESS:  Understood, yes, ma'am.

 9              THE COURT:  Thank you.

10              You may leave the courtroom at this time.

11              THE WITNESS:  Okay.

12              THE COURT:  You may leave the courtroom at this time.

13    Thank you, Mr. Ross.

14              Members of the jury, we have concluded with our second

15    day of trial here today.  Thank you for your thoughtful

16    attention during the trial.  I've watched you watching and

17    listening and following the evidence.  I appreciate that.

18              We will continue to try to do our best, me included,

19    to speak into the microphone so that you all can clearly hear

20    us.  Again, I know that -- now the lighting is actually better.

21    There are actually skylights above the ceiling, and then there

22    are also the lights.  So the pictures don't necessarily have

23    bad lighting.  It's the courtroom that has pretty bad lighting.

24    And you can know that you'll be able to see those photographic

25    exhibits on a screen in your jury room when you retire to

1   deliberate.

2          I mentioned yesterday the fact that it was so

3   important that overnight you continue to follow the Court's

4   instructions on not talking, texting, tweeting, Instagramming,

5   TikToking, whatever it is you do, about this case.  You now

6   have a second day of information.  It is just as important that

7   you continue to refrain from talking with your friends or loved

8   ones or your Internet acquaintances about this case.

9          It's also important that you don't do research about

10  this case.  You've now seen some maps, and you've seen some

11  photographs.  If you happen to pass by one of those locations

12  because you always drive that way, that's fine.  I'm not asking

13  you to go out of your normal routine.  But what I am asking is

14  that you don't go drive by some place to simply see that for

15  your own eyes based upon the evidence that came in today.

16         Similarly, you can't go on Zillow and look and see a

17  picture of some place or anything else, other information about

18  it, or Google Earth.  You just can't conduct any investigation

19  in this case -- about this case on your own.  As I've said

20  repeatedly, to do so would be an injustice.

21         With that admonishment, I will see you tomorrow

22  morning.  Again, thank you for being on time today.  If you

23  again arrive between 8:30 and 8:45 tomorrow morning and report

24  to the jury room, we'll get started as soon as we can.

25         Thank you.  We'll be in recess.

1          (Jury out at 4:48 p.m.)

2          THE COURT:  Thank you.  You may be seated.

3          We're outside the presence of the jury.

4          I have or will have listings of the JERS exhibit list

5    as they previously existed.  We will provide those to counsel

6    to see.  It's tiny font.  You can look at what this is, and

7    this will have the prior terminology used that I highlighted to

8    the Government that needed to be corrected.  You can then

9    compare it with what I believe the Government will be able to

10   provide us.  I know that we have received the new listings to

11   be submitted.  I don't know that we have a list.

12         Do you have a list, Ms. Schneider?

13         MS. SCHNEIDER:  Huh?

14         MR. RIPLEY:  Look at the corner of your desk.

15         MS. SCHNEIDER:  Yes, Your Honor.

16         THE COURT:  You have a list?

17         MS. SCHNEIDER:  I have a list.

18         THE COURT:  You may approach with the list.

19         MR. RIPLEY:  It came in midstream, Your Honor.

20         THE COURT:  No, I appreciate it.  I appreciate the

21   number of people working in the background to keep us on track.

22         MR. RIPLEY:  I believe that's sufficient copies for

23   everyone, Your Honor.  I do not believe that whole thing is for

24   the Court.

25         THE COURT:  No.  I see that.  And I am thankful.

1          So I will -- these are the Government's second amended

2    exhibit list.  I am taking by this representation that these

3    are the same titles that are used on the electronic lists that

4    will be provided to the jury; is that correct?

5          MS. SCHNEIDER:  Yes, Your Honor.

6          THE COURT:  Ms. Sands will hand out these two listings

7    to the parties.

8          I don't know that they have given us a redline, so

9    you'll have to look and see and compare the first to the second

10   to be able to see if you have any outstanding concerns.  But we

11   can talk about that tomorrow because we're not going to go

12   through all of these exhibits right now.  But we have prepared

13   that to facilitate your effective review of those items.

14         I'll have to go back and maybe talk to you tomorrow

15   about one of my notes that I can't read.  It says make a

16   record, and then I can't read it.

17         I do know what another one is.  Another one is a

18   record about the hearsay objections to Exhibits 179 and 180.  I

19   can read that.

20         Mr. Willett, you made an objection to that.  Would you

21   like to be heard more fulsomely outside the presence of the

22   jury as to why you believe that's hearsay and why an exception

23   doesn't apply?

24         MR. WILLETT:  Well, Your Honor, I believe --

25         THE COURT:  And I would ask you to move your

1  microphone so that we can hear you just as well.

2          MR. WILLETT:  Your Honor, I believe it is hearsay

3  because it's being offered for the truth of the matter asserted

4  that the renter, if I am reading the signature correctly -- and

5  I'm not going to affirm that I am -- it appears to be Tiaesha

6  Florence of a vehicle rented on September 12 of 2016.  I don't

7  believe that through the testimony of the witness that they

8  were trying to enter this in through that it was -- that there

9  was sufficient foundation laid to show a business record

10  exception to this document.

11          So for right now it's hearsay, and I would add lack of

12  foundation to my earlier objection just to make sure the

13  appellate record is clear.  So for that reason --

14          THE COURT:  Lack of foundation -- I mean, he testified

15  that he found the record in the car.

16          MR. WILLETT:  Pardon me.  There's really been nobody

17  to show that this is a business record exception from

18  Enterprise Rental Car.

19          THE COURT:  Correct.

20          MR. WILLETT:  That's where I'm going.

21          THE COURT:  In terms of foundation, you agree that the

22  item itself, there's been sufficient foundation for.  But you

23  are objecting to the hearsay within that document as not having

24  sufficient foundation.

25          MR. WILLETT:  Correct.

1          THE COURT:  Thank you.

2          Mr. Breedlove, did you want to be heard separately?

3          MR. RIPLEY:  The only thing I would add, Your Honor,

4    is that the photograph looks to be only parts of that contract.

5    There's a lot cut off.  We don't know what's in that.  So

6    completeness of the document as well, Your Honor.

7          THE COURT:  Ms. Schneider, do you agree that the

8    document contains hearsay?  And, if so, does an exception

9    apply?

10          MS. SCHNEIDER:  No, Your Honor.  And so we'll withdraw

11    our offer of it.  It's not that relevant to what we were trying

12    to prove at this point.

13          THE COURT:  Okay.  So 179 and 180 are withdrawn.

14          That's all I can identify as an issue to discuss with

15    you at this time.

16          Is there anything that the Government needs to bring

17    to our attention at this time?

18          MS. SCHNEIDER:  Yes, Your Honor.  It's my

19    understanding that Mr. Larson has moved to dismiss

20    Mr. Armstrong's appeal with the Court of Appeals and has

21    indicated to me that they would like me upstairs to speak with

22    them.

23          THE COURT:  Okay.  So I have jurisdiction again, and

24    we will plan on making whatever record we need to make about

25    that tomorrow morning at 8:30.

1          MS. SCHNEIDER:  Mr. Larson does have that court

2     appearance at 8:30.

3          THE COURT:  In this court?

4          MS. SCHNEIDER:  No.

5          THE COURT:  We will make that record.

6          Will you please notify counsel and the Court via

7     email -- and you can copy Mr. Larson -- of the availability of

8     Mr. Larson tomorrow, and then we can schedule it accordingly?

9          MS. SCHNEIDER:  Yes.

10          THE COURT:  Okay.  In terms of where we are, we almost

11     got through to the ten witnesses that you had said yesterday.

12     We still have Mr. Ross on the stand.

13          What is your best estimate as to the Government's

14     evidence tomorrow, understanding that we are going to have to

15     spend a little time discussing with Mr. Larson and

16     Mr. Armstrong their status?

17          I also have been made aware that Mr. Vesey may be

18     asserting his Fifth Amendment privilege.  And we'll have to

19     discuss that, whether that's available to him, and those issues

20     outside the presence of the jury as well.  So we'll have to

21     account for timing in that regard.

22          MS. SCHNEIDER:  And that reminded me, Your Honor, due

23     to some of those issues with the material witnesses, I don't

24     know what the status of that is at this point without speaking

25     to people in my office.  So we may be having to -- or

1    requesting to take people out of order.

2            THE COURT:  Mr. Vesey has been detained and is

3    expected to testify in the same way that Ms. Thorpe testified

4    in a prompt way.  And so that needs to be accounted for in the

5    schedule.  Mr. Vesey, as I said, my understanding is that he

6    expressed to the magistrate judge that he perhaps wouldn't

7    testify, and we'll have to discuss that with him tomorrow, make

8    sure he understands that and the Court makes any necessary

9    rulings.

10           The other --

11           MS. SCHNEIDER:  Mr. Grandberry?

12           THE COURT:  -- material witness is on schedule to

13   appear consistent with his subpoena.

14           MR. RIPLEY:  Can I have a moment, Your Honor?

15           THE COURT:  Yes.

16           (Discussion off the record between counsel for the

17   Government.)

18           MR. RIPLEY:  Okay.  In light of -- we plan to have No.

19   10, who is also No. 15, here, Officer Hatfield.  He will be

20   here first thing in the morning, so too will Detective

21   Robinson, Lieutenant DeRudder, and Mr. Pomerance.  Obviously,

22   case agent Bryan Butt is with us the entire time.  We are going

23   to have to figure --

24           THE COURT:  Okay.  Go ahead.

25           MR. RIPLEY:  We are going to have to address the

1   situation with Mr. Armstrong at some point.  Unfortunately, I

2   don't know that any of us know enough about Mr. Larson's

3   schedule yet to really pinpoint that.

4         Based upon the way that the Court -- and by the Court,

5   I mean the United States Magistrate Judge Bremer -- dealt with

6   Mr. Grandberry, he has been re-subpoenaed for tomorrow morning,

7   and the expectation is he testifies sometime between 9 a.m. and

8   3 p.m. tomorrow.  He is listed, you know, much further down the

9   witness list at No. 27.  That is a significant kind of

10  out-of-order situation.  But I think that the best way to

11  handle it is for everyone to prepare for us to potentially get

12  through Ms. Scott, No. 20, and then we add Mr. Grandberry to

13  that list.

14        That's a lot of names, and I'm not --

15        THE COURT:  And Mr. Vesey, but he's farther down the

16  list as well.

17        MR. RIPLEY:  Thank you.

18        I forgot about him.  Thank you.

19        That's a lot of names, and I don't suggest that we all

20  do that so that we spend our Tuesday night buried in work.  But

21  I think if we do that we can accommodate the issues raised by

22  Mr. Grandberry and Mr. Vesey and their arrests and, for one of

23  them anyway, their detention.  I think we can handle and be

24  ready to react to anything with Mr. Armstrong and Mr. Larson,

25  and then we can also move forward with the jury and try to get

1     to a place where we can get this wrapped up.

2            I'm also a big optimist and maybe I'm wrong.

3            THE COURT:  I can't imagine that we'll get to the

4     second appearance of Detective Butt or witnesses 19 or 20

5     realistically tomorrow.  I don't know about your case, but just

6     in terms of the amount of record that I'm going to have to make

7     with individuals, I'm somewhat concerned about that.

8            MS. SCHNEIDER:  I understand that, and I completely

9     agree.

10           We do have quite a few of them -- Mr. DeRudder, very

11    quick; Mr. Pomerance, also quick.  And by "quick," I mean --

12    I'll just tell people, Mr. DeRudder recovered a firearm in Rock

13    Island.  It's going to be enough foundation to put that firearm

14    in.  That's how quick it will be.  There may be some cross.

15    Mr. Pomerance test-fired that firearm.

16           So we have those kind of witnesses tomorrow that

17    differ a little bit from what we had, but I don't mean to

18    suggest that they'll all be that short.

19           THE COURT:  Okay.  Thank you for that information.  It

20    provides the defense with understanding, and they can make

21    reasonable judgments for their own use of the time this

22    evening.

23           MS. SCHNEIDER:  May I just briefly add to that?  I

24    think after Detective Butt today, the witnesses that we had and

25    that we moved through I think is more akin to what we have

 1  coming up between now -- where we're at, and No. 20, outside of

 2  Mr. Culbreath, is more akin to that.  So that's why we were

 3  estimating that far.

 4          THE COURT:  I understand that.  I also understand that

 5  we're going to have to spend time with Mr. Armstrong and

 6  Mr. Vesey, and I don't anticipate those being quick.

 7          MS. SCHNEIDER:  I understand.

 8          THE COURT:  And I'll have to do those outside the

 9  presence of the jury.

10          MS. SCHNEIDER:  Uh-huh.

11          THE COURT:  Any questions or things you need to bring

12  to my attention at this time, Mr. Willett?

13          MR. WILLETT:  No thank you, Your Honor.

14          THE COURT:  Mr. Breedlove?

15          MR. BREEDLOVE:  No.  Thank you, Your Honor.

16          THE COURT:  Again, please, I'm not going to ask you to

17  stay and make the record with Ms. Sands tonight about things

18  that were admitted because we're already at 5:02.  I will ask

19  you to go over the exhibit lists, go over the JERS list that

20  has been amended by the -- the old JERS list, the new exhibit

21  list, and be prepared to see Ms. Sands tomorrow morning before

22  8:30 to make sure that you know what has been admitted and she

23  can correct that.

24          So I would plan on -- we won't go on the record until

25  8:30, but counsel should be present by 8:20 -- 8:15 to make

1    sure that you are correct on the exhibits that have been

2    admitted before we go through with the day.

3              With that, we'll be in recess until tomorrow morning.

4              (The jury trial recessed at 5:02 p.m.)

1              <u>CERTIFICATE</u>

2              I, Chelsey Wheeler, a Certified Shorthand Reporter of

3    the State of Iowa and Federal Official Realtime Court Reporter

4    in and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-titled matter and that the

9    transcript page format is in conformance with the regulation of

10   the Judicial Conference of the United States.

11             DATED this 18th day of October 2023.

12

13             /s/_Chelsey Wheeler_____

14             Chelsey Wheeler
               Certified Shorthand Reporter
15

16

17

18

19

20

21

22

23

24

25